**UNITED STATES of America,**

v.

**Richard GREEN, Defendant.**

**United States of America,**

v.

**William Olivero, Jason Pacheco, Defendants.**

**United States of America,**

v.

**Edward K. Mills, Defendant.**

**United States of America,**

v.

**Jane Doe,[1] Defendant.**

Nos. CR. A. 02–10054–WGY, CR.A. 01–10469–WGY, CR.A. 99–10066–WGY.[2]

United States District Court, D. Massachusetts.

June 18, 2004.

---

**1.** A pseudonym. It will become apparent below why a pseudonym is necessary.

**2.** *See infra* note 2.

Frank M. Gaziano, John A. Wortmann, Jr., United States Attorney's Office, Boston, MA, for USA, Plaintiff.

Martin K. Leppo, Leppo & Leppo, Randolph, MA, John M. Moscardelli, Peters & Moscardelli, Boston, MA, for Richard Green, Defendant.

*SENTENCING MEMORANDA*

YOUNG, Chief Judge.

**Power tends to corrupt and absolute power corrupts absolutely.**

Lord Acton[3]

**If you put all the powers to prosecute, try, and execute a sentence in one person's hands, that is the absolute antithesis of the checks and balances in the system of government that we have.**

**Lt. Cmdr. Charles Swift, U.S. Navy[4]**

## INTRODUCTION

Here's a not-so-hypothetical conversation between an eager and enthusiastic district judge and an experienced and reflective circuit judge.

**District Judge:** What would you think of a system that afforded those accused of crimes scrupulously fair trials over which wholly independent judges preside, but which turns those convicted over to the prosecutors for such punishment as they may determine?

**Circuit Judge:** Utterly unfair, of course. That would be even more "sinister" than the nightmare hypothetical regime that Justice Scalia described in *Monge v. California*.[5]

**District Judge:** Well, isn't this the system we have today under the so-called "guidelines"?

---

**3.** Letter to Bishop Mandell Creighton (Apr. 5, 1887), quoted in J. Bartlett, *Familiar Quotations* 750 (14th ed.1968).

**4.** As quoted in Ian James, *Guantanamo Tribunals Questioned*, The Boston Globe, Feb. 2, 2004.

**5.** 524 U.S. 721, 118 S.Ct. 2246, 141 L.Ed.2d 615 (1998). In dissent in *Monge*, a decision that predated *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), Justice Scalia argued that the Supreme Court's approach to criminal sentencing would permit California to repeal all the crimes in its criminal code, replace them with a crime of "knowingly causing injury to another," punishable by up to 30 days in prison, and permit a sentencing judge to impose an increased sentence up to life imprisonment or death, based on "sentencing enhancements" regarding increasing levels of *mens rea*, level of injury, etc., proved to the judge by a mere preponderance of the evidence. 524 U.S. at 738–39, 118 S.Ct. 2246 (Scalia, J. dissenting). Unlike the system that our hypothetical district judge describes, Justice Scalia's hypothetical system would at least require some proof of the relevant facts before imposing enhanced penalties, and would leave the decision to a judge who, even in state systems where judges are elected or lack the protections from majoritarian pressure that federal judges enjoy, has a sense of historical role and duty that would make her a more reliable sentencer than a prosecutor.

**Circuit Judge:** Not at all. As we've been at pains to point out to you and your colleagues, the Sentencing Guidelines—while intricate—control federal sentencing and must be obeyed.

**District Judge:** I accept that. I have to. But what about the government?

**Circuit Judge:** Naturally they have to obey the guidelines.

**District Judge:** [Persisting] And if they don't?

**Circuit Judge:** No, no, that way lies the Serbonian Bog. If the government can manipulate the guidelines to suit themselves, a defendant's constitutional guarantees wouldn't be worth much.

**District Judge:** Precisely.

That's hypothetical. These sentencing memoranda deal with five criminals. Three insisted on their constitutionally guaranteed trial by jury. The two others pled guilty and cooperated. The most evil and violent is a gang leader who had much information to give. The least, a woman, had little to give but went on courageously to finger a major drug lord. This is reality.

Richard Green is a retail drug dealer preying on the inhabitants of one of Boston's public housing projects. On two occasions he sold small quantities of crack cocaine (0.6 grams and 2.4 grams respectively) to an undercover informant. The government seeks to imprison him for 24 years.

William Olivero is a New York worker for a massive drug conspiracy whose kingpin (and major drug activity) are located in Massachusetts. Though not himself a dealer, Olivero has, on occasion, delivered kilogram quantities of cocaine and associated drug money for the kingpin. Olivero possesses a handgun. The kingpin has been sentenced to life imprisonment for his offenses. The government seeks to imprison Olivero for twenty-four to thirty years.

Jason Pacheco is a marijuana dealer who knew the kingpin, who on occasion purchased kilogram quantities of cocaine from the kingpin for his own account, and who once accommodated the kingpin by allowing his garage to be used for the brief storage and transshipment of a multi-kilogram quantity of cocaine. The government seeks to imprison him for twelve to fifteen years.

Edward K. Mills is a multiple murderer who led a vicious street gang. Eventually apprehended, he recognized the jig was up and cooperated with authorities. A gang leader himself, he had much information to give and his disclosures have led to the conviction of another murderer and the freeing of an individual wrongfully convicted of murder. The government seeks to imprison him for ten years.

"Jane Doe," a pseudonym, is a young, single mother. A drug addict, she dealt cocaine to support her habit. Eventually apprehended, she too cooperated and testified in open court so that the government might secure the conviction of an important drug lord from her homeland. In light of her cooperation, the government recommends a short sentence. As an alien, however, the government proposes to deport her back to her homeland where, the government admits, she will almost certainly be killed, perhaps after torture.

To achieve its ends, the government routinely imposes a stiff penalty upon defendants who exercise their constitutional right to trial by jury. In the first of the

instant cases, the government's attempts to burden a citizen's right to a jury of his peers exceeds all constitutional bounds. The second case involves repeated instances of illegal fact bargaining. The third involves enforcement of a bargain with a cold-blooded killer that the Court characterized as evincing "a moral code more suited to the alleys of Baghdad than the streets of Boston," and the fourth reveals such callous indifference to innocent human life as would gag any fair minded observer. And this Court—stripped of any meaningful role in the sentencing of offenders who come before it—can do little more than explain what's going on. That, at least, I will do.

6. *See* George Fisher, *Plea Bargaining's Triumph: A History of Plea Bargaining in America* 222–23 & tbl. 9.1 (2003); Stephanos Bibas, *Judicial Fact–Finding and Sentence Enhancements in a World of Guilty Pleas,* 110 Yale L.J. 1097, 1150 (2001); Marc L. Miller, *Domination & Dissatisfaction: Prosecutors as Sentencers,* 56 Stan. L.Rev. 1211, 1252–54 & tbl. 5 & n. 150 (2004); Robert E. Scott & William J. Stuntz, *Plea Bargaining as Contract,* 101 Yale L.J. 1909, 1912 (1992) ("[Plea Bargaining] is not some adjunct to the criminal justice system; it is the criminal justice system.").

7. U.S. Sentencing Comm'n, *2001 Sourcebook of Federal Sentencing Statistics* 20 Fig.C

# PART ONE: STRAIGHT TALK ON FEDERAL SENTENCING

## I. Federal Sentencing Policy—The Statutory Framework

### A. The Department of Justice Is Addicted to Plea Bargaining

This is the essential key to an understanding of federal sentencing policy today—the Department is so addicted to plea bargaining to leverage its law enforcement resources to an overwhelming conviction rate that the focus of our entire criminal justice system has shifted far away from trials and juries and adjudication to a massive system of sentence bargaining that is heavily rigged against the accused citizen.[6] Figure 1 says it all.[7]

(2001), *at* http://www.ussc.gov/ANNRPT/2001/SBTOC01.htm (last visited June 16, 2004) [hereinafter *Sentencing Sourcebook*]. This table only deals with convictions at trial and guilty pleas. If acquittals (but not prosecutorial dismissals) are added to the mix, then "only" 95 percent of all federal criminal cases are resolved via plea bargain. Miller, *supra,* at 1252 n. 150 (citing Administrative Office of the U.S. Courts, *Federal Judicial Caseload Statistics* 95 tbl.D–4 (2001)).

Figure 1

Figure C

GUILTY PLEAS AND TRIAL RATES
Fiscal Year 1997 - Fiscal Year 2001

Moreover, "[i]f incarceration rates remain unchanged, 6.6% of U.S. residents born in 2001 will go to prison at some time during their lifetime,"[8] a disproportionate number

8. Thomas C. Bonczar, Bureau of Justice Statistics, *Prevalence of Imprisonment in the U.S.*

of these inmates being African American or Hispanic American.[9] Simply to process the enormous number of convicts or soon-to-be convicts, the Department depends on plea bargaining as its life's blood. Its budget planning reflects the number of indictments on average each additional assistant United States Attorney will produce, and its resources are deployed accordingly. Today, the Department's entire efforts at law enforcement depend on plea bargaining as never before.

Plea bargaining is nothing new, of course. As Professor George Fisher has trenchantly observed:

> Something more than 150 years ago, plea bargaining ... claimed but a tiny beachhead. Supported only by the desire of prosecutors to manage their crushing workloads and to gain an occasional effortless conviction, plea bargaining extended no further than the sentencing power of prosecutors.
>
> . . .
>
> Then, in the last quarter of the nineteenth century, judges found themselves confronted by an onslaught of new, and newly complex, civil suits brought on by the ravages of industrial machinery. They saw no choice but to make terms with the new order in the criminal courts. They embraced plea bargaining and turned their considerable sentencing power to its purpose. Sustained now by the two most powerful courtroom patrons [i.e., judges and prosecutors], plea bargaining swiftly became the dominant force in criminal procedure. It pushed aside the indeterminate sentence, and it supported those institutions, such as probation and the public defender, that aided its cause.[10]

As a result, by the mid–1980s roughly ninety percent of convictions in federal criminal cases were reached through plea bargains.[11]

## B. Enter the Sentencing Guidelines

### 1. Overview

The sentencing system our society has adopted with respect to federal offenders is embodied in the United States Sentencing Guidelines ("Guidelines"). Adopted by large bipartisan majorities in both Houses of Congress,[12] and later held constitutional by the Supreme Court of the United

---

*Population, 1974–2001,* at 2, *at* http://www.ojp.usdoj.gov/bjs/pub/pdf/piusp01.pdf (Aug.2003); *see Kane v. Winn,* 319 F.Supp.2d 162, 166–67, 181–82 (D.Mass.2004) (discussing how this figure in fact understates the extent of incarceration in the United States). Even Massachusetts, hardly a bastion of conservatism, is today spending more on prisons than on higher education. Massachusetts Taxpayers Found., *Bulletin,* Nov. 24, 2003, at 1.

9. *E.g.,* Human Rights Watch, *Race and Incarceration in the United States* tbls.4, 5 *at* http://hrw.org/background-er/usa/race/# P10_1649 (Feb. 27, 2002); *see also Kane,* 319 F.Supp.2d at 178–79 & nn. 25–27. Indeed, were statistics the only measure, our criminal justice system would appear to be the most unchallenged (and therefore effective) expression of institutional racism in America today. While we are at pains to deny it, other countries take notice and use these statistics in anti-American attacks. *See, e.g.,* Information Office of the State Council of the People's Republic of China, *Human Rights Record of the United States in 2001* ch. 5 (2002), *at* http://www.china.org.cn/english/2002/Mar/28587.htm (last visited June 16, 2004).

10. Fisher, *supra,* at 230.

11. Patricia M. Jones, *Sentencing,* 24 Am.Crim. L.Rev. 879, 909 (1987) (citing H.R.Rep. No. 98–1017, at 49 (1984)).

12. *See, e.g.,* Jack H. McCall, Jr., *The Emperor's New Clothes: Due Process Considerations Under the Federal Sentencing Guidelines,* 60 Tenn. L.Rev. 467, 468–69 (1993).

States,[13] the Guidelines were intended to cabin in unwarranted judicial discretion in sentencing while retaining sufficient flexibility to ensure individualized, just sentences in every case.[14] At the time of the Guidelines' passage, it was recognized that there would be a massive power shift from the judiciary to the executive as prosecutorial judgments became by far the major determinant of a defendant's sentence.[15] Still, it was believed that a robust and independent judiciary could hold any excesses in check.[16]

This latter expectation has proved utterly in vain. Against the centrally organized efforts of the Department to manipulate sentences and sentencing policy to achieve the perceived goals of law enforcement, the efforts of individual judges to control the whirlwind have been but a weak reed—unnoticed, derided, and largely rejected. As a result, the Sixth Amendment guarantee of trial by jury has been eroded as never before in the history of our nation, while the institutional judiciary complacently slips into forms of expression and modes of thought that unconsciously rein-

force the Department agenda in a powerfully Orwellian way.

### 2. "Relevant Conduct: The Cornerstone of the Federal Sentencing Guidelines"[17] Is Actually Naught but the Department's Theory of the Offense

In any indeterminate sentencing scheme, a judge must determine where, within the statutorily permissible range, to sentence an offender. When I first came to the state bench in Massachusetts, now a quarter century ago, there were a number of offenses (armed robbery was one) pursuant to which I was empowered to impose any sentence, ranging from straight probation to life imprisonment. To exercise this power wisely, I recall reading everything that I could about an offender and then sitting down privately with a probation officer and asking: "What do we know about this person?"

One object of the Guidelines was precisely to put an end to this unfettered exercise of discretion based on such an informal, off the record, and unguided discussion.[18] In its place, the Guidelines in-

---

**13.** *See Mistretta v. United States*, 488 U.S. 361, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989).

**14.** U.S. Sentencing Comm'n, Guidelines Manual (2003) [hereinafter U.S.S.G.] Ch.3, Pt.A, p.s.; *see also* 28 U.S.C. § 991(b)(1)(B) (2000) (the Guidelines seek to "avoid[ ] unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct").

**15.** James B. Burns, et al., *We Make the Better Target (But the Guidelines Shifted Power from the Judiciary to Congress, Not from the Judiciary to the Prosecution)*, 91 Nw. U.L.Rev. 1317, 1317–18 (1997); *see also* Jeffrey Standen, *The End of the Era of Sentencing Guidelines: Apprendi v. New Jersey*, 87 Iowa L.Rev. 775, 786 (2002) (asserting that the Guidelines have replaced judicial discretion over sentencing with prosecutorial discretion); Albert W. Alschuler, *The Failure of Sentencing*

*Guidelines: A Plea for Less Aggregation*, 58 U. Chi. L.Rev. 901, 903 (1991) (stating that the Guidelines create a more powerful prosecutor).

**16.** Standen, *supra*, at 789.

**17.** William W. Wilkins, Jr. & John R. Steer, *Relevant Conduct: The Cornerstone of the Federal Sentencing Guidelines*, 41 S.C. L.Rev. 495 (1990).

**18.** *See* U.S.S.G. Ch.3, Pt.A, p.s.; William J. Powell & Michael T. Chimino, *Prosecutorial Discretion under the Federal Sentencing Guidelines: Is the Fox Guarding the Hen House?*, 97 W. Va. L.Rev. 373, 379–80 (1995) (discussing the history of sentencing in the United States and the move toward creating a system that would solve the unpredictability and disparity in sentencing).

troduced a concept known as "real offense sentencing," based on an offender's "relevant conduct."[19] Pursuant to this approach—and in keeping with the goal of curbing judicial discretion—a judge must first determine the offender's "relevant conduct" from materials formally placed before him primarily by the Department; then the judge must impose a sentence based on the offender's "real offense," without regard to the actual offense of conviction.[20] This, it was thought, would replicate—in a more controlled fashion—the old, informal conference with the probation officer. It has not worked out that way.

First, the very formalism of the process has enhanced the Department's ability to control the information flow to the judge. After all, unlike a civil litigant,[21] a criminal defendant has always been at an extreme disadvantage in federal court in discovering the weaknesses in the Department's case, and the Guidelines only exacerbate this vast disparity. Moreover, the Guidelines cut the judge off from informal interchange with experienced probation officers—interchange which I learned from my state court service not infrequently added nuance to the Department's version of an offender's history.

Second, the concept of "real offense" sentencing as practiced under the Guidelines not only affects where—within the permissible range—an offender ought be sentenced, it frequently adjusts that range upward considerably. No state system—not one—has adopted this approach.[22] The result has been the routine sentencing of offenders on the basis of crimes with which they have never been charged, the commission of which they deny, without any evidence ever having been proffered against them.[23] Even more bizarre, federal criminal sentences may today be based on conduct of which an offender has been formally acquitted.[24]

The devolution of such enormous power on federal prosecutors has had an all-too-predictable result. While there may still be judicial limits on the outer boundaries of a prosecutor's assertion of relevant conduct (as the case of Jason Pacheco discussed below, shows), none prevents a prosecutor from turning a blind eye on conduct otherwise relevant (as the case of William Olivero discussed below, shows). So it is that the phenomenon known as "fact bargaining" has come to flourish as never before in the federal courts.[25]

The Department today has the power—and the incentive—to ratchet punishment up or down solely at its discretion. It does

19. U.S.S.G. Ch.3, Pt.A, p.s.; *id.* § 1B1.3.

20. *Id.* Ch.3, Pt.A, p.s.; *id.* § 1B1.3.

21. *See* Fed.R.Civ.P. 26–37.

22. *See* Richard S. Frase, *State Sentencing Guidelines: Still Going Strong*, 78 Judicature 173, 176 (1995) (noting that "guidelines states are unanimous in rejecting the broader 'real offense' approach of the federal guidelines, which permit frequent and substantial sentence enhancements based on uncharged 'relevant conduct' ").

23. The case of Richard Green, discussed below, provides an illustration.

24. *See, e.g., United States v. Watts*, 519 U.S. 148, 157, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997) (holding that a jury's verdict of acquittal does not prevent a sentencing court from considering a defendant's conduct underlying the acquitted charge, so long as that conduct is established by a preponderance standard).

25. *See Berthoff v. United States*, 140 F.Supp.2d 50, 62 n. 19 (D.Mass.2001), *aff'd*, 308 F.3d 124 (1st Cir.2002) (defining "fact bargaining" as "the knowing abandonment by the government of a material fact developed by law enforcement authorities or from a witness expected to testify in order to induce a guilty plea").

so most often to burden a defendant's constitutional right to a jury trial and thus force a plea bargain. The result: In the District of Massachusetts, an individual who stands up to the Department and insists on a jury trial gets, upon conviction, a sentence 500 percent longer than a similarly situated defendant who pleads guilty and cooperates.[26]

### 3. Enhanced Plea Bargaining Is Actually the Central Goal of the Guidelines

While reducing unwarranted disparity in the judicial treatment of offenders was touted as the "reform" which the Guidelines sought to work, the Department well recognized the advantage it would derive in marketing plea bargains [27] if judicial discretion in sentencing was sharply diminished. By candidly marginalizing the judicial role, it was thought that offenders would be more likely to plead guilty as they could know with greater certainty what to expect if they did.[28]

There is truth in this observation. My own experience is that guilty offenders hope against hope for some especial leniency and, when that hope is dashed by defense counsel explaining that the Guidelines foreclose such result—if they do not fire the lawyer for being the bearer of bad tidings [29]—many will plead guilty to obtain the discount offered by the Department to induce a plea.

### 4. Acceptance of Responsibility

Like so much of our discourse about sentencing, we employ sophistry rather

26. *Berthoff,* 140 F.Supp.2d at 68 & nn. 32, 33. The Court recounts one telling example from this District. In *United States v. Isola,* Crim. No. 00–10271–EFH, the defendant, who was president of Damon Clinical Laboratories, entered a plea of nolo contendere to an information alleging conspiracy to defraud the United States under 18 U.S.C. § 371, the government dismissed the indictment, and the parties agreed to waive a pre-sentencing report Tr. of 7/28/00 Plea Hr'g, at 1–8 [Docket No. 7]. Judge Harrington imposed a sentence of three years probation and a fine of $100. *Id.* at 15. William Thurston, Isola's co-conspirator and vice president at Damon Clinical Laboratories, insisted on going to trial, and was convicted of conspiring to defraud the United States. *See United States v. Thurston,* 358 F.3d 51, 53–54 (1st Cir.2004). Although the Guidelines prescribed a sentencing range of 63 to 78 months, Judge Harrington sentenced Thurston to three months in prison, departing downward both to correct for the disparity between his sentence and Isola's, and to take account of Thurston's extraordinary good works in his church and community. *Id.* at 54. The First Circuit reversed the departure on both grounds and remanded for imposition of a five-year prison sentence (the statutory maximum) and an appropriate fine. *Id.* at 82.

27. It is appropriate to speak of a "market" for plea bargains. Commentators have long recognized that the contractual nature of the plea bargaining process yields to analysis akin to the commercial arena. *See, e.g.,* Frank H. Easterbrook, *Criminal Procedure as a Market System,* 12 J. Legal Stud. 289 (1983); Scott & Stuntz, *supra;* Jeffrey Standen, *Plea Bargaining in the Shadow of the Guidelines,* 81 Cal. L.Rev. 1471 (1993).

For a critique of conceptualizing criminal procedure as a market, see Stephen J. Schulhofer, *Criminal Justice Discretion as a Regulatory System,* 17 J. Legal Stud. 43 (1988). *See also* Stephen J. Schulhofer, *Plea Bargaining as Disaster,* 101 Yale L.J.1979 (1992) (concluding that plea bargaining should be abolished based on economic analysis).

28. *See, e.g.,* Fisher, *supra,* at 224–27; Rachel E. Barkow, *Recharging the Jury: The Criminal Jury's Constitutional Role in an Era of Mandatory Sentencing,* 152 U. Pa. L.Rev. 33, 97–98 (2003); Stephen J. Schulhofer, *Due Process of Sentencing,* 128 U. Pa. L.Rev. 733, 752–53 (1980).

29. *See, e.g.,* Tr. of 1/16/01 Plea & Related Hr'g at 2, *United States v. Woodward,* Crim. A. No. 99–10393–WGY; *see also Berthoff,* 140 F.Supp.2d at 94 (citing the *Woodward* Plea and Related Hearing Transcript).

than straight talk.[30] Under the Guidelines, an offender is eligible for a discount on his sentence if he "accepts responsibility" for his crime.[31] Actually, this discount has nothing whatsoever to do with true acceptance of responsibility for one's acts. If it did, the discount would be equally available to those who are convicted after trial and it is not.[32] What we mean by acceptance of responsibility is simply the discount offered for pleading guilty (earlier is better), thus saving the Department the trouble, expense, and uncertainty[33] of a jury trial. Indeed, so divorced is the concept from true acceptance of responsibility that even those who protest their innocence of some or all of the charges against them are routinely given the discount—but only if they'll plead guilty.[34]

There is nothing surprising about this discount save the Sentencing Commission's sophomoric attempt to obscure what is going on. Indeed, this discount is, and always has been, the essence of the plea "bargain."[35]

The problem for the Department lies in the fact that the original Sentencing Commission made the discount relatively trivial compared to the draconian sentences it promulgated. This upset the calculations of the Department and the defense bar alike. The "acceptance" discount was all too confining for a Department dependant on a 90 percent plea bargain rate for its very operational existence. At the same time, the Department had to be "tough on crime," so it could hardly ask the Sentencing Commission for a larger across-the-board discount and thus lower the sentencing ranges it had successfully obtained. Much of the institutional development of sentencing policy after the enactment of the Sentencing Reform Act can best be seen as the Department's attempts to "break out of the Sentencing Guidelines corral"[36] and gather to itself the remaining aspects of sentencing discretion while

**30.** *See* Part One, Section I.D.2, *infra.*

**31.** For relatively short sentences, the discount is two levels off the offender's adjusted offense level, U.S.S.G. § 3E1.1(a), and three levels off longer sentences, *id.* § 3E1.1(b). The judge must give all or nothing. *See id.* § 3E1.1. There is no plea bargain discount off mandatory sentences for mere acceptance of responsibility.

**32.** U.S.S.G. § 3E1.1 cmt 2. *But see id.* ("In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct).").

**33.** Today, a full 20.8 percent of those accused by the Department who go to trial are acquitted. Administrative Office of the U.S. Courts, *Judicial Business of the United States Courts*

tbl.D–7 (2004) (on file with the Court) (presenting data for the twelve-month period ending March 31, 2004). This percentage is higher than it has ever been since I came on the bench in 1985. The high acquittal rate could mean any number of things, and speculation without more information would be inappropriate.

**34.** *See, e.g., United States v. Labovitz,* 50 F.3d 1, 1995 WL 133339, at *2 & n. 1 (1st Cir. 1995) (unpublished table decision) (noting that the district court awarded an acceptance of responsibility adjustment to a defendant who tried unsuccessfully to withdraw his guilty plea). It is, of course, permissible to accept a valid guilty plea from one who protests his innocence. *North Carolina v. Alford,* 400 U.S. 25, 38–39, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970). This Court routinely accepts *Alford* pleas, and as far as it is aware, other judges in this District do the same.

**35.** *See* Fisher, *supra,* at 224–26.

**36.** *Berthoff,* 140 F.Supp.2d at 55.

denying those same aspects to the judiciary.

## C. Today the Department Establishes the Sentence; the Federal Judge Simply Imposes It

As the constant institutional force in the development of sentencing policy, it is not surprising that the Department would frequently get its way. The startling, untold story is the extent to which the Department as a functional matter now can determine the sentence to be imposed upon those whom it accuses of crimes. Not surprisingly, it uses its vast powers to induce plea bargains, thus eviscerating the constitutional guarantee of trial by a jury of one's peers. Most of its methods are "legal," some are disfavored but winked at, one is flat-out illegal. All are routine. For the Department today, the Guidelines are hardly a constraint; their value lies in constraining an already marginalized district court judiciary.

How can the Department so confidently induce plea bargains? Let us count the ways:

### 1. Charge Bargaining

The most traditional of the Department's bargaining chips is the ability to drop charges at will. This has always been the prerogative of the executive, and the Department has had extensive recourse to it. Indeed, in the District of Massachusetts the best available data indicates 65 charge bargains in the years 1998–2000.[37] The pressure is placed upon the defendant by bringing a multi-count indictment and then trading away charges or counts more difficult to prove in return for a guilty plea to other counts or lesser charges.

True, Attorney General Ashcroft has recently forbidden Departmental charge bargaining in no uncertain terms:

It is the policy of the Department of Justice that, in all federal criminal cases, federal prosecutors must charge and pursue the most serious, readily provable offense or offenses that are supported by the facts of the case, except as authorized by an Assistant Attorney General, United States Attorney, or designated supervisory attorney in the limited circumstances described below. The most serious offense or offenses are those that generate the most substantial sentence under the Sentencing Guidelines, unless a mandatory minimum sentence or count requiring a consecutive sentence would generate a longer sentence. A charge is not "readily provable" if the prosecutor has a good faith doubt, for legal or evidentiary reasons, as to the Government's ability readily to prove a charge at trial. Thus, charges should not be filed simply to exert leverage to induce a plea. Once filed, the most serious readily provable charges may not be dismissed except to the extent permitted in Section B.[38]

But this appears to be sound and fury, signifying little. Charge bargaining continues in this District as before[39] and Department attorneys seem to know little about the centralized permitting process Attorney General Ashcroft has implement-

---

37. *Id.* at 75–91 App. B.

38. Sept. 22, 2003 Memorandum from Attorney General John Ashcroft Setting Forth Justice Department's Charging and Plea Policies § I.A, *reprinted in* 16 Fed. Sent. Rep. 129 (2003) [hereinafter "Ashcroft Memorandum"].

39. *See, e.g.,* Tr. of 3/23/04 Plea Hr'g, *United States v. David Smith,* Crim. A. No. 02–10147–WGY.

ed.[40]

## 2. Notification of Sentencing Enhancements

Certain criminal statutes permit enhanced sentences upon the Department's notification to the court of a prior conviction before trial (or before sentencing after a plea).[41] This notification need not be through the constitutional processes of a grand jury,[42] simple written notification to the court and the defendant is sufficient.[43]

Departmental attorneys are thus able to threaten to give such notice—therefore ratcheting up sentences in applicable cases—whenever an accused proves recalcitrant about copping a plea. Make no mistake—this happens.[44]

## 3. The "Safety Valve"

Properly concerned about the rigidity of mandatory minimum sentences, Congress passed "safety valve" legislation designed to ameliorate unduly harsh sentences for first time offenders.[45] Even so, the discount for those who are "safety valve" eligible is not left to judicial discretion, but is prescribed by the Guidelines.[46] Although the legislation nowhere so specifies, as a practical matter, of course, the benefits of the "safety valve" are available only to those defendants who will forgo protections of the American jury, plead guilty, and place themselves in the Department's hands. Here's why:

First, the "safety valve" is available only to offenders who do not have more than one criminal history point under the Guidelines—typically first-time offenders.[47] Where the Department likes an offender due to his cooperation, even a series of criminal convictions can be collapsed into a "single" course of conduct, thus making the cooperative offender safety valve eligible.

Far more important, however is the safety valve requirement that the offender cooperate fully with the Department.[48] It is this requirement, of course, that secures the Department's whip hand though, on its face, the safety valve looks like a judge-determined discount. This is because the Department necessarily must advise the court concerning the truthfulness and completeness of the offender's proffer. Where the Department is dissatisfied—and tells the court the proffer is not fully truthful— it takes either investigatory resources not available to the court, or exhaustive hearings to establish the truth of the matter. Most courts, this one included, thus rarely go behind the Department's representation, with the predictable result that the

---

40. *See id.*

41. 21 U.S.C. § 851(a)(1).

42. U.S. Const. amend. V.

43. 21 U.S.C. § 851(a)(1).

44. Because the Department is typically in a position to file a complete information to establish prior conviction early in the case, filing of an information close to the plea or trial date suggests that the Department was withholding filing to "encourage" a defendant to plead guilty. *See, e.g., United States v. Warren,* Crim. A. No. 03–10361–RWZ–2 (indictment [Doc. No. 16] filed 12/3/03, information to establish prior conviction [Doc. No. 55] filed 6/16/04, guilty plea entered 6/16/04); *United States v. Copeland,* Crim. A. No. 02–10291–DPW (indictment [Doc. No. 15] filed 10/2/02, information [Doc. No. 83] filed 9/2/03, guilty plea entered 9/3/03); *United States v. Talvera,* Crim. A. No. 03–10142–WGY (indictment [Doc. No. 11] filed 5/1/03, information [Doc. No. 16] filed 7/8/03, guilty plea entered 7/29/03).

45. 18 U.S.C. § 3553(f).

46. U.S.S.G. §§ 2D1.1(b)(6), 5C1.2(a).

47. *See* 18 U.S.C. § 3553(f)(1).

48. *See id.* § 3553(f)(5).

Department today is firmly in charge of the safety valve. It is activated when the Department wishes and withheld when it does not.[49]

#### 4. Substantial Assistance

Both 18 U.S.C. § 3553(e) and U.S.S.G. § 5K1.1 permit downward departures for offenders who provide "substantial assistance" to law enforcement authorities. These are only available if the Department files a motion requesting them, and in cases where a statute provides for a mandatory minimum sentence, the Department can limit the extent of the downward departure by seeking a departure below the Guidelines range but not below the mandatory minimum sentence.[50] As Figure 2 makes clear, substantial assistance departures are substantially unprincipled.[51]

Figure 2

ACTL Report I, *supra*, at 23.

Utterly within the Department's control, they are, by far, the major ground for downward departure from the Guidelines.[52]

---

**49.** The case of Jason Pacheco, discussed below, provides an example. At his sentencing hearing, Pacheco sought a safety valve reduction, but the Department contested it, and the Court refused to award the reduction. *United States v. Yeje–Cabrera*, Crim. No. 01–10469, Tr. of 8/5/03 Sentencing Hr'g. Only rarely could a defendant establish the requirements of the safety valve in the face of Departmental opposition, and Pacheco failed to do so.

**50.** *See Melendez v. United States*, 518 U.S. 120, 125–27, 116 S.Ct. 2057, 135 L.Ed.2d 427 (1996).

**51.** This table appears in American College of Trial Lawyers, *Report and Proposal on Section 5K1.1 of the U.S. Sentencing Guidelines* 23 (1999), *at* http://www.actl.com/PDFs/Report-ProposalSentencingGuidelines.pdf (last visited June 16, 2004). The version in this opinion is taken from *Berthoff*, 140 F.Supp.2d at 73 App. A.

**52.** In 2001, 17.1 percent of all federal offenders received a downward departure for substantial assistance, and 18.3 percent of all federal offenders received a downward departure for some other reason. *See Sentencing*

The sweeping extent of departures for substantial assistance demonstrates, as nothing else, that the Department today simply cannot enforce the laws without a huge volume of plea bargains, a large number of which turn on the Department's ability to ignore the strictures of the Guidelines and the mandatory minimum sentencing system by cutting deals with offenders. Indeed, in many districts [53] an offender has only a random chance of receiving a sentence within the Guidelines due to the volume of substantial assistance departures *approved by the Department*.

While commentators justly excoriate the substantial assistance discount for its vagaries,[54] its potential racism,[55] its moral bankruptcy,[56] and its inability to produce uniformity given the diversity of individual circuit jurisprudence and legal culture,[57]

*Sourcebook, supra,* Fig.G. In the cases that did not involve substantial assistance, no one reason was invoked in more than 20 percent of the cases, so the next closest ground for downward departure ("general mitigating circumstances") only appeared in about 3.6 percent of cases. *Id.* tbl. 24. In each of the four previous years, the percentage of cases with substantial assistance downward departures was higher than the percentage of cases with departures that fell into one of the other categories. *Id.* Fig. G.

53. The following federal districts depart downward in at least 50 percent of their criminal cases: Middle District of Alabama, District of Arizona, Southern District of California, Northern District of New York, Northern Mariana Islands, and Eastern District of Washington. *Sentencing Sourcebook, supra,* at 53–55 tbl. 26.

54. *See* Linda Drazga Maxfield & John H. Kramer, *Substantial Assistance: An Empirical Yardstick Gauging Equity in Current Federal Policy and Pratice* 2–4 (1998) [hereinafter *Substantial Assistance*], *at* http://www.ussc.gov/publicat/5kreport.pdf (noting the lack of guidance that 18 U.S.C. 3553(e), the Guidelines Manual, and prosecutorial directives provide as to the standards for determining whether assistance is "substantial," and for correlating the type and extent of assistance with the magnitude of departure); *see also Two Sentencing Commission Staff Reports on Substantial Assistance,* 11 Fed. Sent. Rep. 6 (1998) (presenting this report and an earlier report).

55. *See Substantial Assistance, supra,* at 13–14 & n. 30 (discussing data and modeling suggesting that African American offenders were between 7.7 and 9.3 percent less likely to receive substantial assistance departures than non-minority offenders, and that Hispanic American offenders were 7 percent less likely to receive such departures than non-Hispanic offenders); *id.* at 19 (noting that ethnicity, citizenship, and race had statistically significant effects on the magnitude of substantial assistance departures awarded); *id.* at 31 Ex.9, 34 Ex.12 (summarizing statistically significant disparities for race, ethnicity, citizenship, gender, age, and education); *see also* David B. Mustard, *Racial, Ethnic, and Gender Disparities in Sentencing: Evidence from the U.S. Federal Courts,* 44 J.L. & Econ. 285, 308–12 (2001) (finding disparities in the likelihood and magnitude of downward departures based on race (particularly for African Americans and Hispanic Americans), gender (i.e., women are more likely to receive departures), citizenship, age, income level, and education level); Stephen J. Schulhofer, *Sentencing Issues Facing the New Department of Justice,* 5 Fed. Sent. Rep. 225, 229 (1993) ("My research with Commissioner Nagel brought to light the frequent use of substantial assistance motions to cloak leniency for 'sympathetic' (usually white) defendants.").

56. *See* Kate Stith & Jose A. Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* 103 (1998) ("[A]n unintended consequence of the Guidelines has been to rob the traditional sentencing rite of much of its moral force and significance.").

57. *See generally* Lisa M. Farabee, *Disparate Departures Under the Federal Sentencing Guidelines: A Tale of Two Districts,* 30 Conn. L. Rev. 569, 631–32 (1998); *see also id.* (demonstrating that the District of Massachusetts grants substantial assistance departures much more frequently than the District of Connecticut, whereas the latter grants departures on other grounds much more frequently than the former, and exploring the possible reasons for the discrepancies).

the judicial response is muted, and the Department and the defense bar are silent. Judges rarely speak out since the substantial assistance departure allows justice appropriately to be done in many cases. Defense counsel are silent given that their unequivocal duty is toward the defendant getting a break.[58] The Department, of course, is silent because it has enjoyed overwhelming success with the Congress and the people in painting the entire judiciary as soft on crime, even though its own recommendations are the primary force driving down the sentences that are today imposed.

### 5. Ignoring the Guidelines—Officially

The list of inducements to plead laid out above is, however, insufficient for the Department. In judicial districts with unusually high volumes of drug and immigration offenses (primarily along our border with Mexico), the Department simply dispenses with the Guidelines altogether to secure more flexibility (and thus more pleas). These are the so-called "fast track" programs. While Attorney General Ashcroft has attempted to centralize and rein in these programs,[59] they still exist and there is every indication that they will continue to for the foreseeable future. As implemented, these programs constitute a wholesale jettisoning of the Guidelines in order to "move the business." No wonder the Guidelines are held in such derision by the states,[60] when the much vaunted guideline "uniformity" (and the congressional command) does not even apply in Arizona, Southern California, New Mexico, and Southern and Western Texas.[61] More serious, of course, is the constitutional command that the national law apply equally throughout the United States.[62] Offenders are properly complaining of equal protection violations in view of the "here it ap-

---

**58.** When defense counsel are heard on this point, their plaint is usually, "Hey, what about my guy? He cooperated too!"

**59.** *See* Ashcroft Memorandum, *supra,* §§ I.B.2, II.D.2.b.

**60.** *See* Frase, *supra,* at 176 (noting states' unanimous rejection of the Guidelines' "real offense" approach); *see also* American Law Institute, *Model Penal Code: Sentencing* 5 (Report, Apr. 11, 2003) ("[I]t is essential to state at the outset that the proposals assembled here owe almost nothing to federal law, but are inspired by the more numerous and more successful commission-guideline structures at the state level.").

**61.** In 2001, 5,928 of the nation's 10,026 non-cooperation related downward departures were issued in the five districts located in these regions. *See Sentencing Sourcebook, supra,* at 53–55 tbl.26; *see also* Alan Vinegrad, *The New Federal Sentencing Law,* 15 Fed. Sent. Rep. 310, n. 29 (2003). In the Southern District of California, an astonishing 50.5 percent of offenders receive non-cooperation related departures, whereas the figure in the Eastern District of California is 7.9 percent.

*Sentencing Sourcebook, supra,* at 53–55 tbl.26. The figure in the District of Arizona is 62.8 percent. *Id.* Interestingly, in 2001 the Western and Southern Districts of Texas, though they had non-cooperation departure rates much higher than elsewhere in the Fifth Circuit, did not have especially high rates compared to the rest of the nation: the Southern District of Texas in fact had a lower rate than this District. *Id.* Other districts have somewhat high rates of such departures include several in the Second Circuit, where appellate jurisprudence and other factors have led to a fairly uniformly high level of non-cooperation related departures, *see* Farabee, *supra,* at 591–92, as well as the Eastern District of Washington (51.8 percent). *Id.*

**62.** U.S. Const. amend. V; *see Bolling v. Sharpe,* 347 U.S. 497, 500, 74 S.Ct. 693, 98 L.Ed. 884 (1954) (holding that the Due Process Clause of the Fifth Amendment places the same restrictions on actions by the federal government that the Equal Protection Clause of the Fourteenth Amendment places on state governments).

plies, here it doesn't" nature of the Guidelines.[63]

### 6. Ignoring the Guidelines—Unofficially

Pursuant to Fed.R.Crim.P. 11(c)(1)(C), the Department properly may "agree [with the defendant] that a specific sentence or sentencing range is the appropriate disposition of the case, or that a particular provision of the Sentencing Guidelines, or policy statement, or sentencing factor does or does not apply (such a recommendation or request binds the court once the court accepts the plea agreement)."[64]

Note the dynamic here established. Defense counsel favor binding plea agreements because the district judge has no discretion whatsoever, save to accept or reject the plea. Departmental attorneys may use them for a variety of reasons, among them to grant extraordinary benefits not accorded to other defendants tendering pleas[65] or, perhaps, to bend or twist the Guidelines. The district judge can stop this practice, of course, by refusing to accept the plea—but will he? Maybe not, if the agreed sentence accords with the judge's personal sense of justice. After all, there will never be any appeal so the matter is beyond review. No downward departure will ever be reported, and the case will be resolved simply, finally, and completely. Does this happen? While the practice is hard to document,[66] statistics suggest its pervasiveness.[67] Its

**63.** *See, e.g., United States v. Banuelos–Rodriguez,* 215 F.3d 969, 978 (9th Cir.2000) (en banc) (holding that disparities arising from "fast track" programs in neighboring districts did not justify a downward departure); *United States v. Bonnet–Grullon,* 212 F.3d 692, 710 (2d Cir.2000) (similar), *cert. denied,* 531 U.S. 911, 121 S.Ct. 261, 148 L.Ed.2d 189 (2000). As no defendant in the present cases has raised any such issue, the matter is not further pursued.

**64.** Fed.R.Crim.P. 11(c)(1)(C); *see also* Fed.R.Crim.P. 11(c)(4).

**65.** *See* Order of Dismissal of Counts on Gov't's Mot. (Oct. 13, 1993), *United States v. Brest,* Crim. A. No. 92–10342–WGY. (Department attorneys tendered a binding plea agreement providing for straight probation for a corrupt but cooperative witness who testified against a congressman. When the Court wouldn't go along, the Department, having already made its deal with the witness, simply dismissed the charges outright as is its prerogative.). For an example where, in the face of a judge's refusal to accept a recommended sentence, the Department achieved its desired end by dismissing several charges, see the discussion of the Fastow case, *infra* note 282.

**66.** Such documentation would be much easier if the judicial "Statement of Reasons" for a criminal sentence was a public document. It is not. *Judicial Conference Policy Statement, Report of the Proceedings of the United States Judicial Conference,* Mar. 14, 2001, at 14. In the District of Massachusetts, by comparison, the Statement of Reasons is still made public unless the presiding judge orders it sealed for case specific reasons. *See* Minutes of the Court Meeting (District of Massachusetts), Sept. 4, 2001, at 4. A fully searchable electronic database of all public judicial proceedings would be the best corrective to such conduct.

**67.** More specifically, according to the General Accounting Office, in 52 percent of federal drug cases where mandatory minimum sentences apply, district judges imposed sentences below the mandatory minimum. *See* U.S. General Accounting Office, *Federal Drug Offenses: Departures from Sentencing Guidelines and Mandatory Minimum Sentences, Fiscal Years 1999–2001,* at 15 Fig.6 (2003), *at* http://www.gao.gov/new.items/d04105.pdf. Only half of these departures below the mandatory minimum sentence were on account of substantial assistance, so 26 percent of drug cases involve downward departures from the mandatory minimum sentence for "other" reasons. *Id.* Given the limited number of grounds for departure below a statutory mandatory minimum sentence, this high number is difficult to explain unless district judges are accepting binding plea agreements that evade mandatory minimum sentences with some frequency.

likelihood increases due to the ever increasing disrepute of the entire Guidelines structure in the eyes of the judiciary.[68]

### 7. Ignoring the Guidelines—Fraudulently

The most repugnant of the Department's tactics is to lie to the Court in order to induce a guilty plea. This is the process known as "fact bargaining." It occurs when a departmental attorney "swallows the drugs" or "the gun" as the case may be, i.e., fails to report to the probation officer in rendering its descriptions of offense conduct (and then later fails to bring to the attention of the Court) relevant evidence that may affect the guidelines calculation in order to reduce that calculation to secure a disposition to which it and defense counsel have agreed.

This, of course, is flat-out illegal,[69] and Attorney General Ashcroft has prohibited it in no uncertain terms. This Court is unaware of any instance where the Attorney General has disciplined a Department attorney for engaging in the practice.

As the practice constitutes a direct fraud on the Court, it is difficult to uncover. Fact bargaining drove the disparate sentences in *United States v. Rodriguez*,[70] but the First Circuit accepted the Department's all too facile explanation and failed to explore the issue.[71] Again, charge bargaining coupled with prohibited fact bargaining drove the cruelly disparate sentences in *United States v. Thurston*,[72] but the Court of Appeals again failed to detect

---

**68.** *See, e.g., Decisions: United States v. Steven Kim, N.Y.L.J.*, Oct. 24, 2003, at 17 ("[Judge Patterson] denounced Congress' toughening of the federal sentencing guidelines ...."); Frank O. Bowman, III, *When Sentences Don't Make Sense*, Wash. Post, Aug. 15, 2003, at A27 (noting Justice Anthony Kennedy's statement to the American Bar Association that federal sentences are harsher and the Guidelines are less flexible than they should be); Dan Herbeck & Gene Warner, *Battle on the Bench: Federal Judges Around the Nation—Including John T. Elfvin Here—Are Battling John D. Ashcroft's Justice Department*, Buffalo News, Feb. 20, 2004, at A1 (discussing widespread judicial opposition to the Guidelines); Judge John S. Martin, Jr., *Let Judges Do Their Jobs*, N.Y. Times, June 24, 2003, at A31 (explaining that he was retiring because he could no longer in good conscience sentence under the Guidelines regime); Ian Urbina, *New York's Federal Judges Protest Sentencing Procedures*, N.Y. Times, Dec. 8, 2003, at B1 (describing public criticism of the Guidelines by New York district judges and by Minnesota Chief District Judge James Rosenbaum); Alan Vinegrad, *The Judiciary's Response to the PROTECT Act*, N.Y.L.J., Jan. 8, 2004, at 4 (noting criticism by Justices Anthony Kennedy and Stephen Breyer of increasing use of mandatory minimum sentencing); Edward Walsh & Dan Eggen, *Ashcroft Orders Tally of Lighter Sentences: Critics Say He Wants "Blacklist"*

*of Judges*, Wash. Post, Aug. 7, 2003, at A1 (noting Eighth Circuit Judge Myron H. Bright's statement in a concurring opinion that recent changes to the Sentencing Guidelines "will exacerbate the problems with the guidelines").

**69.** *See* U.S.S.G. § 1B1.3(a) (making it clear that all "relevant conduct" must be considered during sentencing); *id.* § 1B1.8 n. 1 (noting that the provision, which places limits on the use of self-incriminating information that the defendant provides as part of an agreement to cooperate with the government, "does not authorize the government to withhold information from the court"); *id.* § 6B1.4(a)(2) & cmt. ("[W]hen a plea agreement includes a stipulation of fact, the stipulation must fully and accurately disclose all factors relevant to the determination of sentence.... [I]t is not appropriate for the parties to stipulate to misleading of non-existent facts ...."). *See also Berthoff*, 140 F.Supp.2d at 61–67 & nn.18–30 (discussing the prevalence and illegality of fact bargaining).

**70.** 162 F.3d 135 (1st Cir.1998), *cert. denied*, 526 U.S. 1152, 119 S.Ct. 2034, 143 L.Ed.2d 1044 (1999).

**71.** *Berthoff*, 140 F.Supp.2d at 64–66.

**72.** 358 F.3d 51 (1st Cir.2004).

it,[73] focusing instead on the perceived inadequacies in the district court's sentencing rationale.[74]

This Court has burdened an already strained probation office by ordering pre-plea pre-sentence reports in virtually every case as the best defense to illegal fact bargaining. The effort has borne fruit; William Olivero and Jason Pacheco, whose cases are discussed below, were potential victims of illegal fact bargaining.

All of these techniques, both legal and illegal, further the Department's goal: securing plea bargains in the overwhelming number of cases in order to enforce the law at the cheapest possible cost and avoid the risks of having to expose the Department's investigations to the neutral review of judges and juries. That these techniques are eviscerating the Sixth Amendment's guarantee of a jury of the people seems rarely to occur to those who practice them and, if it does, it hardly seems important.

**D. The Judicial Reaction: The "Lions Under the Throne" [75] Are Supine and Obedient, Settling for Sophistry and Symbolism.**

Any discussion of sentencing policy in America today must consider the judicial reaction to the massive shift of power and discretion to the Department. In one respect—obedience to the Congressional mandate—that response is precisely what Congress and the American people expect. In two respects, however, the judicial response has been opaque, masking the realities in ways that obscure injustice with a veneer of pseudo-process and procedure.

**1. Obedience**

While the drumbeat of judicial opposition to the Guidelines has been extraordinarily vocal, widespread, and persistent,[76] the judiciary's actual performance after the Supreme Court had established their constitutionality[77] has been faithfully to obey the will of Congress, applying the Guidelines as sensibly, consistently, and compassionately as their labyrinthine provisions will allow. As Judge Bruce Selya so aptly puts it, "when . . . the legislative trumpet sounds clearly, courts are duty bound to honor the clarion call."[78] Obedience to the constitutional expression of the Congressional will is the hallmark of the federal judiciary—a vital aspect of its professionalism and its role in our system of government. Whatever individual judges may think about the wisdom of the congressional choice, this obedience is as prevalent in the sentencing area as in any other area of judicial competence.[79] Indeed, to Congress' apparent surprise, its

---

73. See *Berthoff*, 140 F.Supp.2d at 64–66; *see also supra* note 26.

74. See *Berthoff*, 140 F.Supp.2d at 64–66; *see also supra* note 26.

75. See Francis Bacon, *Of Judicature, in Essays* 316 (1654) ("And let no man weakly conceive, that just laws and true policy have any antipathy; for they are like the spirits and sinews, that one moves with the other. Let judges also remember, that Solomon's throne was supported by lions on both sides: let them be lions, but yet lions under the throne; being circumspect that they do not check or oppose any points of sovereignty. Let not judges also be ignorant of their own right, as

to think there is not left to them, as a principal part of their office, a wise use and application of laws.").

76. See *supra* note 68.

77. See *Mistretta*, 488 U.S. at 361, 109 S.Ct. 647.

78. *United States v. Jackson*, 30 F.3d 199, 204 (1st Cir.1994).

79. See, *e.g.*, U.S. General Accounting Office, *supra*, at App.VI, 77 (Comments from the Judicial Conference Committee on Criminal Law) (noting how the GAO report demon-

own investigators point out that downward departures from the Guidelines are driven more by the Department than by any other source.[80]

## 2. Sophistry

The judiciary is, however, considerably less than candid about how individual sentences are meted out. It seems to satisfy itself with rote incantations of labels that are meaningful and powerful to judges, lawyers, and, most importantly, the public, even when those labels no longer carry any descriptive force in explaining reality. By so doing, they run the risk of fooling themselves into a complacency that reduces their ability to address the quiet slide into oblivion of our precious right to trial by jury.

Consider just these four aspects of procedure and sentencing in federal courts today:

### a. In Federal Sentencing Hearings, "Evidence" Is *Not* Evidence

Appellate courts are fond of noting that the district judge makes the crucial relevant conduct determination pursuant to the well known "preponderance of the evidence" standard.[81] This is a shibboleth. The rules of evidence by their express terms do not apply to sentencing hearings.[82] Instead, courts today must base their conclusions on a mishmash of data including blatantly self-serving hearsay largely served up by the Department.[83] Courts have little chance independently to review this data (and soon they will have much less).[84] Indeed, some data presented at sentencing hearings is so farfetched that the appellate court seems almost embarrassed to uphold reliance upon it.[85] Yet it must do so, for in sentencing the traditional norms simply do not apply. We ought not pretend otherwise.

strates "that judges are not exercising departure authority in violation of the letter or the spirit of the Sentencing Reform Act of 1984"); *see generally id.* at 77–80.

**80.** *See id.* at 15 Fig.6; *Sentencing Sourcebook, supra,* at Fig.G; *see also supra* note 52 (discussing the statistics).

**81.** While this practice is routine throughout the twelve circuits adjudicating criminal matters, it will be sufficient to cite a few recent First Circuit cases. *See, e.g., United States v. Marks,* 365 F.3d 101, 105 (1st Cir.2004); *United States v. Santos,* 363 F.3d 19, 22 (1st Cir.2004); *United States v. Casas,* 356 F.3d 104, 128 (1st Cir.2004).

**82.** Fed.R.Evid. 1101(d)(3).

**83.** *See* Elizabeth T. Lear, *Is Conviction Irrelevant?,* 40 UCLA L.Rev. 1179, 1202–03 (1993); Gerald W. Heaney, *The Reality of Guidelines Sentencing: No End to Disparity,* 28 Am.Crim. L.Rev. 161, 210 (1991); Deborah Young, *Fact–Finding at Federal Sentencing: Why the Guidelines Should Meet the Rules,* 79 Cornell L.Rev. 299, 342–46 (1994). Several commentators have called for application of the Federal Rules of Evidence to Sentencing Hearings. *See generally, e.g.,* Edward R. Becker &

Aviva Orenstein, *The Federal Rules of Evidence After Sixteen Years—The Effect of "Plain Meaning" Jurisprudence, the Need for an Advisory Committee on the Rules of Evidence, and Suggestions for Selective Revision of the Rules,* 60 Geo. Wash. L.Rev. 857, 885–91 (1992); Randolph K. Jonakait, *Insuring Reliable Fact Finding in Guidelines Sentencing: Why Not Real Evidence Rules?,* 22 Cap. U.L.Rev. 31 (1993); Young, *supra,* at 301.

**84.** *See infra* note 109.

**85.** *See, e.g., United States v. Rodriguez,* 336 F.3d 67, 68–71 (1st Cir.2003) (holding that, although it was a "close question," the district court did not abuse its discretion in refusing to hold a full evidentiary hearing before enhancing the defendant's sentence on obstruction of justice grounds, based on the Department's hearsay representation that the author of an allegedly exculpatory letter (which the defendant had procured) had repudiated the letter in an interview with the Department); *United States v. Delgado,* 288 F.3d 49, 57 (1st Cir.2002) (Selya, J., concurring) (agreeing that, based on the binding decision of an earlier First Circuit panel, the district judge was permitted to rely on a hear-

### b. In Federal Sentencing Hearings, "Facts" Are *Not* Facts

Fact finding in a criminal case is grounded in the United States on constitutional bedrock. The right of confrontation of government witnesses,[86] the right to cross examine ("the greatest legal engine invented for the discovery of truth"),[87] and the right to compulsory process [88] are all designed to guarantee the integrity of the fact finding determination. In short, courts find facts based on evidence. Under the Guidelines, however, a criminal defendant is utterly stripped of these rights at sentencing, even though determinations there made may theoretically double or triple the sentence he receives upon the offense of conviction. When appellate courts speak of "facts" found during a sentencing hearing, therefore, they are guilty of far more than misnomer; they are evoking a constitutional process which they must know has no place in today's federal sentencing.[89]

### c. Indeed, the Guidelines Are Today *Not* "Guidelines" at All

Following the Feeney Amendment (discussed in Part One, Section 1.E below), the so-called Guidelines are not guidelines at all, but rather a complete criminal code, never enacted by the Congress,[90] and "in effect, a mandatory minimum sentencing system." [91] As a practical, functional matter, district judges are today afforded no discretion to sentence outside the narrow "guideline" range.[92] To call our present federal sentencing structure a "guidelines" system suggests that the district judge still plays a central role. She does not. Other than determining the controlling sentencing factors (and these, of course, can easily be manipulated by the Department as discussed above), the district judge's role today is purely mechanistic, applying arithmetically the sentencing factors derived from data largely (almost entirely) proffered by the Department. For these reasons, I have commenced routinely to call our sentencing structure the "so-called Sentencing Guidelines" or the "mechanistic approach to sentencing." Simple honesty requires it.

### d. Today, Many Federal Criminal "Trials" Are *Not* Trials at All

With the Department visiting drastic sanctions on those who exercise their

---

say police report in determining whether a crime to which the defendant had earlier pled guilty was a crime of violence, but noting that he would hold otherwise in the absence of such precedent).

86. U.S. Const. amend. VI.

87. 5 J. Wigmore, *Evidence* § 1367, at 32 (J. Chadbourn rev. ed.1974); U.S. Const. amend. VI.

88. U.S. Const. amend. VI. *But see United States v. Moussaoui*, 365 F.3d 292, 313–14 (4th Cir.2004) (holding, in a death penalty case, that the government need not permit witnesses the defendant calls to testify, if providing such information implicates national security concerns and if the government provides a substitute for such testimony that does not materially disadvantage the defendant).

89. The most that can be said is that the district judge has, in good faith, drawn certain conclusions by a fair preponderance of what appears to be the credible data before her. This is the form of words I now attempt to use during sentencing hearings.

90. *Cf. Mistretta*, 488 U.S. at 427, 109 S.Ct. 647 (Scalia, J., dissenting) (referring to the Sentencing Commission as a "junior-varsity congress").

91. Letter from Sen. Kennedy to Sen. Hatch of 4/1/03. *See* Part One, Section I.E.1, *infra*.

92. *See United States v. Roselli*, 366 F.3d 58, 67 (1st Cir.2004) (describing how review of a judge's decision whether to depart below the Guidelines range is now *de novo* under the Feeney Amendment).

Sixth Amendment right[93] to trial by jury and the federal plea rate at 96.6% and rising,[94] actual criminal trials are in steep decline. The statistics maintained by the Administrative Office of the United States Courts, however, seek to obscure this fact by recording as "trials" any hearing where evidence is received.[95] Thus, for federal court statistical purposes we count hearings on motions to suppress and even sentencing hearings where testimony is received as full blown "trials" even when they are nothing of the kind.[96] For increased accuracy, the District of Massachusetts keeps its own statistics on criminal trials.[97] While we have thus far collected less than one year's statistics in one district, our records indicate that 69 percent of our "trials" here in Massachusetts[98] are actual trials. If our experience is typical, the national statistics overstate the number of criminal trials by 31 percent.[99]

### 3. Symbolism

Judging is choice. Choice is power. Power is neither good nor evil, except as it is allocated and used.

Judging in a legal system is professional. Professionals, including judges, represent interests other than their own. One who accepts a professional role in a legal system accepts an obligation to confine the exercise of power within the limits of authority. For each professional role, the limits of authority are defined by law.[100]

This is the classic formulation of the judicial office as expressed by my colleague, Judge Robert Keeton. Judge James Zagel addresses the same point more succinctly. "Don't ignore the law,"

93. As of 1999, there was a 500 percent differential in punishment between those who exercised their rights and those who waived them and cooperated. *Berthoff*, 140 F.Supp.2d at 67–68 & n. 33 (citing and reproducing Report from United States Probation Dep't, District of Massachusetts (Dec. 2, 1999)); *see also* Part One, Section I.B, *supra*.

94. *See supra* Fig. 1.

95. *See* Administrative Office of the U.S. Courts, *Civil Statistical Reporting Guide* 3:18 (1999).

96. Scholars, quite properly, note and question the apparently deliberate inaccuracy in this statistical protocol of the Administrative Office. *See, e.g.,* Kevin M. Clermont & Theodore Eisenberg, *Litigation Realities*, 88 Cornell L.Rev. 119, 143 n. 131 (2002).

This anomaly may explain the apparent uptick in criminal "trials" in the wake of Attorney General Ashcroft's memorandum forbidding charge bargaining. *See* Ashcroft Memorandum, *supra*. Anecdotally, it appears that more defense counsel are filing motions to suppress (which count as "trials" when heard) in an effort to bring the Department back to the bargaining table. This "trend," if it is that, appears to be dissipating as Department attorneys in the field simply ignore the Attorney General's memorandum and continue to charge bargain. Actual criminal trials continue to decline nationwide.

97. An actual criminal trial is defined in Massachusetts as commencing with the taking of evidence after jeopardy has attached. Minutes of the Court Meeting (District of Massachusetts), Nov. 7, 2003, at 3.

98. We do not distinguish between actual civil and criminal trials.

99. Of course, to the extent one measures the prevalence of criminal trials by comparing resolution by plea bargain to resolution by trial, this overstatement is irrelevant. It is only when one is examining statistics on the number of "criminal trials" held, without reference to final resolution of criminal cases, that one has to take the overstatement into account.

100. Robert E. Keeton, *Keeton on Judging in the American Legal System* 5 (1999).

he says.[101] "If you can't perpetrate those errors the law requires, then get off the bench." [102]

Judges strive mightily to obey the law. They keep on striving long after that hallmark of judicial action—choice—has been wrested from them. So it is that probation officers keep churning out detailed pre-sentence reports that describe the offender's complete social and family history,[103] even though, in the vast majority of cases, none of this makes any difference today—and judges carefully read them as though it mattered.[104] So it is that judges engage in all manner of detailed sentencing hearings even though, in the end, they well know that they must at minimum respectfully consider the Department's wide-ranging proffer of data, even if it is utterly without formal evidentiary weight.[105] At least one judge in this District goes so far as to require full evidentiary hearings for sentencing, more akin to traditional trials,[106] but that is certainly not the norm. Finally, judges continue solemnly to impose sentence, look the offender in the eye, and explain their grounds even when all the details have been worked out between the Department and the defense attorney.

Most of this is sizzle, not steak; the trappings of judicial decisionmaking without its core reality.[107] Congress does not want to get rid of the symbolism of judicial sentencing, because that conveys to our people that there has been judgment, that there has been reflection, even when there has not.

Today, invocation of the traditional symbolism of sentencing when the underlying reality is so strikingly different has the perverse effect of unduly propping up a system that is "a massive exercise in hypocrisy." [108]

## E. From Pinnacle to Nuisance: the Feeney Amendment

At this point, the Court needs to recount the saddest and most counterproductive episode in the evolution of federal sentencing doctrine—the passage of the Feeney Amendment.[109]

Even the worst features of the Guidelines had been somewhat ameliorated by

101. James Zagel, *Money to Burn* 184 (2002).

102. *Id.*

103. *But see* Memorandum from Assistant Director John M. Hughes, Office of Probation and Pretrial Services, Administrative Office of the United States Courts, to the nation's Chief Probation Officers (May 11, 2004) (providing that due to Congress's unwillingness further to support the judicial role in sentencing (*see infra* note 103), the Criminal Law Committee of the Judicial Conference has been asked to consider "developing several types of presentence reports that vary in level of detail that judges can request in individual cases. The idea behind the 'menu' of reports is to enable judges to order the type of report that provides the minimum amount of information required for sentencing purposes").

104. *See, e.g., United States v. Pereira,* 272 F.3d 76, 83 (1st Cir.2001) (reversing downward departure based on family obligations under an abuse of discretion standard).

105. *See* Part One, Section I.D.2.a, *supra.*

106. This technique, although within the discretion of the district judge, *see United States v. McAndrews,* 12 F.3d 273, 279–80 (1st Cir. 1993), gives the Department fits (even as it begins to approach the constitutional standard, *see* Part Two, *infra* ) because it reduces the benefit the Department gains from the plea, as it must deploy resources in the courtroom that it would rather expend elsewhere.

107. *See* Stith & Cabranes, *supra,* at 82.

108. *Berthoff,* 140 F.Supp.2d at 64.

109. Pub.L. No. 108–21, § 401, 117 Stat. 650, 657 (2003).

the Supreme Court's decision in *Koon v. United States*,[110] which preserved a small modicum of discretion in the district court judiciary [111] to depart from the Guidelines in appropriate circumstances.[112] It thus could be said that, despite the sharply reduced role of the district court judge under the Guidelines, she was still at the pinnacle of the sentencing process as all plea bargaining had to take place "in her shadow." [113]

In early 2003, the Department and the leadership of the House Judiciary Committee set out to change this once and for all and further to enhance Departmental control over sentencing. The vehicle was a bill crafted by Jay Apperson, Chief Counsel to the House Judiciary Committee.[114] Its sponsor and principal spokesperson is Representative Thomas Feeney, hence the name the "Feeney Amendment." The premise of the Feeney Amendment is simple: federal district judges, soft on crime, have disregarded the congressional mandate and made unwarranted departures

downward from the Guidelines. Representative Feeney succinctly expressed this premise on the House floor, arguing that downward departures exceeded upward departures by a "33 to 1 ratio . . . in order to basically help convicted defendants." [115]

Tragically, the premise of the Feeney Amendment is simply wrong. It is contradicted by Congress's own study [116] and, what is more reprehensible, the Department well knows that the great majority of downward departures result from its own recommendations, made in order to secure more guilty pleas. Thus, Attorney General Ashcroft's repeated paroxysms of outraged rhetoric that such downward departures are "illegal" [117] does not square with the fact that his own attorneys were recommending most of them.[118]

## 1. The Legislation

The stark facts of the passage of the Feeney Amendment sadly demonstrate that today the district court judiciary is nothing more than a nuisance to the De-

---

**110.** 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996).

**111.** *See United States v. Diaz–Villafane*, 874 F.2d 43, 49–50 (1st Cir.1989) (precursor of *Koon* in the First Circuit); *see also* Justice Stephen Breyer, *Federal Sentencing Guidelines Revisited*, 14 Crim. Just. 28, 29 (1999) (discussing the importance of preserving district courts' discretion to depart from the Guidelines range in unusual cases).

**112.** *See* Hon. Patti B. Saris, *Below the Radar Screens: Have the Sentencing Guidelines Eliminated Disparity? One Judge's Perspective*, 30 Suffolk U.L.Rev. 1027, 1029 (1997) (stating that *Koon* "has sent a strong message reaffirming the traditional discretion of the sentencing district court to individualize sentencing where warranted").

**113.** This memorable phrase is borrowed from the famous article. *See* Robert H. Mnookin & Lewis Kornhauser, *Bargaining in the Shadow of the Law: The Case of Divorce*, 88 Yale L.J. 950 (1979).

**114.** Michael S. Gerber, *Down with Discretion*, Legal Affairs, Mar./Apr.2004, at 73.

**115.** 149 Cong. Rec. H2422 (daily ed. Mar. 27, 2003) (statement of Rep. Feeney).

**116.** *See* U.S. General Accounting Office, *supra*, at App.VI, 77 (Comments from the Judicial Conference Committee on Criminal Law) (noting how the GAO report demonstrates "that judges are not exercising departure authority in violation of the letter or the spirit of the Sentencing Reform Act of 1984"); *see generally id.* at 77–80.

**117.** *See, e.g.,* Letter from Acting Assistant Attorney General Brown to Sen. Hatch of 4/04/03, *reprinted in* 15 Fed. Sent. Rep. 355 (2003) (repeatedly referring to "illegal" downward departures).

**118.** This Court, of course, speculates neither that the Attorney General was ill-informed nor that he was misleading Congress.

partmental drive to control all aspects of sentencing. They are these:

Congress had before it a carefully crafted, bipartisan bill designed to afford better protections to child victims of kidnaping and sexual assault.[119] This bill contained the popular AMBER alert provisions supported by the law enforcement community.

As originally drafted, the Feeney Amendment severely restricted downward departures to a scant few specifically enumerated grounds, required judges to give specific reasons for downward departures, legislatively overruled *Koon* as to both matters of law and fact by subjecting downward departures to *de novo* review in the courts of appeals, conferred on the Department the right to determine whether an offender's sentence ought be reduced for acceptance of responsibility, capped at three the judicial members of the seven person Sentencing Commission to further marginalize the judicial voice, and—apparently disgusted at the conduct of this Court [120]—prevented any downward departure after remand upon an alternate theory.[121]

The amendment was "added to the PROTECT Act at the last minute and ... kept under wraps until just before [that] bill was scheduled to go to the House floor," [122] at which time Representative Feeney introduced it and argued in its support.[123] Representative Robert Scott presciently observed that the amendment effectively turned the Guidelines into a scheme of mandatory minimum sentences and decried such drastic changes to federal sentencing policy without any hearings or markups.[124] "The purpose of the sentencing commission is to get away from the floor amendments and the sound bites," he argued.[125] After a twenty minute debate, the House adopted the Feeney Amendment 357–58.[126]

This last minute addition to the PROTECT Act next went to the House–Senate Conference Committee considering that act. The Conference Committee report tweaked the original version slightly.

The outright restriction on downward departures was limited to crimes against children and sex offenses,[127] only the propriety of the ultimate sentencing decision was to be reviewed *de novo* by the courts of appeals,[128] and only the third level of reduction in sentence was to be shifted to the determination of the Department.[129] The chief judge in each district court was made responsible for insuring compliance

119. *See* 149 Cong. Rec. S9115 (daily ed. June 9, 2003) (statement of Sen. Leahy) (characterizing the AMBER Alert bill as "non-controversial" and "bipartisan").

120. In one case, this Court departed downward, was reversed, and then departed downward on other grounds, only to be reversed again. *See United States v. Bogdan*, 302 F.3d 12, 14–15, 17 (1st Cir.2002).

121. *See* H.R. 1104, 108th Cong. (2003) (original version of the Feeney Amendment).

122. Jacob Krawitz & Craig Friedman, *The Feeney Amendment*, Pt.3, MCLE Fed. Jud. Forum, at Part III (forthcoming Nov. 2004); *see also* Alan Vinegrad, *The New Federal Sentencing Law*, *supra*, at *7; Gerber, *supra*, at 72.

123. 149 Cong. Rec. H2420 (daily ed. Mar. 27, 2003) (statement of Rep. Feeney).

124. *Id.* at H2423 (statement of Rep. Scott).

125. *Id.* at H2424.

126. 149 Cong. Rec. H2436. One representative answered "present" and 18 did not vote.

127. 149 Cong. Rec. S5115 (daily ed. April 10, 2003) (statement of Sen. Hatch).

128. *Id.*

129. *See* Pub.L. No. 108–21, § 401(g).

with the reporting requirements,[130] and the Sentencing Commission was ordered to study downward departures, develop specific measures to prevent "abuse,"[131] and "ensure that the incidence of downward departures is substantially reduced" in all cases, and report back to Congress.[132] The remaining provisions, applying to all criminal cases, were left substantially unchanged.

The Conference Committee Report modifying the Feeney Amendment engendered minimal discussion within the Congress. Senator Kennedy charged that the amendment was tantamount to enacting mandatory minimum sentences across the board.[133] Senator Hatch maintained that the amendment's reach was far more modest.[134] Unchallenged—and unheeded— were Senator Kennedy's observations as a principal drafter of the Sentencing Reform Act of 1984 that the Feeney Amendment

fundamentally altered a supposedly "guidelines" structure[135] and Representative William Delahunt's pointed reference to the fact that the Department itself had requested 79 percent of the nearly 20,000 downward departures granted in 2001.[136] Piggybacked onto the popular and necessary PROTECT Act, the Feeney Amendment passed 98 to 0 in the Senate[137] and 400 to 24 in the House.[138] The President signed the bill into law on April 30, 2003.[139]

## 2. The Judicial Response

Although the judicial response to the Feeney Amendment has been uniformly negative,[140] it would add nothing to this opinion to rehearse it here. Since the proper sentencing of offenders is, however, an ongoing judicial obligation and central responsibility, it is important, before turning to constitutional analysis, to limn this Court's institutional accommodations to

130. *Id.* § 401(h).

131. 149 Cong. Rec. S5115 (daily ed. April 10, 2003) (statement of Sen. Hatch).

132. Pub.L. No. 108–21, § 401(m).

133. 149 Cong. Rec. S5134 (daily ed. April 10, 2003) (statement of Sen. Kennedy).

134. *See id.* at S5115 (statement of Sen. Hatch) ("It is important to note that the compromise restricts downward departures in serious crimes against children and sex crimes and does not broadly apply to other crimes, but because the problem of downward departures is acute across the board, the compromise proposal would direct the Sentencing Commission to conduct a thorough study of these issues, develop concrete measures to prevent this abuse, and report these matters back to Congress.").

135. 149 Cong. Rec. S6711 (daily ed. May 20, 2003) (statement of Sen. Kennedy). Senator Kennedy pointed out later that the Conference Committee Report for the Sentencing Reform Act of 1984 (which gave birth to the Guidelines) anticipated a departure rate of approximately 20 percent, twice the present

day departure rate over Department objection. *Id.* at S6712.

136. 149 Cong. Rec. H3074 (daily ed. Apr. 10, 2003) (statement of Rep. Delahunt).

137. U.S. Senate Roll Call Votes 108th Congress—1st Session on S. 151, *at* http://www.senate.gov.

138. Final Vote Results for Roll Call 127 on S. 151, *at* http:// clerk.house.gov/evs/2003/roll127.xml. Two representatives answered "present" and eight did not participate.

139. Pub.L. No. 108–21, § 401, 117 Stat. 650, 657 (2003).

140. *See, e.g.,* Vinegrad, *The Judiciary's Response to the Protect Act, supra,* at 4; Edward Walsh & Dan Eggen, *Ashcroft Orders Tally of Lighter Sentences; Critics Say He Wants "Blacklist" of Judges,* Wash. Post, Aug. 7, 2003, at A1 (describing a letter from Chief Justice Rehnquist to Senator Leahy, stating that the Feeney Amendment "would seriously impair the ability of courts to impose just and reasonable sentences").

the Congressional command. These can best be understood with reference to the disparate tacks being taken by other courts and judges.

### a. Videotaping Sentencing Hearings

In *In re Sentencing*,[141] Judge Jack Weinstein ordered videotaping of all sentencing hearings due to the Feeney Amendment's requirement that appellate courts conduct *de novo* review of a district court's departure from the Guidelines.[142] Judge Weinstein found videotaping necessary to allow appellate courts the opportunity to see the actual individuals they are sentencing because to require the offender and various witnesses to appear again before the appellate court "would be too awkward and time consuming."[143] In his opinion, Judge Weinstein noted:

> The defendant's words, his facial expressions and body language, the severity of any infirmity, the depth of his family's reliance, or the feebleness of his build cannot be accurately conveyed by a cold record. Many defendants are ill educated and inarticulate. They do not have the intellectual capacity to articulate, as might a great novelist, what is in their hearts. They are, after all, mere people.[144]

In short, videotaping each sentencing hearing will "capture, as much as it is possible to do so, the real world humanity that the district court judge confronts."[145] Judge Weinstein rejected any notion that he was trying to be provocative in his order: "I'm trying to conform to the statute and assist the court of appeals in doing what it was required to do under the statute."[146]

These measures appear unnecessary in the First Circuit, where the Feeney Amendment has already been construed so as to continue to permit deferential appellate review to the "factual" conclusions drawn by district judges from the records before them during sentencing.[147]

### b. Sealing Court Documents

In response to the Feeney Amendment's demand that Congress have access to court related documents, Judge Sterling Johnson, Jr. from the Eastern District of New York ordered the United State Probation Office to seal all presentencing reports, plea agreements, and any relevant sentencing documents of any case pending before him.[148] Furthermore, the Commission is the only party that can unseal the documents, for its eyes only—any other party must apply and receive an order from the Court to unseal the documents.[149] Judge Johnson acknowledges "his public flaunting of the [Feeney Amendment]," but simply stated, " 'if Congress wants to make a deck of cards for the judges like

141. 219 F.R.D. 262 (E.D.N.Y.2004).

142. *See* 18 U.S.C. § 3742(e) (2004).

143. 219 F.R.D. at 262.

144. *Id.* at 264.

145. *Id.* at 265.

146. Leonard Post, *Two U.S. Judges Fire at "Feeney": Videotaped Sentences in Brooklyn and a Resignation in Pittsburgh,* Nat'l L.J., Feb. 9, 2004, at 4.

147. *Thurston,* 358 F.3d at 77.

148. Amended Admin. Order 2004–04, *In the Matter of the Sealing of All Pre–Sentence Reports, Plea Agreements and All Other Relevant Sentencing Documents for All Criminal Cases Pending Before the Honorable Sterling Johnson Jr.* (E.D.N.Y. Apr. 7, 2004), *available at* http://www.nyed.uscourts.gov/adminorder04–04.pdf.

149. *Id.*

they did for the bad guys in Iraq, then make me the ace of spades.' "[150]

With all respect to the distinguished judge, here in the District of Massachusetts—save for the necessary security concerns involving individual offenders[151]—we have voted to make the criminal sentencing processes as transparent and public as possible. To that end, contrary to Judicial Conference Policy,[152] we generally make public the statement of reasons for any criminal sentence.[153] We were among the first districts to include criminal proceedings on the federal judiciary's national—albeit sadly flawed—electronic database.[154]

### c. "I am not intimidated but I am obedient."

Much has been said, and written, following the passage of the Feeney Amendment, concerning its intimidating effect on the federal judiciary.[155] The most poignant example is found in *United States v. Kirsch*.[156] Judge Paul Magnuson of the District of Minnesota refused to grant a defendant's motion for a downward departure, reasoning in part:

The Court believes that the day of the downward departure is past. Congress and the Attorney General have instituted policies designed to intimidate and threaten judges into refusing to depart downward, and those policies are working. If the Court were to depart, the Assistant U.S. Attorney would be required to report that departure to the U.S. Attorney, who would in turn be required to report to the Attorney General. The Attorney General would then report the departure to Congress, and Congress could call the undersigned to testify and attempt to justify the departure. This reporting requirement system accomplishes its goal: the Court is intimidated, and the Court is scared to depart. The reporting requirement has another, more invidious effect. Although the Court has a high regard for the Assistant U.S. Attorney who prosecuted this matter, there will be other cases in which the prosecutor will misuse his or her authority. Due to the requirement of reporting departures that is now in place, Courts are no longer able to stop that abuse of power.

150. Vinegrad, *The Judiciary's Response to the PROTECT Act, supra,* at 4.

151. We keep pre-sentence reports secure and non-public (although they are available to the Sentencing Commission pursuant to 28 U.S.C. § 995(a)(1)) and, in the interests of justice, any judge may, of course, seal the statement of reasons portion of the judgment in a criminal case. *See* Minutes of the Court Meeting (District of Massachusetts), Sept. 4, 2001, at 4.

152. *Judicial Conference Policy Statement, Report of the Proceedings of the United States Judicial Conference,* March 14, 2001, at 14.

153. *See* Minutes of the Court Meeting (District of Massachusetts), Sept. 4, 2001, at 4.

154. *Id.*

155. *See, e.g.,* Chief Justice William H. Rehnquist, Remarks to the Federal Judges Association Board of Directors Meeting (May 5, 2003), *available at* http://www.supremecourtus.gov/publicinfo/speeches/sp_05-05-03.html (warning that the reporting required by the Feeney Amendment "could amount to an unwarranted and ill-considered effort to intimidate individual judges in the performance of their judicial duties"); *An Ominous Attack on Judges,* N.Y. Times, Apr. 7, 2003, at A18; Andrew Cohen, *The Umpire Strikes Back,* Am. Prospect, Mar. 2004, at 15; Linda Greenhouse, *Chief Justice Attacks a Law as Infringing on Judges,* N.Y. Times, Jan. 1, 2004, at A14; *Martin, supra,* at A31 (criticizing the Feeney Amendment as an "effort to intimidate judges to follow sentencing guidelines"); Vinegrad, *The Judiciary's Response to the PROTECT Act, supra,* at 4.

156. 287 F.Supp.2d 1005 (D.Minn.2003)

The reporting requirements will have a devastating effect on our system of justice which, for more than 200 years, has protected the rights of the citizens of this country as set forth in the Constitution. Our justice system depends on a fair and impartial judiciary that is free from intimidation from the other branches of government.[157]

I know Judge Magnuson well. He is one of America's foremost jurists, a longtime leader within the federal judiciary, and a mentor and exemplar of judicial independence to the judiciaries of many other nations. If he is "intimidated" and "scared," we have come to a sorry pass.

I do not feel intimidated. The constitutional protections designed to insure an independent judiciary[158] seem adequate to the present day. I am, however, obedient to the congressional will. The passage of the Feeney Amendment (with all its demeaning provisions and legislative history) by overwhelming majorities in both houses of the Congress manifests an inveterate hostility by the Congress to *any* downward departures from the so-called Sentencing Guidelines which the Department does not itself approve. Functionally, therefore, these so-called "Guidelines" have become case discrete minimum mandatory sentences. So be it.

So long as Congress legislates within the broad parameters of the United States Constitution, this Court simply "works for" the Congress, explaining and giving life and effect to its mandates in individual cases. Obedient to the congressional will, therefore, I shall hereafter substitute for the longstanding rule of lenity in interpreting criminal statutes what I will call a "rule of severity" in exercising my limited discretion as to the remaining permitted grounds for an "unguided" downward departure. I shall, accordingly, grant no "unguided" downward departures save upon the most clear and compelling grounds.

Congress has given unmistakable indication of its intent to legislate to the limits of its constitutional power. The only remaining questions, therefore, are constitutional ones.

### F. Conclusion

By collaborating to substitute Department-driven bargaining for adjudication in determining guilt and sentencing, all three branches of government—legislative, executive, and judicial—have severely corroded core constitutional values. The result is the sorry spectacle limned above. This is what passes for justice in the federal courts today.

It is not.

We can do so much better.

We should.

The Constitution of the United States commands it.

### PART TWO: THE CONSTITUTIONAL MANDATE

■ The Court has described the reality of criminal sentencing under the Guidelines not merely to demonstrate that the current system represents unsound policy,

---

157. *Id.* at 1006–07. Learning of Judge Magnuson's opinion, Representative Feeney fired back this barb: "I would remind the judge that he ought to get out the Constitution, where it's very clear that other than the United States Supreme Court, all of the other federal courts are only established by the will of the United States Congress." Elizabeth Stawicki, Minnesota Public Radio, *Judge Speaks Out Against Congress, Ashcroft*, Oct. 22, 2003, *at* http://news.minnesota. publicradio.org/features/2003/10/22_stawickie_sentencing/.

158. U.S. Const. art. III, § 1.

but also to lay the foundation for a discussion of its failure to comply with the United States Constitution. The Court holds that the Guidelines system violates the constitutional rules announced in *Apprendi v. New Jersey*[159] and *Ring v. Arizona.*[160] Although this conclusion does not depend on any empirical assertions, an understanding of how the Guidelines have worked in practice makes it easy to see that the concerns that animate these constitutional rulings are real, not hypothetical.

Moreover, the Guidelines raise other constitutional concerns, and although the Court does not reach these concerns at present, the "facts on the ground" show why it may be appropriate for courts to address them in the future. First of all, it may be that the empirical assumptions under which the Supreme Court upheld the Guidelines against a separation of powers challenge in *Mistretta v. United States*[161] are no longer valid, if indeed they ever were. Second, it may be that the regime produced by the Guidelines, taken together with other changes in federal law regarding aspects of the criminal process, ranging from investigation of crimes to collateral attack on criminal convictions, produces a collective violation of numerous constitutional provisions. Again, an examination of how these provisions operate in practice is necessary to explain why this may be so.

With that, the Court turns to its analysis of *Apprendi* and *Ring.*

## I. The Guidelines Violate *Apprendi*

### A. The Consensus View

It may seem well-settled at this point that the Guidelines do not violate *Apprendi*, at least so long as sentencing enhancements do not exceed the maximum sentence available under the statute defining the crime of conviction. All of the Courts of Appeals that have general jurisdiction over criminal matters, including the First Circuit, have held as much.[162] Each of them has reaffirmed this understanding since the Supreme Court decided *Ring* (June 24, 2002), although none of them appears to have considered the possibility that *Ring* might require a different result.[163] The only authority to the contrary

159. 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

160. 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

161. 488 U.S. 361, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989).

162. *See United States v. Caba,* 241 F.3d 98, 101 (1st Cir.2001); *see also United States v. Ochoa,* 311 F.3d 1133, 1134–36 (9th Cir.2002) (citing *United States v. Buckland,* 289 F.3d 558, 564–66 (9th Cir.2002) (en banc)); *United States v. Tarwater,* 308 F.3d 494, 517 (6th Cir.2002); *United States v. Diaz,* 296 F.3d 680, 683 (8th Cir.), *cert. denied,* 537 U.S. 940, 123 S.Ct. 43, 154 L.Ed.2d 247 (2002); *United States v. Norris,* 281 F.3d 357, 360–61 (2d Cir.2002); *United States v. Fields,* 251 F.3d 1041, 1043–44 (D.C.Cir.2001); *United States v. Jackson,* 240 F.3d 1245, 1249 (10th Cir. 2001); *United States v. Kinter,* 235 F.3d 192,

201 (4th Cir.2000); *United States v. Nealy,* 232 F.3d 825, 829 n. 3 (11th Cir.2000); *United States v. Doggett,* 230 F.3d 160, 165 (5th Cir.2000); *United States v. Mack,* 229 F.3d 226, 235 n. 12 (3d Cir.2000); *id.* at 244 (Becker, C.J., concurring); *Talbott v. Indiana,* 226 F.3d 866, 869 (7th Cir.2000).

163. *See, e.g., United States v. Casas,* 356 F.3d 104, 128 (1st Cir.2004); *see also, e.g., United States v. Merritt,* 361 F.3d 1005, 1015 (7th Cir.2004); *United States v. Pettigrew,* 346 F.3d 1139, 1147 n. 18 (D.C.Cir.2003); *United States v. Floyd,* 343 F.3d 363, 372 (5th Cir. 2003); *United States v. Banks,* 340 F.3d 683, 684–85 (8th Cir.2003); *United States v. Parmelee,* 319 F.3d 583, 592 (3d Cir.2003); *United States v. Ortiz,* 318 F.3d 1030, 1039 (11th Cir.2003); *Ochoa,* 311 F.3d at 1134–36 (9th Cir.); *United States v. Luciano,* 311 F.3d 146, 153 (2d Cir.2002); *Tarwater,* 308 F.3d at 517 (6th Cir.); *United States v. Mendez–Zamora,*

is *State v. Gould*,[164] a Kansas Supreme Court decision invalidating a state sentencing guidelines system that resembles the federal one.[165]

This Court has an obligation to follow First Circuit precedent, and, even if there were no First Circuit precedent on point, it would rarely be appropriate for this Court to take a position contrary to the unanimous view of all the other circuits. It does not appear to the Court, however, that the reasoning laid out below has ever been explored, much less rejected, by any federal appellate court in this country. When an appellate court rejects a constitutional challenge to a statute, it does not foreclose all future constitutional challenges. It does not even foreclose all future challenges based on the particular constitutional provision or precedent invoked. Rather, the court rejects a specific argument or arguments as to why the particular constitutional provision or precedent involved renders the statute unconstitutional. When appellate courts emphasize the limits of their constitutional holdings, they are merely making explicit what is always implicit.

Moreover, the Court has a duty to follow the relevant Supreme Court precedents, and those precedents compel the conclusions the Court reaches below. Of course, if the First Circuit had interpreted those precedents in a contrary manner, this Court would be bound to follow the First Circuit's interpretation, no matter how strongly it might disagree. When the First Circuit has yet to address a particular argument based on those precedents,

however, even if it has held that those precedents do not invalidate the Guidelines, the courts in this District may entertain such an argument. Obviously, in so doing, this Court must proceed with due regard for the considered view of the First Circuit and its sister circuits regarding related arguments.

## B. The Limitations that *Apprendi* and Its Progeny Have Placed on Legislative Definition of Crimes

In determining what consequences *Apprendi* and *Ring* have for the Guidelines, the Court must begin by examining what limits the Constitution places on the power of Congress to marginalize the American jury. The Supreme Court is currently considering a similar question in the case of *Blakeley v. Washington*:[166] whether a state legislature has the power to do by statute what the United States Sentencing Commission has done through promulgation of the Guidelines.[167] As the Court explains, Congress lacks the power to enact the substance of the Guidelines into law, and therefore lacks the power to delegate the enactment of the Guidelines to a governmental agency, even if it is located within the Judicial Branch.

### 1. Pre-*Apprendi* Case Law

Any explanation of how *Apprendi* and *Ring* apply to the Guidelines must begin with an understanding of earlier case law. The Court therefore begins its discussion

---

296 F.3d 1013, 1020 (10th Cir.2002); *United States v. Cannady*, 283 F.3d 641, 649 & n. 7 (4th Cir.2002).

**164.** 271 Kan. 394, 23 P.3d 801 (2001).

**165.** *Id.* at 410–14, 23 P.3d 801

**166.** Case No. 02–1632, 2004 WL 728362 (argued Mar. 23, 2004).

**167.** *See State v. Blakely*, 111 Wash.App. 851, 47 P.3d 149 (2002), *review denied*, 148 Wash.2d 1010, 62 P.3d 889 (2003), *cert. granted*, 540 U.S. 965, 124 S.Ct. 429, 157 L.Ed.2d 309 (2003).

with *In re Winship*,[168] where the Supreme Court held "that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."[169] As the Supreme Court explained: "The [reasonable doubt] standard provides concrete substance for the presumption of innocence—that bedrock axiomatic and elementary principle whose enforcement lies at the foundation of the administration of our criminal law."[170] By reducing the risk that an individual will be convicted in error, use of the reasonable doubt standard serves three ends of surpassing importance. First, it protects individuals from unjustified deprivation of their liberty and imposition of the stigma that attaches to criminal convictions.[171] Second, it "is indispensable to command the respect and confidence of the community in applications of the criminal law."[172] Third, it ensures that "every individual going about his ordinary affairs ha[s] confidence that his government cannot adjudge him guilty of a criminal offense without convincing a proper factfinder of his guilt with utmost certainty."[173]

Since then, the Supreme Court has provided further clarification as to what constitutes a "fact necessary to constitute the crime with which [an individual] is charged."[174] The first important divide is between facts that constitute elements of a crime, which the government must prove beyond a reasonable doubt, and facts that constitute a defense to a crime, which a legislature can require a defendant to prove, typically by a preponderance of the evidence. The Supreme Court's divergent responses to two similar statutory regimes for murder prosecutions demonstrate the principles that inform this inquiry.

Under the Maine approach that the Supreme Court invalidated in *Mullaney v. Wilbur*,[175] the law recognized two types of homicide—manslaughter and murder.[176] Both required the killing in question to be unlawful and intentional, but only the latter required the additional element of malice aforethought.[177] Once the government proved beyond a reasonable doubt that a killing was unlawful and intentional, however, malice aforethought was to be conclusively presumed unless the defendant proved by a preponderance of the evidence that he acted in the heat of passion on sudden provocation.[178] The Supreme Court adopted Maine's highest court's interpretation of Maine law, wherein murder and manslaughter were punishment categories for the single crime of "felonious homicide."[179] The Supreme Court then explained that Maine law "is concerned not only with guilt or innocence in the abstract but also with the degree of criminal culpa-

---

168. 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

169. *Id.* at 364, 90 S.Ct. 1068.

170. *Id.* at 363, 90 S.Ct. 1068 (quoting *Coffin v. United States*, 156 U.S. 432, 453, 15 S.Ct. 394, 39 L.Ed. 481 (1895)) (internal quotation marks omitted).

171. *See id.* at 363–64, 90 S.Ct. 1068.

172. *Id.* at 364, 90 S.Ct. 1068.

173. *Id.*

174. *Id.*

175. 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975).

176. *Mullaney*, 421 U.S. at 685–86 & nn. 1–3, 95 S.Ct. 1881.

177. *Id.*

178. *Id.* at 686–87 & nn. 5–6, 95 S.Ct. 1881.

179. *Id.* at 689–91, 95 S.Ct. 1881.

bility,"[180] and pointed out that "if *Winship* were limited to those facts that constitute a crime as defined by state law, a State could undermine many of the interests that decision sought to protect ... [by] redefin[ing] the elements that constitute different crimes, and characterizing them as factors that bear solely on the extent of punishment."[181] Because *"Winship* is concerned with substance rather than this kind of formalism[,] ... [and] requires an analysis that looks to the operation and effect of the law as applied and enforced by the state, and to the interests of both the State and the defendant as affected by the allocation of the burden of proof,"[182] the Supreme Court held that under Maine's system, the absence of heat of passion upon sudden provocation would have to be proved by the government beyond a reasonable doubt.[183]

In *Patterson v. New York*,[184] however, the Supreme Court upheld the validity of the New York system, under which malice aforethought did not constitute an element of second-degree murder, but a defendant could have his conviction reduced to voluntary manslaughter if he proved the affirmative defense that he "acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse."[185] The Supreme Court emphasized that beyond intent to kill and

causation, "[n]o further facts are either presumed or inferred in order to constitute the crime" of second-degree murder.[186] It also noted that the affirmative defense constituted "a substantially expanded version of the older heat-of-passion concept,"[187] and concluded that New York ought not have to choose between "abandoning [affirmative] defenses [within its criminal code] or undertaking to disprove their existence in order to convict of a crime which otherwise is within its constitutional powers to sanction by substantial punishment."[188] It distinguished *Mullaney* on the grounds that unlike New York, Maine had decided that malice aforethought was a fact of sufficient importance to include it in the definition of murder, and that having done so, it had to prove that fact beyond a reasonable doubt.[189] Still, "there are obviously constitutional limits beyond which the States may not go" in "reallocat[ing] burdens of proof by labeling as affirmative defenses at least some elements of the crimes now defined in their statutes."[190]

It is difficult to see any practical difference between the statutes in *Mullaney* and *Patterson*, so it seems that, read together, they place few substantive limits on the power of legislatures to define "fact[s] necessary to constitute the crime with which [an individual] is charged,"[191]

---

180. *Id.* at 697–98, 95 S.Ct. 1881.

181. *Id.* at 698, 95 S.Ct. 1881.

182. *Id.* at 699, 95 S.Ct. 1881 (quoting *St. Louis Southwestern Ry. Co. v. Arkansas*, 235 U.S. 350, 362, 35 S.Ct. 99, 59 L.Ed. 265 (1914)) (internal quotation marks omitted).

183. *Id.* at 704, 95 S.Ct. 1881.

184. 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977).

185. *Patterson*, 432 U.S. at 198–200 & nn. 2–3, 97 S.Ct. 2319 (quoting N.Y. Penal Law

§ 125.25 (McKinney 1975)) (internal quotation marks omitted).

186. *Id.* at 205–06, 97 S.Ct. 2319.

187. *Id.* at 207, 97 S.Ct. 2319.

188. *Id.* at 207–08, 97 S.Ct. 2319.

189. *See id.* at 214–16, 97 S.Ct. 2319.

190. *Id.* at 210, 97 S.Ct. 2319.

191. *Winship*, 397 U.S. at 364, 90 S.Ct. 1068.

at least as between "elements" and "defenses." [192] Essentially, under these two cases courts will first determine whether, under the terms set by a State's law, the legislature has complied with *Winship*. If the State passes that test, then the Court will determine, guided by history, tradition, and the common law, as well as some consideration of practical consequences, whether the State has gone "too far" in arranging its criminal law to evade *Winship*. [193]

The Supreme Court's approach can best be understood as a response to two problems that arise with some frequency when determining what substantive limits the Constitution places on legislative power: the problem of circularity and the difficulty of creating judicially manageable standards. Much like the concepts of "property" and "contract," "crime" is a creature of positive law, created by the state. It is difficult to determine whether a defense defined in a statute is in "essence" an element of a crime without making some reference to positive law, just as it is difficult to determine whether a regulation constitutes a taking of private property [194] or "impair[s] the Obligation of Contracts," [195] without looking to the entitlements that the law of property and contract create. [196] Even when one relies on history, tradition, and the common law in evaluating the constitutionality of making a fact a "defense" rather than an element, it can be difficult to separate the familiar from the necessary, and the judicial mistakes typified by *Lochner v. New York* [197] advise one to use caution in asserting that a particular governmental action is beyond the reasonable bounds of legitimacy.

In areas where a circularity problem exists, or where the constitutional limitation is at best vague, it is often difficult to construct judicially manageable standards. [198] With respect to elements and

192. *See* Note, *The Unconstitutionality of Determinate Sentencing in Light of the Supreme Court's "Elements" Jurisprudence,* 117 Harv. L.Rev. 1236, 1238 (2004) [hereinafter *Unconstitutionality of Determinate Sentencing* ].

193. *Cf. Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922) ("The general rule at least is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking.").

194. *See* U.S. Const. amend. V.

195. *Id.* art. I, § 10, cl. 1.

196. *Cf. Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1034–35, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) (Kennedy, J., concurring in the judgment) (explaining the circularity problem in takings cases, and noting its existence in areas such as Fourth Amendment limitations on searches).

197. 198 U.S. 45, 56–63, 25 S.Ct. 539, 49 L.Ed. 937 (1905).

198. For example, Courts have long struggled to determine the limits of Congress's power under the Commerce Clause. *See United States v. E.C. Knight Co.,* 156 U.S. 1, 12–13, 15 S.Ct. 249, 39 L.Ed. 325 (1895) (distinguishing between "commerce" and "manufacture," and holding that Congress lacked power to regulate the latter); *Wickard v. Filburn,* 317 U.S. 111, 128–29, 63 S.Ct. 82, 87 L.Ed. 122 (1942) (demonstrating the outer limits of the rule that Congress may regulate activities that "substantially affect" commerce); *United States v. Lopez,* 514 U.S. 549, 567–68, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (striking down a statute that exceeded Congress's power under the Commerce Clause, and admitting that the formulations governing the limits of the Commerce Clause cannot "in the nature of things" be precise). As the Court has already suggested, the Takings Clause involves similar difficulties. *See* Frank I. Michelman, *Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law,* 80 Harv. L.Rev. 1165, 1245–53 (1967) (discussing the difficulty courts have in deciding when governmental interference with property rights requires compensation). Other areas where courts have struggled include the First Amendment (particularly in the area of ob-

defenses, history and tradition made clear that the Constitution permitted some facts to be treated as defenses, for which the defendant would bear the burden of proof, but there was little evidence of a particular principle guiding the division between elements and defenses, much less that such a principle was of a constitutional magnitude. Criminal law covers numerous areas of human experience, and is constantly evolving, making a single determinate test for "elementness" all the more elusive. As it has elsewhere, the Supreme Court has set down per se rules to enforce *Winship's* protections where it can, and has otherwise fallen back on vaguer standards that permit greater legislative latitude. The division between "elements" and "defenses" falls into this latter category.

In *McMillan v. Pennsylvania*,[199] the Supreme Court, "for the first time, coined the term 'sentencing factor' to refer to a fact that was not found by a jury but that could affect the sentence imposed by the judge."[200] In *McMillan*, the Supreme Court upheld a Pennsylvania law that required imposition of a mandatory minimum sentence of five years if a sentencing judge found by a preponderance of the evidence that an individual convicted of one of certain enumerated felonies had "visibly possessed a firearm" while committing the

offense.[201] In no case would this minimum sentence exceed the maximum sentence provided for the enumerated felonies.[202] The Supreme Court articulated and applied "a multifactor set of criteria for determining whether the *Winship* protections applied to bar such a system,"[203] emphasizing that constitutional limits existed on States' ability to evade *Winship* by defining "true" elements as sentencing factors.[204] Specifically, the Supreme Court noted that "[t]he statute gives no impression of having been tailored to permit the visible possession finding to be a tail which wags the dog of the substantive [criminal] offense," and that the petitioners would have a stronger argument if the finding "exposed them to greater or additional punishment."[205] Having upheld the statute, the Supreme Court established that, unlike an element, a sentencing factor need not be proved beyond a reasonable doubt, and unlike an element or a defense, it need not be proved to a jury. The Supreme Court has since employed *McMillan's* approach on several occasions to determine whether a particular fact should be treated as an element or a sentencing factor.[206]

As with the division between "elements" and "defenses," the Supreme Court chose to rely on a permissive and somewhat

---

scenity), the Fourth Amendment prohibition against unreasonable searches or seizures, the Eighth Amendment Prohibition against cruel and unusual punishment, and unenumerated fundamental rights protected under the Due Process Clauses of the Fifth and Fourteenth Amendments, to name a few.

**199.** 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986).

**200.** *Apprendi*, 530 U.S. at 485, 120 S.Ct. 2348.

**201.** *McMillan*, 477 U.S. at 81, 106 S.Ct. 2411.

**202.** *Id.* at 81–82, 106 S.Ct. 2411.

**203.** *Apprendi*, 530 U.S. at 486, 120 S.Ct. 2348 (citing *McMillan*, 477 U.S. at 86–88, 106 S.Ct. 2411).

**204.** *McMillan*, 477 U.S. at 85–88, 106 S.Ct. 2411.

**205.** *Id.* at 88, 106 S.Ct. 2411.

**206.** *See Harris v. United States*, 536 U.S. 545, 552–56, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002); *Jones v. United States*, 526 U.S. 227, 232–52, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999); *Almendarez–Torres v. United States*, 523 U.S. 224, 228–47, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998).

vague standard in ensuring that use of sentencing factors to limit the lower end of statutorily prescribed sentencing ranges complies with *Winship*. *McMillan* left open the possibility, however, that a different sort of rule might govern situations where sentencing factors affected the upper end of sentencing ranges.

### 2. *Apprendi* and Its Progeny

In the landmark case of *Apprendi v. New Jersey*, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." [207] The Court considered this a consequence of the Due Process Clause of the Fourteenth Amendment, which prohibits any deprivation of liberty without due process of law, and of the Sixth Amendment, which guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury." [208]

*Apprendi* dealt with a New Jersey law that permitted a sentencing judge to enhance a convicted criminal's sentence upon a finding by a preponderance of the evidence that the offense was committed with a racially biased purpose. [209] Apprendi had been convicted of two second-degree felonies, each of which had a sentencing range of five to ten years, and a third-degree felony which carried a three-to-five-year sentence that would run concurrently with the other two. [210] The trial judge found racial bias, and therefore imposed a twelve-year sentence on one of the second-degree felony counts. [211] Thus, for that sentence, the sentencing factor had led to a higher sentence than was permitted under the criminal statute defining the second-degree felony.

In holding that this regime was unconstitutional, the Supreme Court emphasized that "the relevant inquiry is one not of form, but of effect—does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?" [212] The Supreme Court "agree[d] wholeheartedly with the New Jersey Supreme Court that merely because the state legislature placed its hate crime sentence 'enhancer' 'within the sentencing provisions' of the criminal code 'does not mean that the finding of a biased purpose to intimidate is not an essential element of the offense.' " [213]

---

**207.** 530 U.S. at 490, 120 S.Ct. 2348. The Supreme Court explained the exception for the fact of prior conviction partly as a concession to stare decisis, and partly under a more principled rationale. *See Apprendi*, 530 U.S. at 488–90, 120 S.Ct. 2348. The exception preserved the Supreme Court's holding in *Almendarez–Torres*, 523 U.S. at 227, 118 S.Ct. 1219, that a sentencing judge could, based on the fact of prior conviction, impose a sentence higher than the statutory maximum for the offense stated in the indictment. *Apprendi*, 530 U.S. at 489–90, 120 S.Ct. 2348. The Supreme Court noted that "it is arguable that *Almendarez–Torres* was wrongly decided," *id.* at 489, 120 S.Ct. 2348, but declined to revisit it, *id.* at 490, 120 S.Ct. 2348, emphasizing that any prior conviction would have been procured subject to the procedural safeguards of criminal proceedings, *id.* at 488, 120 S.Ct.

2348. In the wake of *Apprendi*, in fact, all the facts necessary to produce a conviction will have to be proved to a jury beyond a reasonable doubt, unless the defendant waives his rights, so the "exception" is not really an exception at all.

**208.** *See id.* at 476–77, 490, 120 S.Ct. 2348.

**209.** *Id.* at 469–70, 120 S.Ct. 2348.

**210.** *Id.* at 470, 120 S.Ct. 2348.

**211.** *Id.* at 471, 120 S.Ct. 2348.

**212.** *Id.* at 494, 120 S.Ct. 2348.

**213.** *Id.* at 495, 120 S.Ct. 2348 (quoting *Apprendi*, 159 N.J. 7, 20, 731 A.2d 485 (1999)).

The Supreme Court further clarified *Apprendi's* meaning in *Ring v. Arizona,* which addressed the constitutionality of Arizona's first-degree murder statute.[214] The statute provided that the offense "is punishable by death or life imprisonment as provided by § 13–703."[215] Under the cross-referenced provision, once a jury found a defendant guilty of first-degree murder, the judge would hold a hearing and determine the presence or absence of enumerated aggravating and mitigating circumstances.[216] Only the judge would make this determination, and in order to impose the death penalty, the judge had to find beyond a reasonable doubt that at least one aggravating factor existed, with "no mitigating circumstances sufficiently substantial to call for leniency."[217] As the Supreme Court described this regime, "Ring could not be sentenced to death, *the statutory maximum penalty* for first-degree murder, unless further findings were made."[218]

The Supreme Court held that Arizona's death penalty regime violated the rule announced in *Apprendi.*[219] Recalling *Apprendi's* admonition that the inquiry was "one not of form, but of effect," the Supreme Court stated the following rule: "If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt."[220] It also emphasized that its holding did not rest on the heightened protections that the Constitution affords in death penalty cases; rather, the point was that capital defendants should have the same protections that the *Apprendi* rule affords to all defendants.[221]

In *Harris v. United States,*[222] decided

214. The Court uses the word "clarified," although for purposes of this opinion, it does not matter whether *Ring* "clarified," "expanded," or "reinterpreted" *Apprendi.* Such distinctions might, however, matter in a habeas case; the First Circuit has held that *Apprendi* does not apply retroactively to judgments of conviction that became final before it was decided, and would presumably hold as much for *Ring. See Sepulveda v. United States,* 330 F.3d 55, 66–67 (1st Cir.2003) (citing *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989)).

215. *Ring,* 536 U.S. at 592, 122 S.Ct. 2428 (quoting Ariz.Rev.Stat. Ann. § 13–1105(C) (West 2001)) (internal quotation marks omitted).

216. *Id.* at 592, 122 S.Ct. 2428.

217. *Id.* at 592–93, 597, 122 S.Ct. 2428 (quoting Ariz.Rev.Stat. Ann. § 13–703(F) (West 2001), and citing *Ring,* 200 Ariz. 267, 279, 25 P.3d 1139 (2001)) (internal quotation marks omitted).

218. *Id.* at 592, 122 S.Ct. 2428 (emphasis added).

219. In the process, the Supreme Court overruled *Walton v. Arizona,* 497 U.S. 639, 647–

49, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990). *Ring,* 536 U.S. at 609, 122 S.Ct. 2428.

220. *Ring,* 536 U.S. at 602, 122 S.Ct. 2428.

221. *Id.* at 606–07, 122 S.Ct. 2428. Justice Breyer's concurrence did rely on the special nature of capital cases, and it expressed his continuing belief that *Apprendi* should be overruled, but his vote was not necessary to form a majority in *Ring. Ring,* 536 U.S. at 613–14, 122 S.Ct. 2428 (Breyer, J., concurring in the judgment). All five members of the *Apprendi* majority joined the majority opinion in *Ring.* Justice Scalia, joined by Justice Thomas, wrote a concurring opinion to note his continuing skepticism about the Supreme Court's death penalty jurisprudence, but both Justices joined the majority opinion in full. *See id.* at 610–12, 122 S.Ct. 2428 (Scalia, J., concurring). Justice Kennedy's concurrence provides a seventh vote: despite his misgivings about *Apprendi,* he felt the rule should apply to capital defendants as well. *See id.* at 613, 122 S.Ct. 2428 (Kennedy, J., concurring).

222. 536 U.S. 545, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002).

the same day as *Ring*, the Supreme Court confirmed the continuing viability of *McMillan* by upholding a statute that imposed a mandatory minimum sentence, below the prescribed statutory maximum, upon a sentencing judge's finding by a preponderance of the evidence that a particular sentencing factor was present.[223] Justice Thomas, joined by three other members of the *Apprendi* majority—Justices Stevens, Souter, and Ginsburg—dissented, arguing that any fact the proof of which increases the maximum *or minimum* punishment must be proved to a jury beyond a reasonable doubt.[224]

Justice Scalia, the fifth member of the *Apprendi* majority, "switched sides" in *Harris*, and, although he did not articulate his reasons for doing so at that time, the concurring opinions in *Apprendi* and *Ring* show why. In Justice Scalia's *Apprendi* concurrence, he states that the right to jury trial "has no intelligible content unless it means that all the facts which must exist in order to subject the defendant to a legally prescribed punishment *must* be found by the jury."[225] The point is that "the criminal will never get *more* punishment than he bargained for when he did the crime, and his guilt of the crime (and hence the length of the sentence to which

he is exposed) will be determined *beyond a reasonable doubt by the unanimous vote of 12 of his fellow citizens.*"[226] Under Justice Scalia's approach, the "sentence to which [a defendant] is exposed" is the maximum permissible sentence under the law, not the likely sentence that he would receive.[227]

Moreover, Justice Scalia joined Parts I and II of Justice Thomas's *Apprendi* concurrence, which argued that "the original understanding of which facts are elements was even broader than the rule that the Court adopts today," and established "that a 'crime' includes every fact that is by law a basis for imposing or increasing punishment."[228] Justice Scalia did not, however, join Part III of Justice Thomas's concurrence, which urged overruling of *McMillan*, because "the fact triggering the mandatory minimum is part of 'the punishment sought to be inflicted.'"[229] In other words, Justice Scalia agreed that any fact that in practice increases the maximum punishment (without reference to any "statutory maximum") must be proved to a jury beyond a reasonable doubt, but disagreed that the same should be true of a fact that merely raises the minimum punishment.[230]

223. *Harris*, 536 U.S. at 552, 122 S.Ct. 2406.

224. *Id.* at 574–77, 122 S.Ct. 2406 (Thomas, J., dissenting).

225. *Apprendi*, 530 U.S. at 499, 120 S.Ct. 2348 (Scalia, J., concurring).

226. *Id.* at 498, 120 S.Ct. 2348.

227. *See id.*

228. *Id.* at 501, 120 S.Ct. 2348 (Thomas, J., concurring); *see also id.* at 506, 512, 518, 120 S.Ct. 2348.

229. *Id.* at 522, 120 S.Ct. 2348 (quoting 1 J. Bishop, *Law of Criminal Procedure* 50 (2d ed. 1872)).

230. *See also Ring*, 536 U.S. at 610, 122 S.Ct. 2428 (Scalia, J., concurring, joined by Thomas, J.). In a sense, Justice Thomas's approach focuses more on the individual's settled expectations, whereas Justice Scalia's approach focuses more on state power, although both use the language of contract. In Justice Thomas's view, allowing a sentencing factor to impose a mandatory minimum sentence, without impacting the maximum available sentence, changes the value of the criminal defendant's expectation, because the likely sentence is greater, even if the maximum sentence has not changed. Under Justice Scalia's approach, all that matters is how much power proof of certain facts gives the state over an individual. Beneath the maximum available punishment, it is a matter of relative indifference to Justice Scalia to what extent a

■ Taken together, the cases the Court has discussed stand for the following constitutional rule: "the elements of a crime are all facts necessary to impose the maximum punishment to which the defendant is subject."[231] This is more expansive than the formulation actually stated in *Apprendi,* which only required proof to a jury beyond a reasonable doubt of "any fact that increases the penalty for a crime *beyond the prescribed statutory maximum.*"[232] It is hardly surprising that the *Apprendi* Court would articulate its rule in those terms, though, because the sentencing factor there being considered had precisely that effect. In *Ring,* however, the Supreme Court explicitly stated that death, not life imprisonment, was the prescribed statutory maximum sentence, yet that did not excuse Arizona from proving the facts necessary to impose the death sentence to a jury beyond a reasonable doubt. Thus, *Apprendi* and *Ring* require a court to determine the practical effect of a legal regime: if the finding of a fact increases the maximum punishment that a judge can impose by law, that fact must be proved to a jury beyond a reasonable doubt, regardless of what any statute defines as the "maximum punishment."

Thus, the distinguishing factor on which the shifting majorities in these cases turn is not, as the courts of appeals have apparently assumed, the relation between a sentencing factor and a statutorily prescribed maximum punishment, but rather the practical reality of whether finding a fact increases the punishment to which a criminal defendant is exposed. It is the difference between the Scalia and Thomas concurrences in *Apprendi.* The plain language of *Ring* shows that the *Apprendi* inquiry looks to positive law not for the definition of the maximum available punishment, but rather for the real-life consequences of the finding of a fact. Justice Thomas's *Harris* dissent and Justice Scalia's *Apprendi* and *Ring* concurrences confirm that this is in fact the understanding of the majorities in *Apprendi* and *Ring,* and Justice Scalia's concurrence in *Apprendi* and his refusal to join Part III of Justice Thomas's *Apprendi* concurrence show that his vote in *Harris* is consistent with this understanding. Justice Scalia joined the *Harris* majority not because the sentencing factor in question operated below the statutory maximum, but rather because it created a mandatory minimum without impacting the upper limit of available punishment.

It is a mistake to apply *Apprendi* as though it is as deferential to statutory definitions as the Supreme Court's element/defense jurisprudence. The Supreme Court's permissive approach to distinguishing between elements and defenses is in large part a result of the circularity and administrability problems this Court has already discussed. The distinction between elements and sentencing factors, however, suffers from neither difficulty. The historical and legal research of majorities in *Apprendi* and *Ring* has revealed a clear and principled distinction between elements and sentencing factors, based on the practical effect of finding a particular fact.

The element/defense and the element/sentencing factor inquiries that the Supreme Court has prescribed for the low-

legislature permits a lenient judge, executive, or parole board to impose a lesser punishment; what matters is the defendant's vulnerability to infringement on his liberty. *See Apprendi,* 530 U.S. at 498, 120 S.Ct. 2348 (Scalia, J., concurring).

**231.** *Unconstitutionality of Determinate Sentencing, supra,* at 1247.

**232.** *Apprendi,* 530 U.S. at 490, 120 S.Ct. 2348 (emphasis added).

er courts are only similar superficially. In each case, the court begins with the positive law in question to determine how the state has characterized the fact in question. If the state characterizes the fact as a non-element (either a defense or a sentencing factor), the court then determines whether such treatment violates the Constitution. In the element/defense inquiry, as this Court has already explained, that second determination will in many cases be quite abstract, and deference to legislative decisions is appropriate. In the element/sentencing factor inquiry, however, the second determination is based on the concrete consequences of finding the fact: does finding this fact increase the available punishment? Put another way, how much power over an individual does proof of this fact give to the state? If the state wants proof of a fact to give it more power over an individual's liberty, it must submit that fact to a jury and prove it beyond a reasonable doubt. If the state is willing to confine the effect of proving the fact to lessening a judge's discretion on the lower end of the sentencing range, or is satisfied with permitting the judge, in her discretion, to decide what effect it should have within the sentencing range, then it generally may treat the fact as a sentencing factor. In this latter case, the state need only comply with the permissive standards in *Harris* and *McMillan*.

Thus, although courts must generally defer to a legislature's decision to characterize as a sentencing factor a fact that does not increase maximum punishment under the law, courts must not defer to a legislature's definition of the "statutory maximum" punishment in deciding whether a fact that affects the upper range of punishment is an element.[233] In this latter case, the court merely looks to the positive law to determine the practical effect of finding a fact, and if as matter of law the finding of a fact allows the judge to inflict a greater punishment than she could inflict in the absence of such a finding, that fact is an element and must be proved to a jury beyond a reasonable doubt.

## 3. The Power of Congress and the Sentencing Commission to Create the Guidelines

Having clarified the nature and scope of the inquiry under *Apprendi* and *Ring*, the Court now considers whether, if Congress were to pass the substance of the Guidelines as a statute, that statute would comply with the Constitution. An examination of the practical effect of the Guidelines demonstrates that it would not. Indeed, the *Apprendi* dissenters stated that the Guidelines would be invalid if the majority's rule really meant "that any fact (other than prior conviction) that has the effect, *in real terms,* of increasing the maximum punishment beyond an otherwise applicable range must be submitted to a jury and proved beyond a reasonable doubt."[234] That is essentially how this Court interprets the *Apprendi* rule, and that is essentially the formulation that appears in *Ring*.

The Guidelines create a grid of available punishments, with proof of facts regarding criminal history and relevant conduct permitting a court to move "up" through the grid and impose a higher sentence. Thus,

---

**233.** One could reach the same conclusion by defining "statutory maximum" as "the maximum punishment permitted under law," or less concisely, "the maximum punishment permitted under all statutes affecting the punishment, including those that delegate lawmaking power."

**234.** *Apprendi*, 530 U.S. at 543–44, 550–51, 120 S.Ct. 2348 (O'Connor, J., dissenting, joined by Rehnquist, C.J., and Kennedy and Breyer, JJ.).

when a criminal defendant is convicted of a crime, the facts on which that conviction was based, whether it was procured through jury trial, bench trial, or plea, only permit the judge to impose a sentence within the range prescribed in the "box" for the crime of conviction. Typically, the greatest punishment permitted within this box is something less than the "statutory maximum," insofar as that term is understood to mean "the maximum punishment permitted under the statute defining punishment for the crime of conviction."

As in the Arizona system invalidated in *Ring*, a court cannot impose a sentence higher than that permitted by the crime of conviction box without finding additional facts. To the extent a higher sentence is imposed based on proof of the fact of prior conviction, this complies with *Ring*. To the extent it is based on proof of any other fact, however, it runs afoul of *Ring*. (Obviously, there is no constitutional problem with those sentencing factors that move the court "down" the grid into a lower sentencing range.)

Aggravating sentencing factors under the Guidelines play a dual role; they operate to increase both the minimum and the maximum punishment that the court can impose. If the statutory Guidelines system merely used sentencing factors to impose increasing mandatory minimum punishments, but the "statutory maximum"

sentence was potentially available to all individuals who were convicted of a particular crime, the statutory Guidelines would be constitutional, except in the unlikely event that the system ran afoul of *McMillan*. However, because the hypothetical statutory version of the actual Guidelines would permit different maximum punishments for individuals who commit the same crime, based on facts not proved to a jury beyond a reasonable doubt, they would be invalid under *Ring*.

If Congress cannot impose a system like the Guidelines by statute, it cannot delegate the power to create such a system to an agency, even if that agency is located in the Judicial Branch.[235] It would make a mockery of the constitutional protections at issue if Congress could circumvent them by giving lawmaking power to an agency.[236]

■ First, it is indisputable that Congress cannot give a governmental agency the power to do things that are beyond the power of government generally.[237] Congress cannot grant an agency authority to make rules with the force of law that permit "unreasonable searches and seizures,"[238] infliction of "cruel and unusual punishments,"[239] or denial of "[t]he right of citizens of the United States to vote ... on account of race,"[240] for example.

---

235. *See Apprendi*, 530 U.S. at 523 n. 11, 120 S.Ct. 2348 (Thomas, J., concurring) ("[I]t may be that [the unique status that the Sentencing Guidelines have under *Mistretta* ] is irrelevant, because the Guidelines 'have the force and effect of laws.'" (quoting *Mistretta*, 488 U.S. at 413, 109 S.Ct. 647 (Scalia, J., dissenting))).

236. In using the term "circumvent," the Court in no way implies that Congress was intentionally subverting the Constitution when it created the United States Sentencing Commission. *Apprendi* and *Ring* had not yet

been decided at that time, and it cannot be said those decisions were in any way anticipated.

237. *See, e.g., Sibbach v. Wilson & Co.*, 312 U.S. 1, 9–10, 61 S.Ct. 422, 85 L.Ed. 479 (1941).

238. U.S. Const. amend. IV.

239. *Id.* amend. VIII.

240. *Id.* amend. XV.

■ Congress also cannot delegate to an agency a power that Congress itself does not possess. Congress cannot make an agency or official "the Commander in Chief of the Army and Navy of the United States,"[241] because the power to act as Commander in Chief belongs to the President. Similarly, Congress cannot confer on an agency the power to "nominate, and by and with the Advice and Consent of the Senate, [to] appoint Ambassadors."[242] Although Congress can create so-called Article I courts, it cannot go so far as effectively to confer Article III judicial power on such tribunals.[243] Nor can Congress give an agency the power to "issue Writs of Election to fill" vacancies that "happen in the Representation from any State," as the power to issues such writs resides in "the Executive Authority" of the State in question, not in Congress.[244]

As this Court has demonstrated, Congress does not have the power to impose a regime like the Guidelines. Although the Court does not reach the question, it may be that imposition of such a regime is beyond the power of government altogether.[245] In either case, Congress cannot give this power to the United States Sentencing Commission.

The Court's holding would appear to conflict with *Mistretta v. United States*,[246] where by an 8–1 vote the Supreme Court upheld the Sentencing Reform Act and Congress's delegation thereunder of power to the Sentencing Commission to enact the Guidelines. *Mistretta* was decided long before *Apprendi*, however, and it cannot be said that in 1989, the holding in *Apprendi* was in any way anticipated. As far as the *Mistretta* Court was concerned, Congress had power to enact the Guidelines in statutory form, and thus to delegate that responsibility to the Sentencing Commission.

The case law makes clear that congressional competence in an area is a necessary condition for delegation to the Judicial Branch of rulemaking power in that area. In *Sibbach v. Wilson & Co.*,[247] the Supreme Court stated that "Congress has undoubted power to regulate the practice and procedure of federal courts, and may exercise that power by delegating to this or other federal courts authority to make rules not inconsistent with the statutes or constitution of the United States."[248] It

241. *Id.* art. II, § 2, cl. 1,

242. *Id.*

243. *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 73, 76, 87, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (plurality opinion); *id.* at 91–92, 102 S.Ct. 2858 (Rehnquist, J., concurring in part and concurring in the judgment).

244. U.S. Const. art. I, § 2, cl. 4.

245. Thus, even if federal criminal law were entirely a creature of common law, it might be that *Apprendi* would place limitations on judicial definition of elements and sentencing factors similar to those placed on legislatures. Under this approach, *Apprendi* would be interpreted to address not only the power of legislatures to tie punishment to proof of cer-

tain facts, but the power of the *state* to do so. *See Apprendi*, 530 U.S. at 498, 120 S.Ct. 2348 (Scalia, J., concurring) ("[Justice Breyer's dissent] sketches an admirably fair and efficient scheme of criminal justice designed for a society that is prepared to leave criminal justice to the State. (Judges, it is sometimes necessary to remind ourselves, are part of the State ....)"). Such a reading of *Apprendi* would lay particular emphasis on the role of the jury as a check on the government generally.

246. 488 U.S. 361, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989).

247. 312 U.S. 1, 61 S.Ct. 422, 85 L.Ed. 479 (1941).

248. *Id.* at 9–10, 61 S.Ct. 422; *Mistretta*, 488 U.S. at 387, 109 S.Ct. 647 (quoting this passage).

has long been held that Congress has power to adopt necessary and proper measures, which would presumably include delegation of rulemaking power, to effect powers it has under the Constitution:

Congress [is authorized] to make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this constitution in the government of the United States, or in any department or officer thereof. The judicial department is invested with jurisdiction in certain specified cases, in all which it has power to render judgment.

That a power to make laws for carrying into execution all the judgments which the judicial department has power to pronounce, is expressly conferred by this clause, seems to be one of those plain propositions which reasoning cannot render plainer.[249]

The *Mistretta* Court's own characterization of rulemaking reinforces the understanding that Congress cannot delegate powers it does not have. "[R]ulemaking power originates in the Legislative Branch and becomes an executive function only when delegated by the Legislature to the Executive Branch." [250]

In each of the examples of delegation of power to the judicial branch that *Mistretta* provides, Congress had delegated a power that it obviously possessed. There can be little doubt that Congress could promulgate rules of civil procedure, criminal procedure, or evidence if it wished, so creation of the Judicial Conference of the United States and the Rules Advisory Committees that it oversees is similarly appropriate.[251]

Likewise, Congress has power to ensure that the Courts function efficiently and properly, so it can reasonably delegate responsibilities to that effect to the Judicial Conference and to the Administrative Office of the United States Courts.[252]

It might be argued that delegation to the United States Sentencing Commission of power to promulgate the Guidelines is simply a necessary and proper means of ensuring that the Judicial Branch carries out a task assigned to it by statute. Congress has power to pass criminal statutes, to assign ranges of punishment for violation of those statutes, and to prescribe factors that courts should consider in placing an individual's sentence within that range. The Guidelines, the argument would go, simply ensure that the judiciary carries out that task in an effective and consistent manner.

This argument fails, however. The Sentencing Reform Act is only superficially similar to other acts that delegate rulemaking authority. Ordinarily, an agency is given authority to "fill in the details" of a broadly worded statutory regime, in a way that Congress could do had it so chosen. If Congress tried to "fill in the details" of the legal regime created by the criminal law and the prescribed sentencing factors in the way the Guidelines do, however, it would run afoul of *Apprendi* and *Ring*. In this case, the price of "operationalizing" the statutory regime through creation of the Guidelines is proof of certain facts to a jury beyond a reasonable doubt. The difference between delegations to the Securities and Exchange Commission and

**249.** *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 22, 6 L.Ed. 253 (1825); *Mistretta*, 488 U.S. at 387–88, 109 S.Ct. 647 (quoting this passage).

**250.** *Mistretta*, 488 U.S. at 386 n. 14, 109 S.Ct. 647.

**251.** *See id.* at 386–88, 109 S.Ct. 647.

**252.** *See id.* at 388–90 & n. 15, 109 S.Ct. 647.

the United States Sentencing Commission is the difference between operationalization and circumvention.

It might also be argued, however, that because the courts, through a series of decisions, could create a body of case law essentially equivalent to the Guidelines, the accomplishment of the same end through a Judicial Branch agency would be similarly legitimate. The argument would proceed as follows: It is a function of the Judicial Branch to determine how to exercise its sentencing discretion consistently with the statutory regime. One way the courts could do this would be by assigning determinate limits to the sentences judges impose under particular circumstances. Taken together, these decisions could form a system exactly like the Guidelines. Thus, there could be Supreme Court case law dictating that a sentence outside the range of the appropriate box created by the case law would be an abuse of discretion. Creating a Judicial Branch agency to create a similar set of prescriptions regarding sentencing discretion would be no different than the obviously legitimate practice of allowing an Executive Branch agency to prescribe how the Executive Branch "shall take Care that [particular] Laws be faithfully executed." [253]

As an initial matter, it is not entirely clear that the Supreme Court could create such a system. If our criminal laws were still defined by the common law, rather than by statute, judicial definitions of elements, defenses, and sentencing factors would presumably not be immune from scrutiny under *Apprendi* and *Ring*. The appropriate nature and extent of such scrutiny would certainly raise many difficult questions. [254]

The Court need not reach those questions, however, because even if the Supreme Court could effectively enact the Guidelines through precedent, it does not follow that the United States Sentencing Commission can enact them. The first thing to note is that, to the extent the Supreme Court's power would be part of the judicial power, that power can be exercised only by Article III judges with tenure and salary protections. *Mistretta* itself suggested that the constitutionality of the Sentencing Reform Act would be more doubtful if the Sentencing Commission's tasks involved an exercise of judicial power. [255]

A comparison between Executive Branch agencies and Judicial Branch agencies reveals another reason why Supreme Court power to enact the Guidelines through precedent does not permit such power to be vested in the Sentencing Commission. In the Executive Branch, the constitutional protections against abusive conduct are similar for the highest official in that branch—the President—and lower officials. Apart from the Constitution and laws themselves, the primary checks on the President are democratic. If the President acts irresponsibly or unlawfully, he risks either a failure to achieve reelection or impeachment and conviction in the Leg-

---

**253.** U.S. Const. art. II, § 3.

**254.** *See Mistretta*, 488 U.S. at 394 & n. 20, 109 S.Ct. 647 (suggesting the possibility that if Congress had delegated authority to promulgate the Guidelines, that might raise a concern about combining legislative and judicial power in the Judicial Branch, but expressing no opinion on the matter).

**255.** *Mistretta*, 488 U.S. at 408, 109 S.Ct. 647. *Mistretta* did not have to examine the extent to which a system like the Guidelines could emerge through precedent, because before *Apprendi* it looked like the Guidelines constituted a valid exercise of legislative power.

islative Branch.[256] In the latter case, the President's removal from office would typically reflect majoritarian sentiment; a majority of the most directly representative branch would have to agree that he should be removed; and two-thirds of the body that represents the constituent members of the Union would have to concur. In any case, impeachments are sufficiently rare that the electoral check is the primary one.

As for executive officials, although they are not elected, they are removable by the President, who as the only official in government elected by the entire nation, in some measure reflects the nation's judgment. Even in instances where Congress places limitations on the President's removal powers, as when Congress makes "independent agency" officials removable only for cause,[257] presidential removal remains more like an electoral repudiation than like impeachment—it is still the President who decides whether to seek removal, and whatever reasons the President asserts, his motivation will often be at least partly political. Like the President, executive officials may be removed from office through impeachment. To the extent that the Constitution's division of authority within government reflects practical concerns about threats to individual liberty, it makes little constitutional difference whether Congress delegates rulemaking authority to the President or to an Executive Branch agency.

Things are quite different in the Judicial Branch, however. Although federal judges are subject to impeachment (again, a rarity), they are unelected and largely insulated from majoritarian pressure by tenure and salary protections. Judges are in fact the only officials in the federal government with tenure and salary protections, and it is obvious why. Protection from majoritarian pressures makes it more likely that judges will fairly decide cases in accordance with the Constitution and laws, even when such decisions may be politically unpopular. The Constitution provides important protections for disfavored minority groups and criminal defendants against the political majority, and a judge who must rely on a legislature to remain in office at a particular salary is less likely to enforce those protections. Although these special protections do not always apply to state judges, they are reflective of a historical understanding, shared by both federal and state judges, that judicial independence is a central feature of republican government.

Officials in the Sentencing Commission, however, are not like judges; the protections against abusive behavior are essentially the same as those for executive officials, at least for those in independent agencies. Even when a judge sits on the Sentencing Commission, his tenure as a commission member is governed the same way as that of an independent agency official. Members of the Sentencing Commission have neither life tenure nor salary protections, and are removable for cause,[258] like many independent agency officials. That may render them constitu-

---

**256.** Although the text of the Constitution suggests that there are limits on the grounds that Congress may invoke to impeach a President, *see* U.S. Const. art. II, § 4, in practice those limits have not been observed.

**257.** *See Humphrey's Executor v. United States*, 295 U.S. 602, 629, 55 S.Ct. 869, 79 L.Ed. 1611 (1935).

**258.** 28 U.S.C. § 991(a); *see also Mistretta*, 488 U.S. at 386 n. 14, 109 S.Ct. 647 ("Moreover, since Congress has empowered the President to appoint and remove Commission members, the President's relationship to the Commission is functionally no different from what it would have been had Congress not located the Commission in the Judicial Branch.").

tionally competent to engage in the sort of rulemaking that Executive Branch and independent agencies do, but the same cannot be said for rulemaking that substitutes for judicial decisionmaking.

To the extent that judges can place determinate limits on sentencing ranges in a way that Congress cannot, that power stems from the constitutional and historical differences between judges and officials in the political branches.[259] Congress cannot give an individual with all the characteristics of a political branch official this sort of judicial power by merely "locating" that official in the Judicial Branch. This would constitute the sort of legislative control of exercise of the judicial power that was forbidden in *United States v. Klein*.[260]

In the *Klein* case, the administrator of an estate sought to recover proceeds from the sale of property that government agents had seized from the deceased owner during the Civil War.[261] The administrator had won a judgment in the Court of Claims, under legislation permitting noncombatant rebel owners to bring such claims upon proof of loyalty.[262] The Court of Claims based its decision on an earlier Supreme Court decision holding that one who, like the decedent, had received a presidential pardon must be treated as loyal.[263] Pending appeal, Congress passed an act that rendered pardons inadmissible as evidence of loyalty, and that provided that acceptance, without written protest or disclaimer, of a pardon reciting that the claimant took part in or supported the rebellion would be conclusive proof of disloyalty.[264] The statute also required the Court of Claims and the Supreme Court to dismiss for want of jurisdiction any pending claims based on a pardon. *Id.*

The Supreme Court held that the act Congress had passed pending appeal was unconstitutional. The Supreme Court first acknowledged that Congress "has complete control over the organization and existence of [the Court of Claims] and may confer or withhold the right of appeal from its decisions," under Congress's power to make exceptions to the Supreme Court's appellate jurisdiction.[265] Here, however, Congress did not "intend to withhold appellate jurisdiction except as a means to an end[:] . . . to deny to pardons granted by the President the effect which this court had adjudged them to have."[266] Thus, "the denial of jurisdiction to this court, as well as to the Court of Claims, is founded solely on the application of a rule of decision, in causes pending, prescribed by Congress."[267] The effect was to permit one of the parties before the Supreme Court, the United States Government, to decide the case in its own favor, and to deny effect to the President's pardon power.[268] In passing this statute, then, "Congress ha[d] inadvertently passed the limit

---

259. This Court does not harbor the illusion that law and politics are entirely separate, but it is clear that in this country, judicial decisionmaking differs in important ways from political decisionmaking, whether the difference is characterized as one of kind or degree.

260. 80 U.S. (13 Wall.) 128, 20 L.Ed. 519 (1871).

261. *Klein,* 80 U.S. (13 Wall.) at 136.

262. *See id.* at 138–39, 142–43.

263. *See id.*

264. *Id.* at 143–44.

265. *Id.* at 145; *see* U.S. Const. art. III, § 2, cl. 2.

266. *Klein,* 80 U.S. (13 Wall.) at 145.

267. *Id.* at 146.

268. *Id.* at 146–48.

which separates the legislative from the judicial power." [269]

The *Klein* case is susceptible of several interpretations, not all of them mutually exclusive, but it demonstrates why the Sentencing Commission cannot exercise what is effectively judicial power. The statute at issue in *Klein* did two things, each of which sheds light on the issue at hand. First, Congress used powers that it clearly has—to create inferior tribunals, to define the contours of such tribunals' jurisdiction, to make exceptions to the Supreme Court's appellate jurisdiction, and to prescribe rules of evidence for the federal courts—to achieve unconstitutional ends. Congress's power to pass laws necessary and proper to make the judiciary function properly and decide cases based on relevant statutes is thus constrained by other provisions of the Constitution.[270] Second, Congress gave the federal courts jurisdiction to hear a certain class of cases, but then, while those cases were pending, took two steps that effectively required decision for the government. The jurisdictional provisions would have the effect of dismissing cases where, under the prior rule, the claimant would have won. Congress was effectively exercising judicial power; it all but dictated the results in a class of cases (cases in which the government itself was a party, no less). Even if the United States Sentencing Commission is not a "junior-varsity congress," [271] it is a political body, in the sense that its officials have neither the constitutional protections afforded to judges nor the sense of role that both state and federal judges have in this country, and it is exercising what is, in the first instance, legislative power. The Commission dictates to judges how to exercise their sentencing discretion upon finding particular facts, when the only reason that the Constitution permits such discretion in the first place is that no political body has prescribed how those facts will affect the maximum available punishment. To the effect that non-judges produce rules with the force of law, that is an exercise of legislative power subject to the strictures of *Apprendi* and *Ring*.

### 4. Practical Consequences of *Apprendi*

One might object that interpreting *Apprendi* and *Ring* to invalidate the Guidelines would have little practical effect, because Congress constitutionally could achieve the minimum mandatory sentencing aspects of the Guidelines through functionally equivalent means. The functional equivalence between the invalidated regime and the permissible one would in turn suggest that the Court's judgment regarding the invalidity of the Guidelines is in error.

The dissenters in *Apprendi*, who predicted the possibility that the decision might undermine the constitutionality of the Guidelines, also argued that the majority's rule had little meaning, because legislatures could enact functionally equivalent statutes that circumvented it.[272] The majority responded by noting the ways in which the statutory alternatives that the dissenters proffered would both differ in important ways from the statute in ques-

269. *Id.* at 147.

270. *See also Battaglia v. General Motors Corp.*, 169 F.2d 254, 257 (2d Cir.1948) ("[T]he exercise by Congress of its control over jurisdiction is subject to compliance with at least the requirements of the Fifth Amendment.").

271. *Mistretta*, 488 U.S. at 427, 109 S.Ct. 647 (Scalia, J., dissenting).

272. *See Apprendi*, 530 U.S. at 539–41, 120 S.Ct. 2348 (O'Connor, J., dissenting, joined by Rehnquist, C.J., and Kennedy and Breyer, JJ.).

tion and would be more difficult to pass into law as a matter of democratic politics.[273]

This Court can answer the "functional equivalence" argument here in the same manner that the *Apprendi* majority addressed it with regard to the New Jersey statutes in question. First, it does not seem that any constitutionally permissible system could function in a manner equivalent to the Guidelines. One alternative system would involve sentencing ranges similar to those currently defined in the federal criminal code, and sentencing factors that operated to impose a system of increasing mandatory minimum sentences. Unlike the Guidelines, this regime would potentially expose every criminal to the maximum statutory sentence. Another alternative system would also expose all defendants convicted under a statute to the same maximum sentence, but then style virtually all sentencing factors as mitigating factors that reduce the maximum available punishment. Assuming, perhaps heroically, that such a system would not run afoul of *McMillan, Patterson*, and *Mullaney*, the effect would be different from what happens under the Guidelines. Again, every individual convicted under the statute presumptively would be exposed to the maximum statutory sentence, and would have to prove that he did not brandish a weapon, that his acts were not racially motivated, and so on.

Other alternatives exist, but these two are sufficiently representative to make the Court's second point: these systems might well be more difficult to enact into law than were the Guidelines. Citizens care about the criminal law in part because it determines under what circumstances and to what extent the state can take away a person's life, liberty, or property. Assume, for example, that one of the alternative regimes discussed above applied to the drug laws, such that a person who possessed a gram of marijuana would presumptively be exposed to the same maximum punishment as a person who possessed a large quantity of cocaine. In a system where sentencing factors only impacted the bottom end of the sentencing range, citizens might well be unwilling to permit the government to treat the former infraction, of which over eleven percent of Americans aged twelve and older are guilty, as harshly as it treats the latter, which is decidedly less common.[274] Similar concerns about giving the government unwarranted power over individual liberty might well prevent passage of a regime where the minor marijuana user was presumptively exposed to the same maximum punishment as the serious cocaine user (and likely dealer), unless and until she could affirmatively prove that her crime was less serious than the latter's. Even under the Guidelines regime, the Department cannot expose a drug criminal to the maximum available statutory sentence without proving particular facts about him.

Moreover, either of these regimes might run afoul of the moral sense of the community. The most cursory survey of state and federal criminal law reveals how widespread is the belief that punishment should be proportional to the crime. A statute that presumptively subjects individuals

---

**273.** *See Apprendi,* 530 U.S. at 490 n. 16, 120 S.Ct. 2348.

**274.** *See* National Drug Intelligence Ctr., *National Drug Threat Assessment 2004* 4, 39 (2004), *available at* http://www.usdoj.gov/ndic/pubs8/8731/8731p.pdf (citing 2002 United States population data to the effect that 2.5 percent of individuals aged 12 and older had used cocaine within the last year, whereas 11 percent of individuals aged 12 and older had used marijuana within the last year).

with substantially different levels of culpability to the same maximum sanction might well run afoul of that sense.

On this latter point, the alternatives to the Guidelines might in fact run up against two democratic barriers. The citizenry might refuse to elect a legislator who supported laws that defy community mores, and juries, who are made up of ordinary citizens, might not be willing to convict individuals accused under such laws. In this Court's experience, juries take their charge seriously and seek faithfully to apply the law to the facts presented at trial. Still, the Supreme Court has recognized "the jury's historic function, in criminal trials, as a check against arbitrary or oppressive exercises of power by the Executive Branch,"[275] and there can be little doubt that jury nullification sometimes occurs, typically in response to a sense that a law is unjust or that applying it "correctly" in a particular case would be unjust.[276] For example, one study of 1950s jury trials compared jury verdicts to what the judge would have done: although generally the judge agreed with the jury 75.4% of the time, and in 16% of all cases the jury was more lenient than the judge would have been, in drunk driving cases the agreement rate was only 69%, and in 24% of drunk driving cases the jury was more lenient than the judge.[277] A likely explanation of this discrepancy is that jurors either disagreed that drunk driving should be criminalized or felt that the penalties were too severe.[278]

Of course, the extent of these democratic checks on manipulation of the criminal law must remain a matter for speculation. The point is that it is perfectly understandable why the Constitution would exact a price when the legislature seeks to make the existence of a fact grounds for increased punishment. It may be that to avoid that price, citizens are willing to acquiesce in a system of criminal law that imposes the same maximum punishment for criminals with substantially differing levels of culpability. Still, this is a starker choice than would exist if the Guidelines were constitutional. *Apprendi* and *Ring* at least ensure that citizens will understand the true nature of the choice before them: our history and tradition recognize that only proof of a fact to a jury beyond a reasonable doubt can ensure that it is a reliable basis for increasing punishment, and the rule recognized in theses cases eliminates the temptation to treat any less rigorous process as sufficient.

## II. Other Constitutional Concerns

### A. Separation of Powers

In *Mistretta*, the Supreme Court squarely held that the Sentencing Reform Act did not violate the Constitution, but it is not clear whether the empirical assumptions on which that holding rested are true today. The Court merely expresses con-

---

**275.** *United States v. Powell*, 469 U.S. 57, 65, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984); *see also Dunn v. United States*, 284 U.S. 390, 393, 52 S.Ct. 189, 76 L.Ed. 356 (1932); Alexander M. Bickel, *Judge and Jury—Inconsistent Verdicts in the Federal Courts*, 63 Harv. L.Rev. 649, 652 (1950).

**276.** *See* Irwin A. Horwitz, Norbert L. Kerr & Keith E. Niedermeier, *Jury Nullification: Legal and Psychological Perspectives*, 66 Brook. L.Rev. 1207, 1220–30 (2001) (discussing evidence of jury nullification, as well as con-

trolled studies examining what factors make jury nullification more likely).

**277.** Rebecca Snyder Bromley, *Jury Leniency in Drinking and Driving Cases: Has It Changed? 1958 versus 1993*, 20 Law & Psychol. Rev. 27, 27–29 (1996) (citing Harry Kalven, Jr. & Hans Ziesel, *The American Jury* 56, 58–59, 71, 468 (1966)).

**278.** *See id.* at 28–29.

cerns to be addressed in a future case, however, because it would be inappropriate to do more at this juncture. The Court has already taken a highly unusual step in determining the effect of *Apprendi* and *Ring* on the Guidelines, without meaningful briefing or argument from the parties in these cases. Although, as the Court will explain, that step is justified, the Court should go no further in deciding constitutional questions than is absolutely necessary to decide these cases.[279] The separation of powers question may well be closer than the *Apprendi* one, and it requires evaluation of empirical information that has not been presented to the Court in an adversary proceeding, and is hardly the stuff of judicial notice. Obviously decision of such a question would benefit considerably from briefing and argument as well.

The *Mistretta* Court stated that "had Congress decided to confer responsibility for promulgating sentencing guidelines on the Executive Branch, we might face the constitutional questions whether Congress unconstitutionally had assigned judicial responsibilities to the Executive or unconstitutionally had united the power to prosecute and the power to sentence within one Branch."[280] This Court has described how, under the Guidelines, the Depart-ment has increasingly taken the dominant role in criminal sentencing. The Guidelines have given the Department increased bargaining leverage, dramatically increasing the rate of plea bargains, and the Department is in a position both to manipulate sentences through charge bargaining and to limit the flow of information relevant to sentencing to the judge. It may be that, taken together, the ways in which the Guidelines regime have transferred the power of sentencing to the Department add up to a joining of the power to prosecute and the power to sentence in one branch of government.

Although the separation of powers protects individual liberty, it does so indirectly by ensuring that no branch aggrandizes itself at the other branches' expense or encroaches on another branch's performance of its duties.[281] Thus, it would not necessarily violate the separation of powers if increasing prosecutorial power over sentencing were a result of judicial abdication, rather than of aggrandizement or encroachment by the political branches. Here, the judge theoretically has some power to assert her appropriate role in sentencing; with the defendant's concurrence she can order a pre-plea pre-sentencing report and can reject any plea bargain.[282] Through the former, the judge

---

**279.** *See Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).

**280.** *Mistretta*, 488 U.S. at 391 n. 17, 109 S.Ct. 647.

**281.** *E.g.*, *Mistretta*, 488 U.S. at 380–82, 109 S.Ct. 647; *Buckley v. Valeo*, 424 U.S. 1, 122, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976).

**282.** The recent case of Lea Fastow, wife of former Enron finance chief Andrew Fastow, demonstrates both the power that judges have to reject plea agreements and the power that the Department ultimately retains over sentencing. The Department had originally charged her with six felony counts related to her role in the Enron debacle, and reached a plea agreement under which she would serve only five months in prison. *Wife of Former Enron CFO Sentenced to One Year in Prison*, Toronto Star, May 7, 2004, at E02. Judge David Hittner rejected the agreement, however, as he considered the sentence too lenient, and Mrs. Fastow withdrew her plea. *See id.* The Department charge bargained (ostensibly with the express or delegated permission of the Attorney General), dismissing the indictment (and the felony charges) and replacing it with a single misdemeanor tax charge, to which Mrs. Fastow pleaded guilty. *Id.* In imposing a twelve-month sentence, the maximum under the Guidelines, Judge Hittner stated that "[t]he department of justice's be-

can somewhat reduce the Department's illegal fact bargaining. Through the latter, the court can limit distortion of the sentencing regime by effectively forcing a trial, or at least forcing a plea agreement that complies with the letter, if not the spirit, of the Guidelines. (Although the judge does not have much power to influence the practice of charge bargaining, that is a problem that predated the Guidelines.)

It may be, however, that it is not realistically possible for judges to use these powers to prevent the Department from exercising effective control over criminal sentencing. Given the charge bargaining and fact bargaining practices that the Guidelines facilitate and in which the Department clearly engages, a district judge has to order a pre-plea pre-sentencing report for every plea hearing that implicates a possible sentence above the base offense level. The judiciary simply lacks the resources to accomplish this nationally (although it is in this Court's invariable practice), and, within constitutional limits, funding for the judicial branch is controlled by the political branches.

Moreover, the transfer of bargaining power to the Department, and the tendency of that transfer to make plea bargains both more common and more likely to arise early in the criminal process, mean that district judges are increasingly losing the aid of their most potentially useful partners in finding the truth about facts relevant to sentencing: the defendants. Defense attorneys, who typically are either appointed or are overworked employees of the Public Defender's Office, have incentives to cease their advocacy once a plea agreement is reached. Presumably, if a defendant has entered into a plea agreement, she has no desire to provide a judge with information that might undermine that agreement and expose her to greater punishment.

The passage of the Feeney Amendment only adds to concerns about executive encroachment and aggrandizement, although it does not apply in these cases. At least one court has held that parts of the Feeney Amendment violate the separation of powers.[283] The Court hopes the courts in this District will soon have an opportunity to consider whether decreasing the number of judges on the Sentencing Commission, reducing the availability of downward departures, giving increasing control of sentencing to the Department (through increased control of downward departures for substantial assistance, for example), and creating reporting requirements for judges who depart downwards, have the effect of aggrandizing the Executive and Legislative Branches or encroaching on the Judicial Branch.

### B. The Combined Effect of Various Changes to the Criminal Process

Another question that ought perhaps be considered in a future case is whether, taken together, recent changes in virtually every aspect of our criminal processes violate the Constitution. It is well settled that several actions, none of which individually violates the Constitution, may do so collectively.[284] Similarly, a governmental

---

havior [in replacing the felony charges with a misdemeanor charge] might be seen as a blatant manipulation of the federal justice system and is of great concern to this court." *Id.* (quoting Judge Hittner) (internal quotation marks omitted).

**283.** *See United States v. Mendoza,* No. 03–cr–730–ALL, 2004 WL 1191118, at *5–7 (N.D.Cal. Jan.12, 2004).

**284.** *See, e.g., Wilson v. Seiter,* 501 U.S. 294, 304, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) (*"Some* conditions of confinement may establish an Eighth Amendment violation 'in com-

action that is constitutional when it burdens one constitutional right may be unconstitutional when it burdens more than one constitutional right.[285] Over the last two decades, and particularly in the last ten years, the federal government has made dramatic changes at virtually every step of the criminal process, many of which burden one or more constitutional rights, and which may have a mutually reinforcing effect that violates one or more constitutional provisions.[286]

The criminal process begins with governmental investigation, which is subject to the Fourth Amendment prohibition against unreasonable searches and seizures and the Fifth Amendment prohibition against compelled self-incrimination.[287] There can be no doubt that the USA PATRIOT Act[288] ("PATRIOT Act") has dramatically expanded the investigatory powers of the federal government, and that expansion in turn potentially raises Fourth Amendment concerns.[289]

bination' when each would not do so alone, but only when they have a mutually enforcing effect . . . .").

285. *See Employment Div., Dept. of Human Res. v. Smith*, 494 U.S. 872, 881–82, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) ("The only decisions in which we have held that the First Amendment bars application of a neutral, generally applicable law to religiously motivated action have involved not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections . . . ."). The *Smith* Court cited cases that explicitly invoked multiple constitutional protections, *see id.* at 881 & n. 1, 110 S.Ct. 1595; *see also Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (free exercise and the right of parents to direct the education of their children); *Follett v. McCormick*, 321 U.S. 573, 64 S.Ct. 717, 88 L.Ed. 938 (1944) (free exercise and freedom of speech and of the press); *Cantwell v. Connecticut*, 310 U.S. 296, 304–07, 60 S.Ct. 900, 84 L.Ed. 1213 (1940) (same), as well as cases that implicitly involved both freedom of religion and freedom of speech, *see Smith*, 494 U.S. at 882, 110 S.Ct. 1595; *see also Wooley v. Maynard*, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977); *West Virginia Bd. of Educ. v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). The *Smith* Court also noted that freedom of association claims might be stronger if they involved free exercise concerns as well; *Smith*, 494 U.S. at 882, 110 S.Ct. 1595 (citing *Roberts v. United States Jaycees*, 468 U.S. 609, 622, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984)).

286. Because they are not relevant here, the Court will not discuss the new laws relating to immigrants, alleged terrorists, executive

detention, and the like, troubling though many of them may be.

287. U.S. Const. amends. IV, V.

288. Pub.L. No. 107–56, 115 Stat. 272 (2001).

289. The PATRIOT Act has augmented the Department's power to track and gather communications by: (1) "permit[ting] pen registers and trap and trace orders for electronic communications;" (2) "authoriz[ing] nationwide execution of court orders for pen registers, trap and trace devices, and access to stored e-mail or communication records;" (3) "treat[ing] stored voice mail like stored e-mail (rather than like phone conversations);" and (4) "permit[ting] authorities to intercept communications to and from a trespasser within a computer system (with the permission of the system's owner)." Charles Doyle, Congressional Research Service, *The USA PATRIOT Act: A Sketch* 2–3, CRS Report RL31377 (2002), *available at* http://www.fas.org/irp/crs/RS21203.pdf (last visited June 8, 2004).

It has also eased restrictions on foreign intelligence gathering in the United States by: (1) "permit[ting] 'roving' surveillance (court orders omitting the identification of the particular instrument, facilities, or place where surveillance is to occur when the court finds the target is likely to thwart identification with particularity);" (2) "allow[ing] application for a [Foreign Intelligence Service Act] surveillance or search order when gathering foreign intelligence is *a significant* reason for the application rather than *the* reason;" (3) "authoriz[ing] pen register and trap & trace device orders for e-mail as well as telephone conversations;" and (4) "sanction[ing] court

Once an investigation has led to a criminal indictment,[290] the Constitution guarantees the defendant "the right to a speedy and public trial" by an "impartial jury" of his peers, conducted in the state where the crime is alleged to have been committed, subject to the strictures of the Due Process Clause and the Double Jeopardy Clause, with the right "to be informed of the nature and cause of the allegation[,] to be confronted with witnesses against him[,] to have compulsory process for obtaining Witnesses in his favor, and to have the Assistance of Counsel for his defense."[291] The many rights attendant to criminal trials demonstrate the central importance that such trials have in ensuring that no person is wrongfully deprived of her life, liberty, or property, yet as the Court has described, the Guidelines have dramatically reduced the use of criminal trials, in part by placing a heavy punitive price on those who exercise their right to a jury trial. Whether the Guidelines system merely burdens the right to a jury trial or in fact violates it, it is cause for concern, particularly in light of the dramatic increase in the Department's investigative powers.[292]

Once an individual is convicted of a crime, certain constitutional protections attach to the sentencing process. The Guidelines obviously impact that process considerably. Given that an analysis of the collective effect of changes to the criminal process would be necessary only if the Court's interpretation of *Apprendi* and *Ring* were incorrect, however, it would be premature even to speculate as to whether the Guidelines would burden constitutional rights in the sentencing process under what a higher court determines is the correct interpretation of those decisions. Still, it should be noted that giving an agency (such as the Sentencing Commission) enormous control over policy in an area as sensitive as the criminal law raises accountability concerns that should be considered in determining whether the federal criminal process as a whole complies with the Constitution.

After sentencing, should the defendant be sent to prison, he may challenge the lawfulness of his confinement through the

---

ordered access to any tangible item rather than only business records held by lodging, car rental, and locker rental businesses." *Id.* at 3.

The Patriot Act has also done the following: (1) "authorize[d] 'sneak and peek' search warrants;" (2) "ease[d] governmental access to confidential information;" and (3) "allow[ed] the Attorney General to collect DNA samples from prisoners convicted of any federal crime of violence or terrorism." *Id.* at 5.

290. *See* U.S. Const. amend. V.

291. U.S. Const. art. III, § 2, cl. 3; *id.* amends. V, VI.

292. It might be objected that, to the extent expansion of the Department's investigatory powers allows the government to discover crimes that they might not otherwise have

discovered, that is a good thing, and that a plea bargain does not become more constitutionally suspect merely because it is based on evidence of an actual crime, however obtained. Evidence of crime is not the only thing that investigators can find, however. To the extent that new investigative powers permit the government to discover embarrassing private information, and to the extent defendants may waive their right to a jury trial to avoid revelation of such information, that is a matter of constitutional concern. This is not to suggest that the Department would resort to threats regarding such information in order to force plea agreements. Rather, the Court merely recognizes that prosecutorial abuse is possible, that it was by no means unknown to the framers of the Constitution, and that when an individual's liberty is at stake, it is not sufficient to rely on the Department's well-deserved professional reputation.

writ of habeas corpus.[293] The Great Writ has proved an essential safeguard against legal and factual errors and miscarriages of justice in the criminal process. Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"),[294] however, the availability of habeas review has been curtailed.[295] Although the constitutionality of the statute is not in serious doubt, it may be that the erosion of this safeguard increases the constitutional concerns that changes to earlier stages of the criminal process raise.

Obviously, the concerns the Court has already discussed in regard to the Feeney Amendment would be relevant to this analysis as well. In any case, all of these matters will have to be left for another day.

### III. The Problem of Addressing Constitutional Questions Not Raised by the Parties

■ As a general matter, courts "do not reach for constitutional questions not raised by the parties."[296] "The courts' general refusal to consider arguments not raised by the parties ... is founded in part on the need to ensure that each party has fair notice of the arguments to which he must respond."[297] Such refusal is even more appropriate where the issue to be considered is whether the Constitution invalidates a statute; courts are understandably reluctant to decide such questions.[298] As Thomas M. Cooley once said: "It must be evident to any one that the power to declare a legislative enactment void is one which the judge, conscious of the fallibility of human judgment, will shrink from exercising in any case where he can conscientiously and with due regard to duty and official oath decline the responsibility."[299]

Courts do occasionally decide questions not raised by the parties, however. If a court determines that it lacks subject matter jurisdiction, for example, it must dismiss or remand the case, regardless of whether any party raised the issue.[300] The Supreme Court has also sometimes reached constitutional questions not raised by the parties, perhaps most famously in *Erie Railroad Co. v. Tompkins*.[301] Usual-

---

293. *See* U.S. Const. art. I, § 9, cl. 2 ("The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it.").

294. Pub.L. No. 104–132, 110 Stat. 1214.

295. For example, under AEDPA federal prisoners may not appeal a district court's denial of the writ without obtaining a certificate of appealability, *see* 28 U.S.C. § 2253; Fed. R.App. P. 22, and AEDPA imposes a one-year statute of limitations for filing petitions and places strict limitations on the filing of second or successive petitions, *see* 28 U.S.C. § 2255.

296. *Mazer v. Stein*, 347 U.S. 201, 206 n. 5, 74 S.Ct. 460, 98 L.Ed. 630 (1954) (collecting cases).

297. *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 441, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990) (Marshall, J., dissenting).

298. *See, e.g., Ashwander*, 297 U.S. at 345–48, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) (discussing the importance of avoiding constitutional questions and listing the rules that courts have developed for doing so).

299. *Id.* at 345, 56 S.Ct. 466 (quoting 1 Thomas M. Cooley, *Constitutional Limitations* 332 (8th ed.1927)) (internal quotation marks omitted).

300. *See* Fed.R.Civ.P. 12(h)(3); *see also, e.g., St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 537, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978).

301. 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *see id.* at 88–89, 58 S.Ct. 817 (Butler, J., dissenting); *see also Andrews v. Louisville & Nashville R.R. Co.*, 406 U.S. 320, 331 & n. 4, 92 S.Ct. 1562, 32 L.Ed.2d 95 (1972) (Douglas, J., dissenting) (noting other examples

ly, but not always, in such cases the Supreme Court will seek further briefing and argument from the parties.[302]

The conflict between the Guidelines and the mandate of *Apprendi* and *Ring* first came to this Court's attention when it encountered a February 2004 Note in the *Harvard Law Review* on the subject.[303] The Court was at that point nearly ready to issue its sentencing opinion in two of these cases, and the sentencing hearings in all of them had occurred some time before that. The Court reexamined the relevant precedent, and it became increasingly clear that the Court could not "conscientiously and with due regard to duty and official oath decline the responsibility" to apply *Apprendi* and *Ring* in its sentencing analysis.

Perhaps it would have been better immediately to have sought further briefing and argument from the parties, but the Department has already appealed two of the sentences here discussed, thus depriving this Court of jurisdiction to do ought but explain itself. A third has been transferred to another judge, and one is not yet ripe for sentencing. As to Jason Pacheco, the remaining defendant to be considered, such a course would involve additional months of delay, beyond the substantial delay that has already occurred, in informing him of his sentence and permitting him to be transferred to the facility where he will serve out the remainder of his sentence. Naturally, the parties will have an opportunity to raise such arguments as they may on appeal, likely with the benefit

of the Supreme Court's decision in *Blakeley v. Washington*. Had the Court not addressed these questions, the defendants would doubtless have raised them on habeas review anyway, particularly if the Supreme Court decides *Blakeley* the way *Apprendi* and *Ring* suggest it must. Resolution of the questions the Court has addressed would therefore merely be delayed.

■ There are three aspects to the constitutional questions raised in this case that make the Court's decision to address them appropriate. The first is that they involve individuals' liberty and the moral force of the criminal law. If this Court's analysis is correct, the Guidelines have deprived many if not most of the criminal defendants in the federal system of fundamental constitutional rights that protect them from arbitrary exercises of state power. Although the First Circuit has denied "that the *Apprendi* rule can be characterized as a watershed rule of criminal procedure," [304] there can be little doubt that the requirement of proof beyond a reasonable doubt and the right to have a jury determine facts that expose a defendant to greater punishment are among the surest guarantees that an individual will not be deprived of her liberty in error. The magnitude of the liberty interests at stake and the need "to command the respect and confidence of the community in applications of the criminal law," [305] compel the Court to confront the constitutional issues in these cases.

---

where the Supreme Court has passed on constitutional questions not raised by the parties).

**302.** *United States v. O'Brien,* 391 U.S. 367, 390, 88 S.Ct. 1673, 20 L.Ed.2d 672 (Douglas, J., dissenting) (discussing cases where the Supreme Court had ordered reargument based on constitutional arguments that the parties had not raised).

**303.** *See Unconstitutionality of Determinate Sentencing, supra.*

**304.** *Sepulveda,* 330 F.3d at 60.

**305.** *Winship,* 397 U.S. at 364, 90 S.Ct. 1068.

Second, the jury is an institution of central importance in our system of government, and courts must jealously guard against encroachments on the jury's province. It is the jury to which the founders of this nation turned to fill the role of impartial fact finder. Its primacy is guaranteed by the United States Constitution,[306] and the American jury system is our most vital day-to-day expression of direct democracy.[307] There is no other routine aspect of our civic existence today where citizens themselves are the government. Moreover, beyond involving citizens directly in one of the most fundamental processes of government, the jury system "injects community values into judicial decisions" and "allows equitable resolution of hard cases without setting a legal precedent."[308] Moreover, jurors' "very inexperience is an asset because it secures a fresh perception of each trial, avoiding the stereotypes said to infect the judicial eye."[309] In Massachusetts, Mme. Justice Abrams has summed up the jury's enormous contribution as follows:

The jury system provides the most important means by which laymen can participate in and understand the legal system. "It makes them feel that they owe duties to society, *and that they have a share in its government* .... The jury system has for some hundreds of years been constantly bringing the rules of law to the touchstone of contemporary common sense."[310]

Without juries, the pursuit of justice becomes increasingly archaic, with elite professionals talking to others, equally elite, in jargon the eloquence of which is in direct proportion to its unreality. Juries are the great leveling and democratizing element in the law. They give it its authority and generalized acceptance in ways that imposing buildings and sonorous openings cannot hope to match. Every step away from juries is a step which ultimately weakens the judiciary as the third branch of government.[311] The Court must therefore confront the issues raised by a regime that has taken just such a step.

The impact of the constitutional questions in these cases on juries suggests a third reason why it is appropriate to address those questions *sua sponte.* Despite the magnitude of the constitutional values at stake, for both criminal defendants and for the jury system, it is exceptionally difficult for a constitutional challenge to the Guidelines to emerge. Even if ordi-

---

**306.** U.S. Const. art. III, § 2, cl. 3; *id.* amends. VI, VII.

**307.** *See Powers v. Ohio,* 499 U.S. 400, 406–07, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) (quoting passages from 1 Alexis de Tocqueville, *Democracy in America* 334–37 (Schocken 1st ed.1961)).

**308.** Note, *The Right to a Jury Trial in Complex Civil Litigation,* 92 Harv. L.Rev. 898, 898 (1979).

**309.** *Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 355, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) (Rehnquist, J., dissenting) (quoting H. Kalven & H. Zeisel, *The American Jury* (1966)).

**310.** *Commonwealth v. Canon,* 373 Mass. 494, 516, 368 N.E.2d 1181 (1977) (Abrams, J., dissenting) (alteration and emphasis in original) (quoting 1 W. Holdsworth, *A History of English Law* 348–49 (3d ed.1922)) (internal quotation marks omitted), *cert. denied,* 435 U.S. 933, 98 S.Ct. 1510, 55 L.Ed.2d 531 (1978).

**311.** Hennessey, Clay & Marvell, *Complex and Protracted Cases in State Courts* (National Center for State Courts, 1981). Indeed, it may be argued that the moral force of judicial decisions—and the inherent strength of the third branch of government itself—depends in no small measure on the shared perception that democratically selected juries have the final say over actual fact finding.

nary citizens had standing to challenge encroachments on the province of the jury, they would not be likely to do so. Thus, the only individual remaining to protect these interests is the defendant. As the Court has already discussed, however, thanks in considerable measure to the Guidelines system, the overwhelming majority of criminal cases end in plea bargains. If a criminal defendant has agreed to a plea bargain, she presumably does not wish to do anything to endanger that bargain, including challenging the validity of the Guidelines. For those few cases that do make it to trial, defense lawyers tend to be either appointed counsel or overworked Public Defenders, and in either case their limited time and resources mean that it is typically all they can do to master the facts of the case and prepare for trial. In any number of these cases, a defendant's efforts will better be spent pursuing a downward departure than challenging the entire system. The Court thus encounters a unique situation where a constitutional violation has widespread effects, but almost none of the impacted people are in a position to challenge it.

The Court has thus determined that the circumstances of these cases make it legally justified and practical to decide the constitutional questions that the Court has decided. Judges take an oath swearing to uphold the Constitution, and here the Supreme Court has articulated a rule of constitutional law that applies to the cases at bar and has consequences of fundamental importance for the rights of individuals and for the integrity of our system of government. This is thus an appropriate occasion to make one of those rare excep-

tions to the general rule against deciding constitutional issues not raised by the parties.

## IV. THE APPROPRIATE REMEDY UNDER *APPRENDI* AND *RING*

Having held that the Guidelines violate *Apprendi* and *Ring,* the Court must now determine the appropriate remedy. There are a few options. The first would be to leave the Guidelines framework in place, but require proof to a jury beyond a reasonable doubt of any fact other than a prior conviction that increases the maximum sentence beyond that in the offense of conviction box. Were the Court considering these issues at the beginning of the criminal process, *Apprendi* would also require the government to include in the indictment any such facts it intended to prove.[312] Under this approach, at this late stage in these cases, the Court could only impose sentences based on offenses of conviction and prior convictions.

A second option would be to leave the Guidelines in place, and to convene sentencing juries, who could then decide whether the government has proved any aggravating facts (other than prior conviction), beyond a reasonable doubt. Once a sentencing jury made its determination, the Court could then determine an appropriate sentence within the range authorized by the jury's verdict. Justice Thomas has in fact suggested bifurcation between the conviction and sentencing portions of the criminal process as a means to avoid putting prejudicial information before the jury that decides the question of innocence or guilt.[313]

---

**312.** *See Harris,* 536 U.S. at 564, 122 S.Ct. 2406 ("The judge's role in sentencing is constrained at its outer limits by the facts alleged in the indictment and found by the jury." (quoting *Apprendi,* 530 U.S. at 483 n. 10, 120

S.Ct. 2348) (internal quotation marks omitted)).

**313.** *Apprendi,* 530 U.S. at 521 & n. 10, 120 S.Ct. 2348 (Thomas, J., concurring).

A third option would be to treat the Guidelines as inapplicable to these cases, and simply to look to the sentencing range and the permissible sentencing factors in the relevant statutes. In other words, the Court would sentence under the system that existed before the Sentencing Reform Act became law.

As between "*Apprendi*-izing" the Guidelines and ignoring them altogether, the Court chooses the former. This approach better preserves Congress's goals in passing the Sentencing Reform Act, which constituted a powerful rejection of the prior system. Moreover, these cases have proceeded under the assumption that the Guidelines system applies, and it would constitute too great a disruption of the defendants' settled expectations to return to pre-Sentencing Reform Act practice. In general, cases in this District proceed under the assumption that the Guidelines are constitutionally valid, and the Court expects that this will continue unless and until some higher court confirms the validity of this Court's constitutional analysis. It would cause considerable difficulty for prosecutors and defense attorneys, both of whom have limited resources, if the Court effectively created two completely different sentencing regimes within the District. The difference between proving the existence of sentencing factors to a judge and to a jury is much less than the difference between the regimes before and after the passage of the Sentencing Reform Act.

The next question is whether the Court should simply sentence based on the offense of conviction and any prior convictions, or should instead convene sentencing juries. With reservations, the Court chooses the former approach. The jury verdicts in these cases came down some time ago, and relevant facts may be too far distant to permit a fair trial on them. It is by no means clear that the convening of sentencing juries at this point would comply with the Fifth Amendment's guarantee of a speedy trial in criminal cases. Had the Court recognized the constitutional issues in these cases sooner, the Department might have been able to prove sufficient facts to achieve higher sentences, and the Court regrets that the Department has lost its chance to do so. The Court must err on the side of protecting the defendants' liberty, however, particularly when the constitutional protections at issue directly implicate the reliability of determinations that affect that liberty.

## PART THREE: CASE SPECIFIC ADJUDICATION IN THE GREEN, OLIVERO, AND PACHECO CASES

### I. Richard Green (Criminal Action No. 02–10054–WGY)—Unconstitutionally Piling on Unproven Conduct

#### A. Factual Background

■ On October 28, 2002, Richard Green ("Green") was convicted of one count of distributing cocaine base ("crack cocaine"), one count of theft of government property, and one count of attempted distribution of crack cocaine. On March 31, 2003, the Court sentenced Green to twenty years in prison and both Green and the Department have appealed.

On March 20, 2002, Green was indicted for (1) conspiracy to distribute crack cocaine in violation of 21 U.S.C. § 846 (Count I); (2) distribution of crack cocaine in violation of 21 U.S.C. § 841(a)(1) (Count II); (3) theft of government property in violation of 18 U.S.C. § 641 (Count VI); and (4) attempted distribution of crack cocaine in violation of 21 U.S.C. § 841(a)(1) (Count VII). The indictment specified no quantity in any of the drug counts. On October 28, 2002, the jury convicted Green on Counts II, VI, and VII, but acquitted him of Count I.

At the sentencing hearing, the Department submitted to the Court data that the amount of crack cocaine involved in the offenses for which Green was convicted totaled 3.0 grams.[314] Pursuant to U.S.S.G. § 1B1.3(a)(2), the Department sought to include at least four additional quanta of crack cocaine in the calculation of Green's sentence: (1) 1.85 grams of crack cocaine seized on September 29, 2001 from Marcus Miller ("Miller"), who was indicted with Green; (2) 0.4 grams of crack cocaine purchased from Miller on October 18, 2001; (3) 2.1 grams of crack cocaine purchased from Miller and Christopher Thomas ("Thomas") on December 4, 2001; and (4) 41.75 grams of crack cocaine seized from 98 Crown Point Drive in Hyde Park, Massachusetts. Adding these quantities to those for which Green was convicted at trial results in a total of 49.1 grams of crack cocaine allegedly attributable to Green. In addition, the Department argues that at least another 0.9 grams of crack cocaine is attributable to Green based on a "morass of historical evidence demonstrating that Green had been a central figure in crack distribution at the [Franklin Hill Housing] Project for years and had been trafficking quantities far in excess of the amounts that were purchased or seized in the course of the investigation." [315] Therefore, the Department contends that at least 50 grams of crack cocaine are attributable to Green under the Guidelines.

Moreover, the Department submitted data that attribute to Green three guns, ammunition, quantities of marijuana, and various drug paraphernalia seized from 98 Crown Point Drive. It also sought to include this data as relevant conduct under the Guidelines.

## B. Calculating the Sentence

### 1. The Constitutional Maximum

Under the Guidelines, the base offense level for each of the drug charges is 12.[316] The base offense level for theft of government property in excess of $1,000 is 6. No enhancements were submitted to or found by the jury. Green's criminal history category based on his prior convictions is III. Thus, the maximum constitutional sentence he could receive on each of the drug counts of conviction considered separately is 21 months, and the maximum constitutional sentence on the theft offense is 8 months. Were this Court to impose consecutive sentences, therefore, the maximum sentence Green could constitutionally receive given the jury verdict is 4 years 2 months.[317] This is Green's maximum potential sentence.

---

**314.** The amount embodied in Count II was 0.6 grams and the amount embodied in Count VII was 2.4 grams.

**315.** Dep't's Sentencing Mem. [Doc. No. 117] at 1–2.

**316.** As noted above, neither of the drug charges specified a drug quantity.

**317.** The Court recognizes that the Guidelines would engage in a more complex grouping of criminal offenses before applying the criminal history. *See* Green's Pre–Sentence Report ¶¶ 100–20. It is not the Guidelines which govern the maximum sentence here, however,

but the United States Constitution. That is, the relevant positive law, including federal statutes and the Guidelines, define the consequences of finding a fact, and the Constitution determines whether, based on those consequences, the fact must be submitted to a jury and proved beyond a reasonable doubt. Since Green's criminal offenses, considered separately, warrant a constitutionally permissible sentence of 21 months for each of the drug offenses and 8 months for the theft offense, the Court deems it constitutionally appropriate simply to add the constitutionally available maxima. *See Apprendi*, 530 U.S. at 474, 120 S.Ct. 2348 (noting that when a court determines the maximum permissible sen-

### 2. Calculating the Mandatory Minimum Sentence under the Guidelines

The Guidelines provide a clear procedure for sentencing a defendant convicted on multiple counts. First, counts "involving substantially the same harm" are grouped together.[318] An offense level for each group is determined either by using the offense level, enhanced by relevant conduct, for the most serious offense within the group, or by using the offense level for the aggregate quantity of drugs or money, if such counts are included within the group.[319] In this case, Green's convictions of distribution of crack cocaine and attempted distribution of crack cocaine are grouped together under U.S.S.G. § 3D1.2 for purposes of sentencing.

Section 2D1.1 of the Guidelines governs violations of 21 U.S.C. § 841(a)(1). The base offense level for Green's distribution and attempted distribution of crack cocaine is determined by the Drug Quantity Table found at U.S.S.G. § 2D1.1(c). For Green's convictions of Count II and Count VII, the total amount of crack cocaine attributable to him is 3.0 grams. This amount of crack cocaine results in a base offense level of 22.[320]

At the sentencing hearing, this Court concluded by a preponderance of the data before it that Green was an "organizer" of many aspects of the offense. Green's role in the offense, therefore, warranted a two-level increase in the offense level.[321] Furthermore, the Court concluded by a preponderance of the data before it that Green obstructed justice, which warranted an additional two-level increase in the offense level.[322]

Given Green's role in the offense and his obstruction of justice, the adjusted offense level for the crack cocaine counts would be 26, absent consideration of the relevant conduct at issue. The undisputed adjusted offense level for Green's conviction of theft of government property is 6. Under the multiple count provisions of U.S.S.G. § 3D1.4, Green's combined adjusted offense level would be 26. Given Green's undisputed criminal history category of III, the applicable total punishment under the Guidelines would be 78–97 months.[323]

With respect to uncharged conduct, the Court concluded that the Department had failed to demonstrate by a fair preponderance that the 2.1 grams purchased from Miller and Thomas were attributable to Green. The Court did conclude by a preponderance of the data before it, however, that the following amounts of crack cocaine were attributable to Green: 1.85 grams of crack cocaine seized from Miller on September 29, 2001; 0.4 grams of crack cocaine purchased from Miller on October 18, 2001; and 41.75 grams of crack cocaine seized at 98 Crown Point Drive. In addition, the Court concluded that at least another 5 grams of crack cocaine were attributable to Green, based on the "morass" of historical and other information cited by the Department. The total amount attributable to Green for Guidelines purposes, therefore, is in excess of 50 grams, but fewer than 150 grams. Pursuant to U.S.S.G. § 2D1.1(c)(4), Green's adjusted offense level for the crack cocaine

tence for one count of an indictment, the other counts and the sentences for them are irrelevant).

**318.** U.S.S.G. § 3D1.2.

**319.** *Id.* § 3D1.4.

**320.** *Id.* § 2D1.1(c)(9).

**321.** *Id.* § 3B1.1(c).

**322.** *Id.* § 3C1.1.

**323.** *Id.* § 5A.

attributable to him is 32, rather than 22. Moreover, the Court concluded by a preponderance of the data before it that the weapon seized at 98 Crown Point Drive was a specific offense characteristic attributable to Green, requiring a two-level increase.[324] After adding two levels for Green's role in the offense and two levels for obstruction of justice, as described above, the Court determined that the total offense level would be 38, rather than 26. Given Green's criminal history category, the applicable minimum sentence under the Guidelines is 292 months.[325]

This minimum sentence under the Guidelines exceeds the offense statutory minimum for any of the offenses of conviction. The statutory maximum sentence for distribution or attempted distribution of fewer than 5 grams of crack cocaine is 20 years.[326] The statutory maximum sentence for theft of government property in excess of $1,000 is 10 years.[327] Under the Guidelines, however, sentences for multiple offenses are to be imposed without respect to congressionally enacted statutory maxima, but rather with respect to the Guidelines' maxima based on the total punishment range, up to the aggregate statutory maxima. They specify that if the total minimum punishment under the Guidelines exceeds the offense statutory maximum on each of the counts of conviction, the sentences are to be imposed consecutively to the extent necessary to achieve the prescribed total punishment.[328] Pursuant to U.S.S.G. § 5G1.2, therefore, the Court must impose consecutive sentences on two or more of the counts to achieve the Guidelines' prescribed total punishment.

### 3. The Sentence

As will frequently be the case until the Department begins to submit the facts that raise the maximum sentence ceiling to a jury, as required by the Constitution, here the minimum mandatory sentence required by the Guidelines calculation exceeds the maximum sentence permitted under the Constitution. Thus, this Court had no choice but to sentence Green to the constitutionally permissible maximum sentence—4 years 2 months. As Green's actual sentence exceeds what the Court now recognizes to be the constitutionally permissible maximum, it respectfully recommends that the Court of Appeals vacate the sentence here imposed and remand for sentencing in accordance with the constitutional mandate.

### 4. What Actually Happened Here, and Why

As noted above, this Court's full understanding of *Apprendi* and *Ring* did not mature until February 2004 and thereafter, first from reading the *Harvard Law Review* Note and thereafter from reading the briefs in *Blakeley v. Washington* and the transcript of the oral argument. Still, the *Apprendi* decision alone convinced this Court that no consecutive sentences could thereafter be imposed where uncharged conduct drove the Guidelines minimum mandatory sentence above the highest offense statutory maximum. The trouble was, by the time the Court confronted this issue in sentencing Green, several circuit courts—including the First Circuit in an unpublished opinion—had ruled that *Ap-*

---

324. *Id.* § 2D1.1(b)(1).

325. *Id.* § 5A. Note that the minimum sentence under the Guidelines is nearly four times greater than that calculated absent the relevant conduct at issue.

326. 21 U.S.C. § 841(b)(1)(C) (2000).

327. 18 U.S.C. § 641.

328. U.S.S.G. § 5G1.2.

*prendi* poses no obstacle to calculations that result in the total punishment exceeding the highest offense statutory maximum on each particular count.[329]

The Court thus considered the limits that the Due Process Clause imposes upon the application of the Guidelines in certain cases.[330] In *McMillan,* the defendant challenged a Pennsylvania statute that imposed a minimum prison sentence for a defendant found by a preponderance of the evidence at sentencing to have "visibly possessed a firearm" in connection with the underlying substantive offense. Although the Court held that the statute did not violate the Due Process Clause, it also stated:

> [The Pennsylvania statute] operates solely to limit the sentencing court's discretion in selecting a penalty within the range already available to it without the special finding of visible possession of a firearm. [The statute] "ups the ante" for the defendant only by raising to five years the minimum sentence which may be imposed within the statutory plan. The statute gives no impression of having been tailored to permit the visible possession finding to be *a tail which wags the dog of the substantive offense.*[331]

In other words, the Court recognized that the Due Process Clause limits—at some point—the use of relevant conduct in sentencing.

The First Circuit extended *McMillan's* reasoning in *United States v. Lombard.*[332] *Lombard* involved a challenge to a life sentence based on related conduct—two murders of which the defendant had been acquitted in state court—where the underlying substantive offenses were firearms violations.[333] Apart from consideration of the murders, the defendant's offense level would have translated into a sentencing range of 262–327 months.[334] The court held that the life sentence enhancement implicated the Due Process Clause and that the sentencing court had the authority to consider a downward departure because the enhancement was an impermissible "'tail which wags the dog' of defendant's trial and conviction."[335] The First Circuit explained the reasons supporting its holding:

> Our concerns have arisen from a situation where acquitted conduct calling for a challenged sentence increase is itself very serious conduct, substantively more

---

**329.** *Saccoccia v. United States,* 42 Fed.Appx. 476, 482 (1st Cir.2002) (unpublished opinion); *United States v. White,* 240 F.3d 127, 135 (2d Cir.2001); *United States v. O'Neal,* 5 Fed. Appx. 255, 257–58 (4th Cir.2001) (unpublished opinion); *United States v. Feola,* 275 F.3d 216, 219–20 & n. 1 (2d Cir.2001); *United States v. McWaine,* 290 F.3d 269, 275–76 (5th Cir.2002); *United States v. Hollingsworth,* 298 F.3d 700, 702 (8th Cir.2002).

This Court has recently held that unpublished decisions and opinions issued by the First Circuit are binding on lower courts, even if they are not binding on future First Circuit panels. *Alshrafi v. American Airlines, Inc.,* 321 F.Supp.2d 150, 157–59 & n. 9 (D.Mass.2004); *see Anastasoff v. United States,* 223 F.3d 898, 899–905 (8th Cir.), *vacated as moot,* 235 F.3d 1054 (8th Cir.2000)

(en banc). As this Court has explained, however, the First Circuit has not yet addressed the arguments on which the Court's holding in Part Two of this opinion are based.

**330.** *See McMillan,* 477 U.S. at 88, 106 S.Ct. 2411; *United States v. Lombard,* 72 F.3d 170, 182–83 (1st Cir.1995).

**331.** *McMillan,* 477 U.S. at 88, 106 S.Ct. 2411 (emphasis added).

**332.** 72 F.3d 170 (1st Cir.1995).

**333.** *Id.* at 172.

**334.** *Id.* at 175 n. 6.

**335.** *Id.*

serious than the offense with which defendant was charged, where consideration of that conduct resulted in an enormous increase in the sentence (including possibly beyond the sentence that would have been imposed for a conviction), where the ultimate sentence is itself enormous, and where the judge is seemingly mandated to impose that sentence. Such a situation increases the risk that what the judge is required to and in fact is sentencing the defendant for is not the convicted offense as enhanced by relevant conduct, but directly for conduct as to which the defendant has not been charged, tried by a jury, nor convicted on proof beyond a reasonable doubt.[336]

Although the First Circuit noted that *Lombard* might be an "unusual" case,[337] similar concerns arise in the instant case. First, consideration of the conduct here would result in a Guideline range increase from approximately six to eight years, to approximately twenty-four to thirty years.[338] Such an increase is enormous, especially considering that the statutory maximum sentence for distribution of crack cocaine in this case is twenty years. Second, the Court is mandated to impose that sentence because under U.S.S.G. § 5G1.2, where a defendant is convicted of multiple counts, a sentencing judge is re-

quired to impose consecutive sentences in order to achieve the total punishment prescribed by the Guidelines.[339] The "relevant conduct" here represents more than an "enhancement"; it is the conduct for which Green would be sentenced.

A recent opinion by the First Circuit does not command a different result. In *United States v. Goodine*,[340] the court held that "[p]ermitting the judge to make a determination as to drug quantity is not permitting the tail of the sentencing to wag the dog of the substantive offense." [341] At trial, *Goodine* was convicted of possession with intent to distribute at least five but less than fifty grams of crack cocaine, but the sentencing judge determined by a preponderance standard that he was responsible for 309.2 grams.[342] The judge sentenced him accordingly.[343] The First Circuit's opinion does not discuss the details of the sentencing judge's findings, but it appears that *Goodine* is readily distinguishable from the instant case. In *Goodine*, the defendant was convicted of possession with the intent to distribute. Thus, the amount of drugs in his possession was relevant for sentencing upon that conviction and the sentencing judge so found in that case.

In the instant case, however, the so-called "relevant conduct" that would drive

---

**336.** *Id.* at 186 (footnote omitted).

**337.** *Id.* at 187.

**338.** As the First Circuit noted in *Lombard*, "[w]hether an increase in a sentence is enormous is a matter of degree, not resolved simply by the label of ratios, percentages, or the like." 72 F.3d at 186 n. 23. The Court is satisfied that the increase contemplated in this case is sufficiently large.

**339.** Specifically, the Sentencing Guidelines state:

If the sentence imposed on the count carrying the highest statutory maximum is less

than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment. In all other respects, sentences on all counts shall run concurrently . . . .
U.S.S.G. § 5G1.2(d).

**340.** 326 F.3d 26 (1st Cir.2003).

**341.** *Id.* at 32.

**342.** *Id.* at 27–28.

**343.** *Id.* at 28.

the Guidelines skyward is far more attenuated. The data submitted here includes the 41.75 grams of crack cocaine seized from 98 Crown Point Drive and, more strikingly, a vague "morass" of historical information about Green's previous illicit, drug-related conduct that suggested Green was responsible for much more. In other words, this data represents information concerning conduct especially separate and apart from that upon which Green was convicted. While the Guidelines may define this data as "relevant conduct," it differs markedly in quality and quantity from typical drug quantities determined at sentencing. This conduct, from some other time and place, is *de facto* the conduct for which Green is sentenced under the Guidelines, but it was demonstrated by a mere preponderance standard, not beyond a reasonable doubt.[344]

In this case, the Court fulfilled the Guidelines' mandate to draw "factual" conclusions from the record before it. The Guidelines state that it is "appropriate" that facts relevant to sentencing be demonstrated by only a preponderance and the Supreme Court has validated that approach.[345] The Supreme Court, however, has left open the question "as to whether, in extreme circumstances, relevant conduct that would dramatically increase the sentence must be based on clear and convincing evidence,"[346] suggesting that extreme cases might present impermissible tail-

wagging. Moreover, the First Circuit has held that the application of the Guidelines in a particular case may present a constitutional violation.[347] This is precisely what the Court held when sentencing Green. As applied in this case, the "relevant conduct" provisions of the Guidelines, in violation of the Due Process Clause, constitute a tail wagging the dog of the substantive offenses for which Green was convicted.

Accordingly, for the purpose of calculating the Guidelines in what the Court then considered a constitutional manner, it attributed to Green neither the 41.75 grams of crack cocaine seized from 98 Crown Point Drive, nor any amount derived from the "morass" of other historical information, since to do so would violate the Due Process Clause, as discussed above. At sentencing, the Court did not find by a preponderance that the 2.1 grams of crack cocaine purchased from Miller and Thomas were attributable to Green. Therefore, the total amount of crack cocaine attributable to Green was 5.25 grams.[348] Green's adjusted offense level, therefore, was 26.[349] The Court added two levels for Green's role in the offense and two levels for Green's obstruction of justice, but the Court did not add two levels for Green's special offense characteristic—the weapon sized from 98 Crown Point Drive—because to do so would similarly violate the Due Process Clause as impermissible tail wagging under the Guidelines. Green's ad-

**344.** One circuit court has ruled that in exceptional cases proof by clear and convincing evidence is required at sentencing. *United States v. Hopper,* 177 F.3d 824, 833 (9th Cir. 1999); *but see United States v. Layne,* 324 F.3d 464, 473 (6th Cir.2003).

**345.** *See, e.g., United States v. Watts,* 519 U.S. 148, 156, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997).

**346.** *Id.* at 156–57, 117 S.Ct. 633.

**347.** *Lombard,* 102 F.3d at 3 (1st Cir.1996) ("A challenge to the constitutionality of the guidelines as applied is certainly a permitted subject for an appeal . . . .").

**348.** This total comprises the 3.0 grams for which Green was convicted; 1.85 grams seized from Miller on September 29, 2001; and 0.4 grams purchased from Miller on October 18, 2001.

**349.** U.S.S.G. § 2D1.1(7).

justed offense level, therefore, was 30. Given a criminal history category of III, Green's total punishment would be 121–151 months.[350] In addition, the Court invoked its discretion under U.S.S.G. § 5K2.0 and departed upward to twenty years (240 months) because the Court considered such an upward adjustment just, given the data before it. The Court now recognizes that each of the upward adjustments it made was unconstitutional in light of the analysis in Part Two of this memorandum.

## II. William Olivero (Criminal Action No. 01–10469–WGY)—Starkly Illegal Fact Bargaining

### A. Introduction

On December 12, 2002, William Olivero ("Olivero") was convicted of one count of conspiracy to distribute cocaine in violation of 21 U.S.C. § 846. On June 5, 2003, the Court sentenced Olivero to a term of 4 years (48 months) in prison.

### 1. Background

On December 20, 2001, a grand jury returned an indictment against twenty-one defendants, charging each of them, *inter alia*, with conspiracy to distribute more than 5 kilograms[351] of cocaine in violation of 21 U.S.C. § 846. Fifteen defendants pled guilty to the crimes charged against them, and five proceeded to trial. Seven of these defendants pled guilty on the very

eve of trial.[352] Olivero was originally among this number. Pre-plea pre-sentence reports had been prepared concerning each of these defendants, including Olivero. Olivero's pre-plea pre-sentence report described him as a minimal participant (consistent with the proposed plea agreement).[353] No mention of any weapon or any enhancement due to the possession of a weapon was made in either the pre-plea pre-sentence report or the plea agreement.[354] The plea colloquy with Olivero proceeded until the Court informed Olivero that, were he to plead guilty, the Court would most likely remand him to custody immediately. That was the deal breaker for Olivero, as he had come up from New York. Olivero thus proceeded to trial on November 5, 2002 with three other co-defendants. On December 12, 2002, a jury convicted all four co-defendants in that trial of conspiracy to distribute cocaine.

### 2. The Department's Case against Olivero

The conspiracy at issue in this case comprised an extensive, complex, and pernicious drug distribution ring, led by Raphael Yeje–Cabrera ("Yeje–Cabrera"). Many of the principal players in the organization were members of Yeje–Carbrera's immediate or extended family. At trial, the Department adduced evidence that Olivero worked on behalf of the organization in New York. Specifically, the Department

---

**350.** *Id.* § 5A.

**351.** At trial, the evidence demonstrated that the overarching conspiracy had, in fact, handled more than 260 kilograms of cocaine.

**352.** One defendant, Marcos Perez, died while in pre-trial detention.

**353.** In its proposed plea agreement with Olivero, the Department "agree[d] that Defendant's Base Offense Level should be reduced by four levels pursuant to U.S.S.G.

§ 3B1.2(a)." The Department changed its position at Olivero's sentencing subsequent to trial and argued that he should not receive any reduction for his role in the offense.

**354.** Although the proposed plea agreement [Doc. No. 319] was embodied in a letter to Olivero's counsel dated October 14, 2002, the Department filed the document with the Court on October 30, 2002, just prior to the commencement of trial on November 5, 2002.

sought to prove that Olivero was a member of the organization and that more than 5 kilograms of the cocaine in question were attributable to him—that is, he could reasonably have foreseen transactions involving that amount in furtherance of the conspiracy.

### a. Drug Weight Attributable to Olivero

By late 2002, this Court was deep into exploring the implications of *Apprendi*. Since the drug weight attributable to a defendant in a drug conspiracy may in turn establish the statutory offense maximum sentence, the Court had commenced submitting that issue to the jury over the Department's objection.

The Department argued to the jury that Olivero was responsible for more than 5 kilograms of cocaine. In its instructions to the jury with respect to the amount of cocaine attributable to each defendant, the Court said:

If you find the person guilty [of conspiracy], but only if you find the person guilty ... I want you to tell me a third thing. And then it's right here. If they're guilty of conspiracy how much cocaine is involved?

Now, why do I need to know that? Why is that part of the proof? And this, too, the government's got to prove this beyond a reasonable doubt. Why is that important?

Well no secrets about that. It bears on the sentencing. And while sentencing is left to me, if a person's guilty I need to know how much. And I will tell you precisely how this works.

I want you to ask yourself, if you find the person guilty, ... how much cocaine is involved beyond a reasonable doubt.... And understand it can be different amounts for different people. Why? Because they were in the conspir-

acy at different times or because they, though they conspired and they clearly[,] willfully, knowingly joined a conspiracy ... [,] they didn't know and it wasn't reasonable that they would know that a specific shipment in a specific amount was going down.

So it could be different amounts for different people. It doesn't automatically follow that it's the same amount.

And in analyzing this I want you to analyze it really at three different levels.... If you can tell me beyond a reasonable doubt how much with respect to a particular individual charged here, tell me that amount and write it here in this blank....

Now that's the most specific. If you can do that you're required to do that, beyond a reasonable doubt, unanimously, focusing on the individual accused.

But let's say you can't do that. Because you can't agree or the evidence doesn't persuade you beyond a reasonable doubt. Then what I need to know is, is it more than five kilograms. Again no secrets. That's a break point in the law. That's something I need to know. The government alleges that it's more than five kilograms. So just tell me, if you can't say a particular amount beyond a reasonable doubt ... it's perfectly appropriate that you then say to me beyond ... five kilograms. And again the burden of proof on the government is beyond a reasonable doubt as to this.

But let's say that you can't say that but you are satisfied beyond a reasonable doubt that the person is guilty of conspiracy to possess cocaine with intent to distribute it. If you are you would check guilty but leave the blank blank. If you can't agree it's still a valid verdict. I will then properly be instructed as to what I'm to do, but we just don't know how much was the amount that

the person reasonably was in the conspiracy for. And that's a perfectly valid verdict.

Now logically ... you could, theoretically you could find all these people not guilty, you could find some of them guilty and some of them not guilty, you could find all of them guilty. And the same is true for the amounts.... [T]hey could be guilty for different amounts, or if you couldn't agree beyond a reasonable doubt you could leave that blank, or some could be guilty for specific amounts and others you would say, well, beyond five kilograms, and others you would leave blank. Those are all theoretic possibilities. Those are all committed to your wise and good judgment.[355]

The verdict form submitted to the jury asked whether Olivero was guilty of conspiracy to distribute cocaine. The verdict form also asked the jury to specify a particular amount of cocaine attributable to Olivero, if possible. The jury found Olivero guilty, but it neither specified a particular drug weight, nor an amount over five kilograms; that is, the jury left the space referencing drug weight blank.[356]

### b. The Weapon

At trial, the Department adduced evidence that a search of Olivero's bedroom revealed a Smith & Wesson nine millimeter handgun. The United States Probation Office (the "Probation Office") was not apprised of any of this evidence at the time

it prepared the pre-plea pre-sentence report for Olivero, which it submitted to the Court. Accordingly, it could not—and did not—make reference to the handgun.

### B. The Constitutional Maximum Sentence

Since the Department failed to prove beyond a reasonable doubt any particular amount of cocaine attributable to Mr. Olivero due to his participation in the conspiracy, the base offense level is 12.[357] His criminal history category is I. The maximum constitutionally permissible sentence is, therefore, 16 months.[358]

### C. The Mandatory Minimum Guidelines Sentence

Pursuant to U.S.S.G. § 2D1.1(a)(3), the base offense level for conviction of conspiracy to distribute cocaine is determined by the Drug Quantity Table found at U.S.S.G. § 2D1.1. The Department here adduced evidence at trial that would have permitted a finding that more than 150 kilograms of cocaine were attributable to Olivero. Of course, the jury did not find that amount— or any particular amount—attributable to Olivero beyond a reasonable doubt. If the amount attributable to an individual convicted of this crime meets or exceeds 150 kilograms, the base offense level under the Guidelines is 38.[359] The Department also adduced evidence at trial that federal agents found a handgun in Olivero's bedroom during a search. Under U.S.S.G.

---

**355.** Jury Instructions at 26–29.

**356.** In contrast, the jury found Yeje–Cabrera guilty and attributed more than 260 kilograms of cocaine to him. Accordingly, the Court sentenced him on March 26, 2003 to a term of life in prison. The jury found Wilfredo Perez ("Perez") guilty of conspiracy involving more than 5 kilograms of cocaine. The Court sentenced Perez to a term of 360 months in prison on March 25, 2003. The Jury found Nerys Cabrera guilty but—similar to Olive-

ro—did not specify any drug weight attributable to her. The Court sentenced her to a term of 63 months in prison on March 19, 2003.

**357.** U.S.S.G. § 2D1.1(c)(14).

**358.** *Id.* § 5A.

**359.** U.S.S.G. § 2D1.1(c)(1).

§ 2D1.1(b)(1), the handgun would trigger a two-level enhancement as a specific offense characteristic, resulting in an total offense level of 40 for Olivero. Olivero's criminal history category was I, and, therefore, the Guidelines imprisonment range would be 292 to 365 months.[360]

At sentencing, the Court considered itself bound to attribute no more than 499 grams of cocaine to Olivero,[361] did not increase the offense level pursuant to the evidence of the handgun, and reduced the offense level by four levels for Olivero's role in the offense. The Court's conclusions resulted in a total offense level of 20. Given Olivero's criminal history category of I, the Guidelines range was 33 to 41 months. The Court, however, departed upward and sentenced Olivero to a term of 48 months in prison.

### 1. The Weapon and Departmental Fact Bargaining

 With respect to the weapon recovered from Olivero's apartment, the Department engaged in constitutionally impermissible fact bargaining. Fact bargaining—as opposed to acceptable charge bargaining—is:

> the knowing abandonment by the government of a material fact developed by law enforcement authorities or from a

witness expected to testify in order to induce a guilty plea. It usually involves ignoring a quantity of drugs or the possession or use of a firearm reasonably attributable to a defendant and forming part of his or her relevant conduct.[362]

The Guidelines themselves—which are mathematically driven at sentencing by these so-called "facts"—state that "it is not appropriate for the parties to stipulate to misleading or nonexistent facts, even when both parties are willing to assume the existence of such 'facts' for purposes of the litigation." [363] Indeed, fact bargaining "involves a fraud on the court as the government's recital of material facts during the plea colloquy and at sentencing necessarily must omit or at minimum gloss over facts material to sentencing." [364] Ultimately, massive sentencing disparities result from such conduct.[365]

Prior to the *Berthoff* decisions, the First Circuit was presented with the issue of fact bargaining in *United States v. Rodriguez*.[366] Although the First Circuit held that fact bargaining in that case did not constitute a constitutional violation, this Court explicated the shortcomings of that opinion in *Berthoff*.[367] Without reiterating those deficiencies and encouraged by the First Circuit's acknowledgment in its *Ber-*

---

**360.** *Id.* § 5A.

**361.** If the Court attributed 500 grams of cocaine to Olivero, the statutory maximum punishment would increase from twenty years to life in prison. *See* 21 U.S.C. § 841(b)(1)(B)(ii)(II), (c); *see also id.* § 846. No quantity of cocaine was proved to the jury beyond a reasonable doubt, so *Apprendi* forbids sentencing enhancements based on drug quantity.

**362.** *Berthoff*, 140 F.Supp.2d at 62 n. 19. In *Berthoff*, this Court denied the petition for habeas corpus but granted a certificate of appealability ("COA") on the issue of fact bargaining. In affirming this Court's denial

of habeas in *Berthoff*, the First Circuit held that the COA was inappropriately issued in that case, but it "acknowledge[d] that the district court raise[d] *serious and troubling issues* regarding sentencing disparity that merit careful consideration in an appropriate case." 308 F.3d at 129 (emphasis added).

**363.** U.S.S.G. § 6B1.4 cmt.

**364.** *Berthoff*, 140 F.Supp.2d at 62.

**365.** *Id.* at 63–64.

**366.** 162 F.3d 135, 150–53 (1st Cir.1998).

**367.** *See* 140 F.Supp.2d at 65–67.

*thoff* opinion that fact bargaining raises "serious and troubling issues,"[368] this Court will not acquiesce in a fraud in this case.

Here, the Department drafted a plea agreement for Olivero—who was prepared to accept it—that made no mention of any weapon. Likewise, the Probation Office's pre-plea pre-sentence report contained no such reference. After Olivero chose to exercise his Sixth Amendment right to trial by jury, the Department submitted information at sentencing that attributed a weapon to Olivero and argued that his sentence should therefore be increased. It is undisputed that the Department was in possession of this weapon at the time it drafted the plea agreement. When asked about the disparity at the sentencing hearing, the Department merely responded that, in the course of preparing for trial, further information regarding the weapon manifested itself, and though that information was not previously available, it was nonetheless perfectly ripe for consideration at sentencing.[369]

The Court rejected the Department's characterization. First, nothing new about the weapon or its appropriate attribution surfaced at trial; the Department was well aware of the weapon prior to trial. Second, and more importantly, it was clear to the Court that the Department had used the weapon as a negotiating chit prior to trial. In a very real way, the Department burdened Olivero's exercise of his Sixth Amendment right by offering to withhold evidence of the weapon if he waived his right to a trial and saved the Department the burden of trying him. The Guidelines,

however, already recognize the benefits accruing from a guilty plea by awarding a two or three-level reduction for "Acceptance of Responsibility."[370] The Department's fact bargaining unconstitutionally placed additional and impermissible burdens on Olivero's Sixth Amendment right to trial. Accordingly, although the Court concluded by a preponderance of the data before it at sentencing that the weapon was attributable to Olivero, the Court refused to increase Olivero's offense level because the Department had engaged in unconstitutional fact bargaining.[371]

### 2. Olivero's Role in the Offense

The Guidelines permit a sentencing judge to reduce the offense level in a case based on the convicted individual's "Mitigating Role."[372] Specifically, if a sentencing judge concludes that an individual was a "minor participant," a "minimal participant," or something in between, the judge may reduce the offense level by two, three, or four levels. In its draft plea agreement, the Department stated that it believed Olivero should receive a four-level reduction, but it changed its position at sentencing. When the Court asked about the discrepancy, the Department responded that

It does not constitute fact bargaining to look at the evidence at the state of its development and make certain conclusions. As the evidence develops and more ... people are interviewed and you become involved in preparing for trial, that is precisely the reason that the three points in the guidelines are given to you for acceptance of responsi-

---

**368.** 308 F.3d at 129.

**369.** Disposition Tr. at 17–18.

**370.** U.S.S.G. § 3E1.1.

**371.** Of course, under the Court's new understanding of *Apprendi*, increasing the sentence range based on the gun would be unconstitutional.

**372.** U.S.S.G. § 3B1.2(a).

bility and not given to you if you go to trial.[373]

The Court found this answer to be disingenuous. Clearly, the four-level decrease recommendation was another chit during plea negotiations; the Department did not believe Olivero to be a minimal participant just before trial, only to "discover" during trial that he was not. Because the Court did not believe the Department's representation to be entirely truthful, it reduced Olivero's offense level by four levels.

The Court notes, however, that the Department might have advanced a far more compelling answer to the Court's question. Prior to trial, Olivero was prepared to plead guilty to conspiracy with respect to all 260 kilograms of cocaine. Based on the jury's verdict and the Court's conclusions at sentencing, however, the relevant drug quantity could not exceed 499 grams.[374] The Department might have argued that, with respect to the overall conspiracy involving 260 kilograms to which the draft plea agreement referred, Olivero was indeed a minimal participant. With respect to 499 grams, however, Olivero was not a minimal participant. Therefore, the Department might have argued that a four-level reduction for Olivero's role in the offense was not warranted at sentencing, although it may well have been an appropriate recommendation during plea negotiations involving the overarching conspiracy. The Department did not make this argument.

### 3. Drug Weight Attributable to Olivero

At sentencing, the Department argued dubiously that the Court should attribute the entire 260 kilograms to Olivero, thereby increasing Olivero's maximum Guidelines sentence to life in prison. The Department grounded its argument in *Derman v. United States*.[375] In *Derman*, the defendant was convicted of conspiring with another defendant to manufacture and distribute marijuana.[376] Specifically, the enterprise consisted of a large marijuana-growing operation housed in an underground greenhouse.[377] Drug quantity—the relevant measure of which was the number of marijuana plants involved—was a contested issue, but the district court judge did not instruct the jury on the question of drug quantity. The judge then found that the defendant was responsible for more than 1,000 plants, for which the maximum statutory sentence is life in prison.[378] The petitioner argued that this constituted an *Apprendi* violation. On appeal from a denial of habeas relief, the First Circuit held that "[t]he rule, then, is that the government need only allege and prove to the jury the bare facts necessary to increase the statutory sentencing maximum *for the conspiracy as a whole*."[379] In other words, so long as the jury finds beyond a reasonable doubt "that the conspiracy involves a drug quantity that surpasses the threshold amount needed to trigger the relevant (higher) statutory maximum," the judge may determine the amount of drugs attributable to an individual conspirator without violating *Apprendi*.[380]

---

**373.** Disposition Tr. at 21–22.

**374.** *See* Part Three, Section II.C.3, *infra.*

**375.** 298 F.3d 34 (1st Cir.2002).

**376.** *Id.* at 37–38.

**377.** *Id.* at 37.

**378.** *Id.*

**379.** *Id.* at 43.

**380.** *Id.* at 43 n. 4. In *Derman,* the court ruled that an *Apprendi* error had occurred, but that error related to the failure to have the jury determine the number of plants involved in

The Department interpreted the First Circuit's holding in *Derman* to mean that here, where the jury found Yeje–Cabrera responsible for 260 kilograms, Olivero—as his convicted co-conspirator—was also responsible for the amount of the conspiracy as a whole where the jury did not make a specific individualized determination. Such an application of *Derman,* however, is unwarranted.

The First Circuit has cautioned that *Derman* will not necessarily apply in all cases. The First Circuit said subsequently that:

> [W]e recognize that [*Derman*] is not necessarily the last word on the subject. Conceivably, borrowing from related doctrines, one could construct a foreseeability test of some kind—attributing to each defendant the amount that the individual agreed upon, actually handled, and reasonably could have foreseen that others would handle—and could ask the jury by special interrogatories to identify such an amount.[381]

The court noted that *"Derman* itself involved a relatively simple conspiracy" and that, "[i]n such cases, it would be a simple matter for the government to indict on the charge that a particular defendant joined an agreement to possess the quantity of drugs ... and to seek a special verdict to that effect."[382] However:

> That simple approach may break down for more complex conspiracies involving multiple transactions of different amounts of drugs imported at different times, with a shifting cast of actors. A series of problems implicating sentencing then arises. A particular defendant,

for example, may have agreed to import seven kilograms of a drug, but not agreed to import ten, although it was reasonably foreseeable to him that his coconspirators would import ten. Or a particular defendant may have gone in and then out of a conspiracy.... Some of these problems might be solved by more specificity in indictments, by tailored instructions, and by special verdicts.[383]

This Court heeded the First Circuit's cautions in *Nelson–Rodriguez* in this case. This case was a complex, hub-and-spoke conspiracy, in which various defendants played vastly different roles. At least twenty-one people were involved in this large cocaine operation that spanned many states and involved millions of dollars. Whereas *Derman* involved a "relatively simple conspiracy," the instant case presented a "complex conspirac[y] involving multiple transactions of different amounts of drugs ... with a shifting cast of characters."[384] Consonant with the reasoning in *Nelson–Rodriguez,* the Court in this case tailored its jury instructions by asking the jury to determine the amounts attributable to each defendant—and the jury complied. Indeed, the jury's verdict was entirely consistent with the evidence presented and the instructions supplied. As the mastermind or "hub" of the conspiracy, Yeje–Cabrera was responsible for all 260 kilograms. One of his lieutenants, Perez, was responsible for more than five kilograms. All of this the jury determined beyond a reasonable doubt.

 The Department failed, however, to prove beyond a reasonable doubt that

---

the conspiracy. *Id.* at 43. Here, the jury did make such a determination, at least with respect to Yeje–Cabrera and Perez.

**381.** *United States v. Nelson–Rodriguez,* 319 F.3d 12, 46 (1st Cir.2003).

**382.** *Id.*

**383.** *Id.* at 46–47.

**384.** *Id.*

Olivero was responsible for more than five kilograms. Having dutifully differentiated between the various coconspirators, the jury provided the Court with an appropriate foundation for Olivero's sentencing. According to the Department, however, the Court should have ignored the jury's finding, concluded by a preponderance of the data before it that Olivero was responsible for the amount of the conspiracy as a whole (260 kilograms), and ruled that the statutory maximum is life—not twenty years. The Court appropriately refused to do any of these things.

If the Department's request were honored, "a judge-made factual determination" would impermissibly "boost[ ] the defendant's sentence beyond the basic statutory maximum." [385] Therefore, consonant with Part Two above, the Court rules that where the jury is asked to find beyond a reasonable doubt whether a particular coconspirator is responsible for a particular drug weight that triggers an increase in the Guidelines maximum sentence and the jury does not so find, the jury's finding determines the constitutionally permissible maximum sentence.[386]

### D. The Proper Sentence

■ Since the Court's conclusions—even excluding the weapon and awarding a minimal role downward adjustment—result in a minimum mandatory Guidelines sentence of 33 months while the constitutionally permissible maximum sentence is 16 months, the Court's 48 month sentence is improper and, having lost jurisdiction,[387] the Court respectfully recommends that its sentence be vacated and the case remanded for resentencing.[388]

---

385. *United States v. Robinson*, 241 F.3d 115, 121 (1st Cir.2001).

386. *See United States v. Goodine*, 326 F.3d 26, 32 (1st Cir.2003) (noting that "a jury's determination [of drug weight] will cap the maximum sentence a judge can impose").

387. Having discovered an error in its sentencing calculations, the Court attempted to vacate its sentence on June 11, 2003 [Doc. No. 580], but—unknown at that time—a notice of appeal [Doc. No. 579] had already been filed, thereby depriving this Court of jurisdiction. Accordingly, the Court vacated its June 11th order on July 7, 2003.

388. The sentencing of William Olivero has produced a curious offshoot. It is best described by a scholarly commentator:

i. Judge Young's experiences with the House Judiciary Committee.

On June 5, 2003, Judge Young sentenced William Olivero to four years in prison for participating in a complex drug conspiracy. The pre-sentence report in Mr. Olivero's case, however, had recommended a minimum sentence of twenty-four years. Due to the underlying reasons for Judge Young's reducing Mr. Olivero's recommended sentence, Judge Young's actions did not technically constitute a *departure*. Further, it was unlikely the Feeney Amendment applied to Mr. Olivero's sentencing because all of Mr. Olivero's criminal actions pre-dated Feeney's passage. Nonetheless, citing to his reporting duties as a Chief Judge under 28 U.S.C. § 994(w), Judge Young wrote a special letter to F. James Sensenbrenner, Chairman of the House of Representatives Committee on the Judiciary, on the day of sentencing to explain the reasons for his reduction of Mr. Olivero's sentence.

Almost nine months after sending his letter, Judge Young received a written response from Jay Apperson, who serves as Chief Counsel for the House Judiciary Committee and who was a primary architect of the Feeney Amendment. Jay Apperson's letter requested a copy of four documents: (1) the opinion from Mr. Olivero's case; (2) Mr. Olivero's initial plea colloquy; (3) a full transcript of Mr. Olivero's trial; and (4) a full transcript of Mr. Olivero's sentencing hearing. Judge Young forwarded all of the documents requested, except for the opinion, which had not yet issued, within twenty-four hours of receiving Apperson's correspondence.

Jay Apperson's letter was problematic in two ways. First, the Feeney Amendment only requires district courts to report to the Sentencing Commission and to the Justice

### III. Jason Pacheco (Criminal Action No. 01–10469–WGY)—Fact Bargaining—Again

#### A. Prior Proceedings

On December 20, 2001, a grand jury returned an indictment against twenty-one defendants, charging each of them, *inter alia*, with conspiracy to distribute more than 5 kilograms of cocaine in violation of 21 U.S.C. § 846. This is the same indictment discussed in Part Three, Section II, *supra*.

#### 1. The Indictment

Count One of the indictment named twenty-one defendants.[389] That count simply provided as follows:

COUNT ONE: (21 U.S.C. § 846—Conspiracy To Distribute Cocaine)

The Grand Jury charges that:

From a date unknown to the Grand Jury, but from at least on or about July 7, 2000, and continuing thereafter until on or about December 20, 2001, at Westport, elsewhere in the District of Massachusetts, in the District of New York, in the District of Arizona, in the District of Tennessee, and elsewhere,

1. RAFAEL YEJE–CABRERA, (a/k/a "Ralph" and "Rolando")
2. JOSE CABRERA (a/k/a "J"),
3. MIGUEL CABRERA (a/k/a "Mack"),
4. JOSE YEJE (a/k/a "Ty"),
5. NERYS CABRERA
6. FARID YEJE,
7. OMI MONTANEZ, (a/k/a "Nene"),
8. MARCOS PEREZ, (a/k/a "Marquito"),
9. ROBERT LOPES, (a/k/a "Bobby"),
10. FABIANO MEDEIROS,
11. WILFREDO PEREZ,
12. ABISMAEL CASTILLO, (a/k/a "Isaac" and "Ish"),
13. EMILIO VASQUEZ, (a/k/a "Joel"),
14. RICCARDO CORONADO, (a/k/a "Primo"),
15. FAUSTO MENA,

Department, not to the House Committee on the Judiciary. Accordingly, the legal basis for Apperson's "request" is not readily apparent. More-over, the alleged purpose of Apperson's letter, to "request" documents, is questionable. In Judge Young's letter of June 5, 2003, Judge Young told F. James Sensenbrenner that he would be posting "the initial plea colloquy, the full trial, and the full sentencing hearing" on a publicly-accessible internet site and, further, that he would "transmit a copy" of the opinion in the case as soon as it issued. Even so, Apperson's letter requested these very same documents. Thus, Apperson's "request" seems unnecessary unless its actual purpose was to intimidate or to assert some legally unidentifiable authority.

As of the date of this writing, Judge Young remains unaware of the stage or nature of the Judiciary Committee's inquiry regarding him. There has been no suggestion of legislative action against Judge Young, as there has been with respect to Judge [James M.] Rosenbaum. Nonetheless, according to Judge Young, the fact of his correspondence with the House Judiciary Committee has "rippled quietly through all the highest levels of the judiciary." In fact, when Judge Young recently met Judge Carolyn King, Chief Judge of the Fifth Circuit, he was surprised to learn that she knew all about his interactions with the House Judiciary Committee. Edwin Caldie, *Lack of Discretion: The Negative Effects of Binding Federal Judges During Sentencing*, MCLE Fed. Jud. Forum (forthcoming Nov. 2004); *see also* Krawitz & Friedman, *supra*.

**389.** The other counts in the indictment related to various defendants other than Pacheco.

16. FERNANDO DUARTE,

17. ALEXANDER CORDERO, (a/k/a "Crippled Alex"),

18. DEREK PERRY,

19. WILLIAM OLIVERO, (a/k/a "Alejandro" and "K"),

20. JOSE ARCENTALES, (a/k/a [ ] "Crip"),

21. JASON PACHECO,

defendants herein, did knowingly and intentionally combine, conspire, confederate, and agree with each other and with other persons known and unknown to the Grand Jury, to possess with intent to distribute, and to distribute, more than 5 kilograms of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).[390]

#### 2. The Department's Case Against Pacheco

Pacheco's trial commenced on March 3, 2003. At trial, the Department adduced evidence that Pacheco—while not a principal in the Yeje–Cabrera conspiracy—did purchase quantities of cocaine from Yeje–Cabrera's organization. Pacheco's involvement was primarily two-fold: (1) Pacheco's purchases of cocaine from Yeje–Cabrera and his distributors; and (2) Pacheco's involvement with a cocaine shipment parked for a short time in his garage.

#### a. Pacheco's Cocaine Purchases

Fabiano Medeiros ("Medeiros") testified at trial that he delivered kilograms of cocaine for Yeje–Cabrera's organization. Medeiros averred that he delivered cocaine to Pacheco on more than one occasion, including one incident in which he accompanied Yeje–Cabrera to Pacheco's residence at 105 Cornell Street in New Bedford and gave Pacheco one kilogram of cocaine. Medeiros testified that he alone delivered one kilogram of cocaine to Pacheco at Pacheco's residence on two other occasions. Medeiros also testified that he "re-rocked"[391] one kilogram for Pacheco at Yeje–Cabrera's request in exchange for $700.

Robert Lopes ("Lopes") testified at trial that he also made cocaine deliveries for Yeje–Cabrera and his organization. Lopes testified that he delivered one kilogram of cocaine to Pacheco on one occasion, that Pacheco later gave him cash which he had allegedly received for the cocaine, and that Lopes delivered the cash to Yeje–Cabrera.

#### b. The Cocaine Transaction Involving Pacheco's Garage

The Department also adduced evidence that, on December 10, 2001, government agents intercepted a conversation between Yeje–Cabrera and an alleged cocaine supplier named "Ramon"[392] during which the supplier said that he was bringing Yeje–Cabrera "25 really good ones." The supplier was apparently referencing high-quality cocaine. According to Omi Montanez ("Montanez"), who testified that he was Yeje–Cabrera's "partner," Yeje–Cabrera obtained an amount of cash from him for the "25 really good ones." Department agents intercepted other conversations indicating that the transaction would take place at Pacheco's garage at 105 Cornell Street. Surveillance agents

---

**390.** Indictment [Doc. No. 9] at 2–3.

**391.** Medeiros testified that "re-rocking" essentially means adding a cutting agent to convert one kilogram of cocaine into two.

**392.** The Department had apparently obtained a criminal complaint against this alleged supplier, but stated in its memorandum that "Ramon" was shot and killed in Arizona earlier that year. Dep't's Opp'n [Doc. No. 644] at 8 n. 4.

assigned to monitor Pacheco's residence testified that they observed Pacheco in and around his garage, as well as Yeje–Cabrera and others. Such officers also testified that they stopped a car with Connecticut license plates immediately after it departed from Pacheco's garage, identified one of the passengers as "Ramon," and seized almost $50,000 in cash hidden beneath the seats.

### 3. The Court's Partial Directed Verdict

As soon as the Department rested its case on March 24, 2003, Pacheco's counsel moved for a directed verdict of acquittal pursuant to Fed.R.Crim.P. 29, arguing that the Department had failed to prove that Pacheco was a member of the Cabrera conspiracy charged in Count I. This argument resonated with the Court, which reasoned that, at most, the Department had proved a lesser included offense of conspiracy. The Court ruled that Pacheco was nothing more than a "spoke to a hub," the "hub" being the Yeje–Cabrera conspiracy, and rendered a partial directed verdict.[393] Specifically, the Court ruled as follows:

> We can look at this as a species of boolean algebra. And I'm not being flip here. Mr. Wilson is not wrong when he talks about conspiracies within conspiracies.
>
> On your best evidence I think we have this. Here is the, what I'll call the Cabrera conspiracy ["A"]. On your best evidence here's the Pacheco conspiracy ["B"]. . . . [394]

Now, the conspiracy for which Mr. Pacheco is liable, if everything goes your way, is this conspiracy [B]. That's what he's in on. That's what his criminal intent is. His intent is to get, however many drugs are in this conspiracy [B], into his possession with the intent, it doesn't have to be proved, it's got to be enough to be assumed that he then distributes them out.

> This is the conspiracy [A] you've charged. This is the conspiracy—query, maybe you charged something more. But against his motion for directed verdict that's the conspiracy [B] you've proved. You've proved no more. We're not having anymore. This is the conspiracy [B].[395]

As will become apparent—if not already obvious—this ruling is fatally flawed in two respects, one legal and one factual. The trial continued and, on March 26, 2003, the jury found Pacheco guilty of conspiracy to distribute more than 5 kilograms of cocaine.

### 4. The Legal Flaw—Variance

Post-trial, Pacheco moved for a directed verdict of acquittal or, in the alternative, for a new trial. Most significantly, Pacheco argued for the first time that the Department's case and his subsequent conviction amounted to an unconstitutional variance.

A " '[v]ariance occurs when the facts proved at trial are different that those alleged in the indictment.' "[396] A

---

**393.** Tr. of Directed Verdict Hr'g at 8.

**394.** The Court drew two intersecting circles, "A" and "B," in which A was the Yeje–Cabrera conspiracy and B was the Pacheco conspiracy.

**395.** *Id.* at 10–11 (paragraph structure altered).

**396.** *United States v. Tormos–Vega,* 959 F.2d 1103, 1115 (1st Cir.1992) (quoting *United States v. Flaherty,* 668 F.2d 566, 582 (1st Cir.1981)).

variance, however, does not necessarily require reversal; rather, "in order to reverse a conviction, a court must find that the variance affected the defendant's 'substantial rights.' " [397] In other words, to obtain a reversal, a defendant must show that (1) a variance occurred; and (2) the variance prejudiced the defendant.

### a. Did a Variance Occur?

The thorny legal problem presented here derives from the complexity of criminal conspiracy law. As the First Circuit has recognized:

> [C]onspiracy law, like most criminal law, focuses upon the activities of an individual defendant. It is therefore dangerous to think of a conspiracy as a kind of "club" that one joins or a "business" in which one works. Those metaphors falsely suggest that the "member" or "employee" *automatically* becomes legally responsible for the entire enterprise. Instead, "the gist of the [conspiracy] offense remains the agreement, and it is therefore essential to determine what kind of agreement or understanding existed *as to each defendant*." [398]

Indeed, the First Circuit has noted that "the issue of variance most often comes up when the indictment charges one overall conspiracy but the trial evidence reveals separate conspiracies and that a particular defendant is a member of only some of those conspiracies." [399] In *United States v. Glenn*,[400] the First Circuit set forth a two-pronged analysis used in determining whether a variance occurred (before determining whether a defendant's substantial rights were affected). Specifically, a reviewing court should ask: "(1) Is the evidence sufficient to permit a jury to find the (express or tacit) agreement that the indictment charges? (2) If not, is it sufficient to permit a jury, under a proper set of instructions, to convict the defendant of a related, similar conspiracy?" [401]

■ First, Pacheco argues that the facts proved at trial differed from those alleged in the indictment because the Court rendered a partial directed verdict in which the Court ruled that the Department had not proved that Pacheco was a member of the broad, overarching Yeje–Cabrera wholesaler conspiracy; rather, the Court ruled as matter of law that the Department had proved only that Pacheco was a member of a smaller distribution conspiracy. Given its partial directed verdict, the Court agrees. In its Rule 29 order, the Court ruled that the government failed to prove Pacheco's involvement in the Yeje–Cabrera organization, the conspiracy charged in the indictment.

Moreover, here the evidence was sufficient to permit the jury to convict Pacheco of a related, similar conspiracy. "In such instances, of course, there is the possibility that a defendant can be prejudiced by being convicted of a crime other than the one with which s/he was charged." [402] The testimony of Lopes and Medeiros constitutes evidence sufficient to convict Pacheco of a related, similar cocaine conspiracy. Both men testified that they had delivered cocaine to Pacheco and the jury could well

---

**397.** *Id.* (quoting *Berger v. United States*, 295 U.S. 78, 82, 55 S.Ct. 629, 79 L.Ed. 1314 (1935)).

**398.** *United States v. Glenn*, 828 F.2d 855, 857 (1st Cir.1987) (alteration in original) (internal citation omitted) (quoting *United States v. Borelli*, 336 F.2d 376, 384 (2d Cir.1964)).

**399.** *United States v. Fisher*, 3 F.3d 456, 463 n. 19 (1st Cir.1993).

**400.** 828 F.2d 855 (1st Cir.1987).

**401.** *Id.* at 858.

**402.** *Fisher*, 3 F.3d at 463 n. 19.

have convicted Pacheco of such criminal conduct. Given the Court's directed verdict, therefore, there was a variance between the indictment and the proof offered at trial.

### b. Did the Variance Affect Pacheco's Substantial Rights?

"The 'substantial rights' protected by this rule [against variance] are that the defendant have sufficient knowledge of the charge against him in order to prepare an effective defense and avoid surprise at trial, and to prevent a second prosecution for the same offense."[403] In addition, as Pacheco argues here, the "doctrine of variance also protects against prejudicial 'spillover,' so that in cases with multiple defendants proof that one defendant was involved in one conspiracy does not lead the jury to believe that another defendant was involved in a separate conspiracy."[404]

■ In this case, it is undisputed that the Department presented substantial evidence of the large Yeje–Cabrera organization. This evidence imbued Pacheco's case with more than a tincture of his culpability with respect to that broad conspiracy, notwithstanding the fact that the Court ruled as matter of law that the evidence was insufficient to connect Pacheco with the charged conspiracy. This case is precisely analogous to *Glenn,* in which the First Circuit ruled that Glenn, who had been charged with importing and conspiring to import hashish and marijuana, but whose participation in any marijuana conspiracy was not proved at trial, suffered from an unconstitutional variance.[405] The outcome in the instant case similarly constitutes an impairment of Pacheco's substantial rights,

given the Court's order pursuant to Rule 29.

### 5. The Factual Flaw—Sufficient Evidence of Pacheco's Involvement in the Over-Arching Yeje–Cabrera Conspiracy

■ The post-trial variance motion occasioned a careful review of the Department's evidence in its case in chief. Upon reconsideration, the Court concluded that it had erred in issuing its Rule 29 order. Although the Court is satisfied that Pacheco played no more than a minimal role in the Yeje–Cabrera conspiracy, he was nonetheless a member of that conspiracy. The bulk of the evidence presented by the government focused on the several small transactions between Pacheco, Medeiros, Lopes, and Yeje–Cabrera. These transactions were acts for which Pacheco was culpable, but they did not serve to pull Pacheco into the overarching Yeje–Cabrera conspiracy. In rendering its directed verdict, however, the Court failed to consider the evidence adduced regarding the cocaine transaction involving Pacheco's garage. Although the evidence revealed that Pacheco was restive and, indeed, may even have been unhappy about the circumstances, the Court has no doubt that he there agreed—perhaps implicitly[406]—to assist the primary Yeje–Cabrera conspiracy. Unfortunately for Pacheco, notwithstanding any desire he may have had to maintain clean hands, that night he became a small but distinct cog in Yeje–Cabrera's conspiratorial wheel. The Court simply overlooked this evidence when handing down its ruling. But for Pacheco's criminal acquiescence in the use of his

---

**403.** *Tormos–Vega,* 959 F.2d at 1115.

**404.** *Id.*

**405.** 828 F.2d at 860.

**406.** The First Circuit has recognized that a conspiratorial "agreement or understanding may be tacit." *Glenn,* 828 F.2d at 857.

garage during that transaction, the Court's directed verdict would have been proper.

█ The Court may withdraw or alter an order entered pursuant to Rule 29 before judgment enters.[407] In *United States v. Baggett*,[408] the jury was never informed of the district court's oral ruling, "but rather was allowed to deliberate and render a guilty verdict."[409] The Sixth Circuit explained: "Because reversal of the district court's judgment on appeal does not require the government to retry Defendant, but rather requires only the reinstatement of the jury's guilty verdict, the double jeopardy clause is not offended."[410]

█ Similarly, the jury in this case was neither present when the ruling was announced nor informed of the ruling at any subsequent time. The Court delivered a rather generic jury charge regarding the law of conspiracy, a charge which—in retrospect—was more than fair to Pacheco, and the jury was allowed to deliberate and render a guilty verdict.

Successor defense counsel makes much of the fact that the Court has imposed

sentence on Pacheco and entered judgment. This overlooks the facts that the variance issue was thoroughly aired prior to the imposition of sentence, that all parties agreed that it was desirable to sentence Pacheco and enter judgment so that he could be moved from the custody of the United States Marshals to the Bureau of Prisons for greater rehabilitative services, and that judgment entered expressly subject to resolution of the post trial motion. Pacheco has thus waived any procedural argument that the Court cannot revisit the partial directed verdict order. Moreover, the Court is satisfied that vacating its Rule 29 order does not prejudice Pacheco's constitutional rights. Thus, because the Court erred both legally and factually in issuing its ruling, it vacates that order [Doc. No. 517] and denies Pacheco's motion for a new trial [Doc. No. 638].

## B. The Constitutional Maximum Sentence

The jury having found Pacheco guilty of conspiracy to possess more than 5 kilo-

---

**407.** See *United States v. LoRusso*, 695 F.2d 45, 54 (2d Cir.1982) ("Where no judgment has been entered, however, and there has been no dismissal of the jury (nor any indication to the jury of a ruling that could prejudice the defendant on such counts as are eventually submitted), there appears to be no constitutional impediment to the court's modification of its oral decision to dismiss the original count."); *United States v. Byrne*, 203 F.3d 671, 674 (9th Cir.2000) (holding that the Double Jeopardy Clause was not violated by the district court's reconsideration where "there was no announcement of the court's decision to the jury" and the court indicated that its initial ruling was not final); *United States v. Baggett*, 251 F.3d 1087, 1095 (6th Cir.2001) ("*Byrne* and *LoRusso* stand for the proposition that an oral grant of Rule 29 motion outside of the jury's presence does not terminate jeopardy, inasmuch as a court is free to change its mind prior to the entry of judgment."); *see also Price v. Vincent*, 538 U.S. 634, 642–43, 123 S.Ct. 1848, 155 L.Ed.2d 877 (2003) (conclud-

ing that a state court's ruling that the Double Jeopardy Clause did not prevent continued prosecution of the defendant after a trial court issued a vague, oral directed verdict was not an objectively unreasonable application of clearly established federal law).

In *Vincent*, the Supreme Court reversed the Sixth Circuit's opinion that the Double Jeopardy Clause did prevent further prosecution of the defendant. *Vincent*, 538 U.S. at 643, 123 S.Ct. 1848. In its opinion, the Supreme Court cited *LoRusso*, *Byrne*, and *Baggett* as evidence that "numerous other courts have refused to find double jeopardy violations under similar circumstances," but it did not itself rule on the issue. *Id.* at 643 & n. 2, 123 S.Ct. 1848.

**408.** 251 F.3d 1087 (6th Cir.2001).

**409.** *Id.* at 1095.

**410.** *Id.*

grams of cocaine with intent to distribute, his Guidelines base offense level is 32. His criminal history category is I. The maximum sentence that may constitutionally be imposed is, therefore, 151 months (12 years 7 months).

### C. The Mandatory Minimum Guideline Sentence—Fact Bargaining—Again

In this case, the mandatory minimum Guidelines sentence is driven entirely by the weight of cocaine properly to be attributed to Pacheco. There is no real dispute that 7 kilograms of cocaine are properly so attributed.[411] The dispute centers on the amount of cocaine briefly parked in Pacheco's garage. This quantity of cocaine is crucial because, if this cocaine, added to that already attributed to Pacheco exceeds 15 kilograms, Pacheco's base offense level would jump to 34, the appropriate Guidelines sentence would range between 151 to 188 months,[412] and the Court would have no choice but to sentence Pacheco to the constitutionally maximum sentence.

■ Here again the Department was prepared to fact bargain. The Court *finds,* based on the totality of the record before it, that the Department was prepared to represent to the Court that the total amount of cocaine properly attributable to Pacheco did not exceed 15 kilo-

grams. At sentencing, however, Pacheco having invoked his Sixth Amendment right to trial by jury, the Department argued vigorously that the quantity of drugs properly attributable to Pacheco far exceeds 15 kilograms. The Court would therefore be warranted in ignoring the Department's flip-flop and holding it to its pre-trial position.[413]

It does not do so here, however. Instead, after careful scrutiny of the entire record, this Court concludes that the amount of cocaine to be attributed to Pacheco does not exceed 15 kilograms. Accordingly, in the exercise of its limited discretion, this Court sentenced Pacheco within the Guidelines range to 12 years.[414]

### IV. Conclusion to Part Three

... And right action is freedom From past and future also. For most of us, this is the aim Never here to be realised; Who are only undefeated Because we have gone on trying ... [415]

[Part Four of this opinion—detailing the Court's reasons for refusing the Department's command further to reduce the sentence of a triple murderer (who is now on the streets) and its reasons for stalling the sentence of a woman whom the Department has, figuratively, seduced and

---

**411.** These are "the one kilogram of cocaine delivered to Pacheco by Bobby Lopes, the five kilograms delivered to Pacheco by Fabiano Medeiros, and the one kilogram that had to be 'fixed' after Pacheco improperly cut it." Pacheco's Pre–Sentence Report ¶ 70.

**412.** U.S.S.G. §§ 2D1.1(c)(3), 5A.

**413.** *See* Part Three, Section II.C.1, *supra,* at 149–52.

**414.** See how easy that is? As this is a so-called "factual" conclusion, it is entitled to deferential review from the Court of Appeals. Moreover, as this sentence falls within the appropriate Guidelines range, the Depart-

ment has no basis for appeal. In truth, the conclusions here drawn by the Court represent a completely honest assessment of the data in the record and the inferences drawn from personally observing the witnesses during the course of a full trial. Still, the point needs to be made that the Guidelines regime imposes strong incentives to manipulate the trial court's fact finding function in order to work substantial justice. This is one of the saddest and most insidiously corrupting influences of the Guidelines.

**415.** T.S. Eliot, "The Dry Salvages."

abandoned—will follow as soon as possible.]